RACHEL KREVANS (CA SBN 116421)
rkrevans@mofo.com
NATHAN B. SABRI (CA SBN 252216)
nsabri@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

BARNES & THORNBURG LLP
Paul B. Hunt (appearance pro hac vice)
paul.hunt@btlaw.com
Joshua P. Larsen (appearance pro hac vice)
joshua.larsen@btlaw.com
11 S. Meridian Street
Indianapolis, IN 46204
Telephone:  (317) 236-1313
Facsimile:  (317) 231-7422

BARNES & THORNBURG LLP
Chad S.C. Stover
(appearance pro hac vice)
chad.stover@btlaw.com
1000 N. West Street, Suite 1500
Wilmington, DE 19801-1050
Telephone:  (302) 300-3434
Facsimile:  (302) 300-3456

Attorneys for Plaintiff
CORNING OPTICAL
COMMUNICATIONS WIRELESS LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CORNING OPTICAL COMMUNICATIONS WIRELESS LTD.,<br><br>Plaintiff,<br><br>v.<br><br>SOLID, INC., et al.,<br><br>Defendants. | No. CV14-03750 PSG<br><br>**CORNING WIRELESS'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHELE RILEY**<br><br>Hearing Date: September 22, 2015<br>Hearing Time: 10:00 a.m.<br>Courtroom: 5, 4th Floor<br>Judge: Hon. Paul S. Grewal<br><br>REDACTED PUBLIC VERSION |

Defendants' launch six attacks at the opinions of Michele Riley, Corning Wireless's damages expert. Each of these arguments is flawed, as explained below. Defendants ask the Court to "overstep its gatekeeping role and weigh facts." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014). Defendants' alleged issues are nothing more than potential cross-examination topics, not bases for exclusion.

## I. RILEY'S STARTING REASONABLE ROYALTY REFERENCE RANGE SHOULD NOT BE EXCLUDED

Defendants first argue that Riley's failure to consider Corning Wireless's response to Interrogatory No. 11 is grounds for her exclusion. Motion[1] at 4. Corning Wireless's April 30, 2015 response to Interrogatory No. 11 was a preliminary damages calculation produced pursuant to the Court's Order (ECF No. 191). The response came with the following objections and reservations of rights:

> Corning Wireless reserves the right to further supplement and amend its response to this interrogatory as discovery continues and during expert discovery. This will be necessary at least because Corning Wireless has not completed its review of Defendants' documents, many of which were produced only recently, and has just begun taking depositions of Defendants' witnesses. Thus, the damages amounts and reasoning provided below are preliminary, exemplary, and will be updated as discovery continues.

The Court's order contemplated updates to the damages model. ECF No. 191 at 3-4 ("To be sure, new information may come to light as the case proceeds that might drastically alter Corning's positions.") When Ms. Riley served her expert report, the damages amounts and reasoning were updated, just as the response forecasted would be the case. This is not grounds for exclusion, and Defendants cite no authority for exclusion in this situation.

Defendants' second argument is that the "upper range" of Riley's reasonable royalty reference range is flawed because it represents a blended incremental profit margin of Corning Wireless's entire DAS business unit. Motion at 4-5. But there is no rule against considering a related company in the hypothetical negotiation, particularly where, as here, a license would

---

[1] References to "Motion" are to Defendants' Notice of Motion and Motion to Exclude Expert Testimony of Michele Riley, ECF No. 327.

1  impact the related entity's finances. In fact, courts, including this Court, have ruled that
2  consideration of a related entity is proper in the reasonable royalty analysis. *See Accessories*
3  *Marketing Inc. v. Tek Corp.*, No. C 11-4773-PSG, 2013 WL 1409887, at *1 (N.D. Cal. Apr. 2,
4  2013) (denying motion to exclude "[b]ecause SSI [related entity] and TEK are competitors in the
5  tire kit repair market, a license to TEK could very well impact SSI's profits, which could itself
6  impact AMI's [plaintiff] profits from SSI's sales…"); *see also Union Carbide Chemicals &*
7  *Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1378 (Fed. Cir. 2005) (where the patent
8  holder was a holding company whose parent company was a competitor of the infringer, the
9  patent holder properly introduced evidence regarding the impact of the infringer's sales on the
10 parent company's sales in evaluating a hypothetical negotiation between the holding company
11 and the infringer); *Synethes U.S.A. LLC v. Spinal Kinetics, Inc.*, Case No. 5:09-CV-01201 RMW,
12 2012 WL 4483158, at *12 (N.D. Cal. Sept. 27, 2012) ("[the patentee] is a mere holding company
13 and any negotiation on its behalf would be conducted by and for the benefit of its corporate
14 parent"). Riley's analysis is consistent with this precedent and should not be excluded.

15 ## II. RILEY'S DOWNWARD ADJUSTMENT OF THE REFERENCE RANGE TO
16 ACCOUNT FOR NORMAL INDUSTRY PROFITABILITY SHOULD NOT BE
17 EXCLUDED

18  Riley adjusted the royalty rate downward by ▇ to account for the normal profits earned
19 by a distributor in a relevant comparison group. The ▇ figure is drawn from transfer pricing
20 studies performed for Corning and, before the acquisition, MobileAccess, by
21 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. ECF Nos. 258-62, -64, and -66. Defendants
22 complain that the 4% figure was calculated based on computer and electronics distributors rather
23 than specifically on DAS distributors, and thus is flawed.
24  But computer and electronics distributors encompass DAS distributors. Even further,
25 Corning Wireless, a DAS company, relied on these studies and the ▇ figure as representative of
26 the normal profits earned by a DAS distributor. This shows the reliability and relevance of the
27 figure.
28

Defendants do not and cannot contest that these are valid studies. They were performed by "Big Four" accounting firms ▇▇▇▇▇▇▇▇▇▇▇▇ in the ordinary course of business. They were and are used to determine whether Corning's DAS ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ECF No. 258-62 at COCW00159531.

The methodologies used by these studies are well-settled and rely on consideration of comparable companies as identified by the independent accounting firms. The particular methodology used in the 2007 report by ▇▇ was the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, which ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id*. at COCW00159560 (emphasis added). The Conclusions section within the Executive Summary notes that PWC compared MobileAccess to ▇▇▇▇ ▇▇▇▇ identified in the comparable profits method analysis and ▇▇▇▇ ▇▇▇▇ *Id*. at COCW00159531.

Riley appropriately acknowledged in her deposition that these studies do not relate only to the DAS industry or the teachings of the '837 patent. However, for a determination of normal industry profit under the construct of the hypothetical negotiation, these studies, performed in the ordinary course, are valid indicators of normal industry profit, and Riley considered them appropriately.

Defendants rely on only attorney statement to argue Riley's ▇▇ adjustment is wrong. Ms. Riley relies on her experience and the thoroughly researched written opinions of preeminent accounting firms. There is no ground to exclude Ms. Riley's well-reasoned and supported downward adjustment.

### III. RILEY'S USE OF MARKET SHARE AS A PROXY FOR BARGAINING POSITION STRENGTH SHOULD NOT BE EXCLUDED

Riley used an additional downward adjustment beyond that required by the *Georgia-Pacific* analysis. She based this downward adjustment on the market shares and bargaining

positions of the parties. It resulted in a more conservative royalty rate. Yet Defendants challenge this adjustment.

In pages of unsupported attorney argument, Defendants attempt to prove that Riley's use of the relative market shares of the parties could have no relevance to bargaining position strength. The relevant literature is uniformly to the contrary and shows that relative market share is frequently used a proxy for competitive strength and bargaining power. Thus, Riley's opinions should not be excluded.

Defendants apparently object to any methodology that attempts to share profit between the negotiating parties. However, this is exactly the purpose of a royalty payment. *See* 2012 KPMG study titled, Profitability and royalty rates across industries: Some preliminary evidence, at 2 ("Royalty payments can be interpreted as a profit sharing mechanism. In other words, by receiving royalty income, a technology licensor shares the profits streams generated from the licensee's efforts in commercializing the patented technology."), attached as Ex. A to the Stover Declaration filed herewith.

The literature on running royalties includes studies of the factors influencing the determination of a royalty. An important factor is the commercial relationship between the negotiating parties, as demonstrated by Degnan and Horton in "A Survey of Licensed Royalties," les Nouvelles, June 1997 (attached as Ex. B). Survey respondents were asked to rank the importance of a number of factors that influenced the determination of the amount of upfront fees or running royalties to be paid or received. The commercial relationship between the parties was ranked by the respondents as important for both in and out licensing. The licensors' anticipated profits were ranked by the respondents as equal to or slightly more important than the commercial relationship between the parties, as were the Licensee's anticipated profits. *Id*. at 92, Table 5.

Even a cursory search of the literature shows that Riley's opinions are based in sound economic theory:

- "Competitive/business strength criteria include measures such as: market share…" Helen Meek & Richard Meek, *Strategic Marketing Management: Planning and Control*, at p. 98 (2003).

- 4 -

PL.'S OPP. TO DEFS.' MOT.TO EXCLUDE RILEY EXPERT TESTIMONY

- "I use the market share of sales to proxy for market power…" Tze-Minn Tham, *Essays in Agency, Incentives and Contracting*, at p. 74 (2008) (Ph.D. dissertation, University of Michigan).

- "…market share [can be used as a] proxy for the pricing power…." Kenneth Ahern, *Bargaining Power and Industry Dependence in Merger*, at p. 11, (Ross School of Business, University of Michigan, August 2009), available at http://webuser.bus.umich.edu/kenahern/Ahern.BPPM.pdf (attached as Ex. C to the Stover Declaration filed herewith).

Defendants argue that Riley's use of market share as a proxy for bargaining position strength would lead to nonsensical results in other factual scenarios. But Riley is not arguing that market share is an accurate proxy in every scenario. She tailored her analysis to the facts of this case, as required by the decisions Defendants cite.

Defendants' comparisons to decisions on the Nash Bargaining Solution are similarly unavailing. Riley's opinion is based on her analysis of the particular facts of this case: the relative markets shares of the parties, the DAS industry, the asserted patent, the parties' profitabilities, competition between the parties, and Corning's unwillingness to relinquish market share. Riley Report[2] at 38-60.

And as shown above, her theories are sound and supported by the economic literature, not "novel." As the Federal Circuit has noted, the hypothetical negotiation methodology encompasses "flexibility." *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988) (stating that method encompasses "flexibility because it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators"). Defendants' motion to exclude should be denied.

---

[2] References to the "Riley Report" are to the Expert Report on Damages by Michele C. Riley, ECF No. 327-29, Ex. 12 to the Platt Declaration.

## IV. RILEY'S FINAL DOWNWARD ADJUSTMENT OF THE ROYALTY RATE IS SUPPORTED BY THE EVIDENCE AND NOT ARBITRARY

Riley found that *Georgia-Pacific* factor 3 – nature and scope of the license—would have a downward effect on the negotiated royalty rate within the reference range because the license would be non-exclusive—Commscope is already licensed. Based on this factor and consideration of all the other *Georgia-Pacific* factors in the context of a hypothetical negotiation, Riley concluded that the parties would have arrived at a royalty rate of 19%. Riley Report at 38-60.

Defendants pick at Riley's final downward adjustment of the royalty rate based on the presence of the Commscope license as *ipse dixit* and akin to the 25% rule rejected by the Federal Circuit. But Riley followed the relevant case law and presented reasoning for her final downward adjustment under the accepted *Georgia-Pacific* factors. Indeed, Defendants' expert agreed with Riley that the presence of the Commscope license would decrease the royalty rate. Reed Rebuttal Report[3] at 57. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *Apple Inc. v. Motorola, Inc.*, 757 F.3d at 1314 (citing *i4i Partnership v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010)). Such is the case here where the downward adjustment was made after analysis of *Georgia-Pacific* factor 3—nature and scope of the license. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (holding that use of the *Georgia-Pacific* factors "properly tie[s] the reasonable royalty calculation to the facts of the hypothetical negotiation at issue").

Defendants attempt to require of Riley a degree of precision not possible. Weighing the *Georgia-Pacific* factors and arriving at a royalty rate for a hypothetical negotiation inherently requires judgment calls because the factors are qualitative not quantitative. *See Riles v. Shell Exploration & Prod. Co.,* 298 F.3d 1302, 1311 (Fed. Cir. 2002) (noting that the reasonable royalty analysis "necessarily involves some approximation of the market as it would have

---

[3] References to the "Reed Rebuttal Report" are to the EXPERT REBUTTAL REPORT OF BRETT L. REED served on June 12, 2015 and included as Ex. D to the Stover Declaration filed herewith.

1   hypothetically developed absent infringement"). Patent damages need not be calculated with
2   absolute certainty. *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1327 (Fed.
3   Cir. 1987) ("The determination of a damage award is not an exact science, and 'the amount need
4   not be proven with unerring precision.'") (quoting *Bio–Rad Laboratories, Inc. v. Nicolet
5   Instrument Corp.*, 739 F.2d 604, 616 (Fed. Cir. 1984)) (internal citation omitted). Interestingly,
6   Defendants' damages expert failed to provide the level of precision and absolute objectivity that
7   Defendants attempt to require of Riley. *See, e.g.,* Reed Rebuttal Report at 89 ███████████
8   ████████████████████████████████████████████████████████████████████
9   █████████████████████████████████.

10      Once again, Defendants' may explore her analysis on cross-examination, and their motion
11  to exclude should be denied.

12  **V.   RILEY'S ROYALTY BASE IS TIED TO THE ALLEGED INFRINGEMENT**

13      For purposes of opining on damages, Riley assumed that the accused Alliance Multi-
14  Carrier DAS infringes the asserted '837 patent. Defendants' damages expert made the same
15  assumption. Reed Rebuttal Report at 1. This is Corning Wireless's infringement contention—the
16  Alliance DAS infringes. Defendants disagree with this position. But this is no reason to exclude
17  Corning Wireless's damages expert, who accepted infringement as an assumption.

18      When calculating the royalty base, Riley relied on financial spreadsheets produced by
19  Reach Holdings and Tri-Power Group in response to an interrogatory asking for revenue from
20  sales of the Accused Products. *See* Reach's 5th Supplemental Interrogatory Responses, Third and
21  Fourth Supplemental Responses to Interrogatory No. 3 (identifying REACH0088864 and
22  TRIPOWER3530, on which Riley based her calculations), attached as Ex. E to the Stover Decl.
23  Thus, Riley's royalty base calculation is directly tied to the alleged infringement. If these
24  spreadsheets were wrong, it was Defendants' responsibility to bring this to Corning Wireless's
25  attention—they did (and have) not. Where approximate apportionment between infringing and
26  noninfringing items is not possible, the infringer must bear the burden and the entire risk. *TWM
27  Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 900 (Fed. Cir. 1986); *see also Electro Scientific Indus. Inc.
28  v. General Scanning Inc.*, 247 F.3d 1341, 1353 (Fed. Cir. 2001) (where accused device could be

1  put to infringing and noninfringing uses, denying remittitur because infringer failed to put forth
2  evidence on extent of noninfringing use).

3  If Defendants argue that some of their sales were infringing while others are not, they can
4  put forth sales data distinguishing the sales they claim infringe from the sales they claim do not.
5  The jury can apply their royalty rate to the royalty base they find is supported by the evidence—
6  Riley's royalty base or a lower royalty base if they accept Defendants' infringement argument.
7  Defendants' argument goes to the weight to be given Riley's testimony, not its admissibility.
8  Defendants' motion to exclude should be denied.

## VI. RILEY'S LOST PROFITS OPINIONS ARE LEGALLY PROPER AND SHOULD NOT BE EXCLUDED

Defendants' begin their attack on Riley's lost profits opinions with a brief rehash of their motion for summary judgment on lost profits. These arguments fail here for the same reasons they fail in Defendants' motion for summary judgment. As Corning Wireless showed, Corning Wireless is not attempting to recover the lost profits of its parent company and has presented a well-supported and legally permissible lost profits analysis. *See* ECF No. 275-4 at 33-36.

Defendants then argue that Riley's opinions on demand for the patented product should be excluded under Rule 702 because her opinions are nothing more than her layperson's understanding cloaked in the guise of expert testimony. Motion at 12. Not true. Riley's opinion on demand for the patented products is based on her review of the parties' financial results, product literature, and independent third-party research reports. Riley Report at 22-24. She also spoke with the Vice President of Strategy for Corning's DAS business unit, William Cune, and Controller, Robert Hutton, and reviewed relevant deposition testimony from the case. *Id*. at 17 and 33. She analyzed this reliable data in light of her particular expertise and background in finance, marketing, and accounting to determine that consumers demand the patented products. *Id*. at 22-24. This is much more than the testimony of a "layperson" and would be helpful to the jury.

Defendants' argument is also undercut by the fact that their damages expert, Brett Reed, who has a similar background to Ms. Riley, opined on consumer demand in the DAS market

1  when critiquing Riley's *Mor-Flo* market share analysis. Reed Report at 23-32. Defendants do not explain how Reed is qualified to render such opinions while Riley is not.

Defendants' critique regarding demand for the patented *features* misses the point—it is demand for the patented *products* that is the relevant legal inquiry in the lost profits opinion Defendants seek to exclude. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314, 1331 (Fed. Cir. 2009) ("the focus on particular features corresponding to individual claim limitations is unnecessary when considering whether demand exists for a patented product under the first *Panduit* factor"). Even Defendants' damages expert agrees: "The *Panduit* factors require: (1) an assessment of the evidence of demand for the patented product." Reed Report at 15. Defendants have conflated the first *Panduit* factor and the entire market value rule. This confusion is fatal to their argument.

Finally, the decisions cited by Defendants do not support their argument and further show that Defendants have confused the issue. In *Good Tech. Corp. v. MobileIron, Inc.*, as the Court is well aware, expert testimony from a *technical* expert on the commercial acceptability of noninfringing alternatives was barred. No. 5:12-cv-05826, ECF No. 436 at 15-16 (N.D. Cal. July 5, 2015). Riley is not a technical expert and her challenged testimony is not on the commercial acceptability of non-infringing alternatives. Thus, this decision is inapposite. In *LaserDynamics* and *Imonex*, opinions on the entire market value rule were at issue. Motion at 12. Here, Defendants' seek to exclude an opinion of the demand for the patented *product*—not demand for the patented *features*—so these decisions are not applicable.

Ms. Riley's lost profits opinions are proper and should not be excluded.

Dated: September 15, 2015                BARNES & THORNBURG LLP


By: */s/ Chad S.C. Stover*
    Chad S.C. Stover
    Attorneys for Plaintiff
    CORNING OPTICAL
    COMMUNICATIONS WIRELESS LTD.