1             UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4


5

6   CORNING OPTICAL COMMUNICATIONS    )  C-14-03750 PSG
    WIRELESS LTD.,                     )
                                       )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,              )
                                       )  SEPTEMBER 22, 2015
8         VS.                          )
                                       )  PAGES 1-109
9   SOLID, INC. AND REACH HOLDINGS,    )
    LLC,                               )
10                                     )
              DEFENDANTS.              )
11  _____  )

12
                 TRANSCRIPT OF PROCEEDINGS
13          BEFORE THE HONORABLE PAUL S. GREWAL
              UNITED STATES MAGISTRATE JUDGE
14
    A P P E A R A N C E S:
15
    FOR THE PLAINTIFF:    BARNES & THORNBERG LLP
16                        BY:   PAUL B. HUNT
                                JOSHUA P. LARSEN
17                        11 SOUTH MERIDIAN STREET
                          INDIANAPOLIS, INDIANA  46204
18
                          BY:  CHAD S.C. STOVER
19                        1000 N. WEST STREET, SUITE 1500
                          WILMINGTON, DELAWARE  19801
20
                          MORRISON & FOERSTER
21                        BY:  NATHAN B. SABRI
                          425 MARKET STREET
22                        SAN FRANCISCO, CALIFORNIA  94105

23           APPEARANCES CONTINUED ON NEXT PAGE

24  OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595
25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

1

2      APPEARANCES (CONTINUED)

3

4      FOR THE DEFENDANTS:      JONES DAY
                                BY:  S. CHRISTIAN PLATT
5                                    JAQUELINE K.S. LEE
                                     THARAN G. LANIER
6                               1755 EMBARCADERO ROAD
                                PALO ALTO, CALIFORNIA  94303
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    SEPTEMBER 22, 2015

 2                     P R O C E E D I N G S

 3       (COURT CONVENED AT 1:38 P.M.)

 4            THE COURT:  ALL RIGHT.  WELCOME BACK.  WHY DON'T WE

 5    GO AHEAD AND CALL THE OTHER MATTER ON THE COURT'S AFTERNOON

 6    CALENDAR.

 7            THE CLERK:  CALLING CASE NUMBER 14-3750, CORNING

 8    OPTICAL COMMUNICATIONS WIRELESS LIMITED VERSUS SOLID, INC., ET

 9    AL.

10        COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

11            MR. HUNT:  GOOD AFTERNOON, YOUR HONOR.  I'M PAUL HUNT

12    FROM BARNES & THORNBURG FOR CORNING WIRELESS.

13        AND I'M JOINED BY CHAD STOVER, HE'S ALSO FROM

14    BARNES & THORNBURG, AND JOSHUA LARSEN FROM MY FIRM.

15        I'M ALSO JOINED BY NATHAN SABRI FROM MORRISON & FOERSTER.

16            THE COURT:  GOOD AFTERNOON TO EACH OF YOU.

17            MR. PLATT:  GOOD AFTERNOON.  CHRISTIAN PLATT FROM

18    JONES DAY.  ALSO WITH ME IS GREG LANIER AND JACQUELINE LEE.

19            THE COURT:  GOOD AFTERNOON.  WELCOME BACK.

20        WELL, WE OBVIOUSLY HAVE A LARGE NUMBER OF MATTERS TO

21    ADDRESS AND GET THROUGH THIS AFTERNOON.  I APPRECIATE YOUR

22    PATIENCE WITH MY TAKING THE OTHER MATTER FIRST.  I WANTED TO

23    SPARE COUNSEL THE FULL LITANY THAT WE'RE ABOUT TO ENGAGE IN.

24        I HAVE SOME THOUGHTS ABOUT HOW TO BEST STRUCTURE AND

25    ORGANIZE OUR TIME THIS AFTERNOON AND I INVITE YOUR COMMENTS OR
```

1    SUGGESTED CHANGES TO THOSE THOUGHTS.

2        FIRST AND FOREMOST, I THINK WE CAN TAKE CERTAIN MATTERS

3    OFF CALENDAR TODAY AND DEFER THEM.

4        I'M REFERRING TO, FOR EXAMPLE, THE JURY INSTRUCTIONS, THE

5    VERDICT FORM.  THOSE ARE MATTERS I TYPICALLY LIKE TO TAKE UP AT

6    A CHARGE CONFERENCE, PROBABLY IN THE SECOND WEEK OF TRIAL,

7    EARLY SECOND WEEK OF TRIAL.

8        YOU ALSO HAVE PRESENTED A NUMBER OF EXHIBITS AND

9    OBJECTIONS TO THOSE EXHIBITS.  I WOULD LIKE TO DEFER THOSE

10   ISSUES AS WELL.  MY NORMAL COURSE IS TO TAKE UP EXHIBITS THE

11   MORNING OF TESTIMONY AS THEY ARE IDENTIFIED TO ME.  I'VE FOUND

12   THAT TENDS TO WINNOW THAT LIST CONSIDERABLY.  SO ABSENT SOME

13   OBJECTION, WE CAN DEFER THOSE ISSUES.

14       SIMILARLY, DEPOSITION DESIGNATION OBJECTIONS AND SO FORTH.

15   WE'LL TAKE THOSE UP THE MORNING OF TESTIMONY.

16       THAT LEAVES PLENTY OF OTHER WORK FOR US, AND WHAT I WOULD

17   LIKE TO START WITH, WITH YOUR CONCURRENCE, IS THE MOTION FOR

18   RECONSIDERATION THAT HAS BEEN BROUGHT BY CORNING.

19       SO, MR. HUNT, THIS IS YOUR MOTION.  WHY DON'T WE FIGURE

20   OUT WHETHER OR NOT THE SUMMARY JUDGMENT ORDER STANDS.

21       TELL ME WHY YOU THINK IT SHOULD NOT.

22       MR. HUNT:  THANK YOU, YOUR HONOR.

23       IN THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, THEY MADE

24   ONE ARGUMENT AND ONE ARGUMENT ONLY, AND THAT'S THAT THERE WAS

25   IMPORTATION BY THE PLAINTIFF, CORNING WIRELESS.

1          AND I THINK IT'S CLEAR FROM THE COURT'S ORDER THAT THERE

2     WAS NO EVIDENCE OF IMPORTATION, AND BECAUSE THAT WAS THE ONLY

3     BASIS ON WHICH THEY MOVED FOR SUMMARY JUDGMENT TO LIMIT

4     PRE-FILING, THERE WAS NO NEED FOR US TO RESPOND WITH ANY OTHER

5     EVIDENCE.

6          THEY CITED A SINGLE, I THINK, INTERROGATORY ANSWER WHICH

7     SAID NOTHING ABOUT IMPORTATION.

8          SO CLEARLY WE COULD EASILY AND DID EASILY DEFEAT SUMMARY

9     JUDGMENT ON THE ONLY BASIS THAT THEY SOUGHT TO ESTABLISH, WHICH

10    WAS IMPORTATION.

11         I MAY ADD, TO THE EXTENT THAT THAT MATTERS AT THIS POINT,

12    SINCE THAT ISSUE HAS BEEN RAISED, WE HAVE PROVIDED THE

13    PLAINTIFF WITH SOME ADDITIONAL INFORMATION ABOUT IMPORTATION.

14         I HAVE COPIES OF DOCUMENTS.  THE ONLY REASON WE DIDN'T

15    FILE THEM LAST NIGHT IS I PERSONALLY AM UNAWARE OF THEIR

16    SENSITIVITY, MEANING WHETHER IT'S SOMETHING THAT SHOULD BE

17    FILED UNDER SEAL, AND I DIDN'T HAVE THE MECHANISM BETWEEN LAST

18    NIGHT AND THIS MORNING, AS I WAS TRAVELING, TO DO SO.

19         SO WITH THE COURT'S PERMISSION --

20              THE COURT:  SURE.  IF YOU HAVE SOMETHING, I'D LIKE TO

21    TAKE A LOOK AT IT.

22              MR. HUNT:  THIS MAY BE -- I THINK IT'S TWO EXHIBITS

23    ON OUR EXHIBIT LIST, BUT I'VE JUST STAPLED THEM TOGETHER AS A

24    SINGLE DOCUMENT (HANDING).

25         SO WHAT WE HAVE HERE, YOUR HONOR, IN A SINGLE DOCUMENT IS

 1    A U.S. CUSTOMS AND BORDER PROTECTION ON THE FIRST PAGE ENTRY

 2    SUMMARY.  NUMBER 22 IS CONSIGNEE KNOWN WHERE THERE'S JUST A

 3    NUMBER THERE, 74 DASH WHATEVER.

 4         UNDER 26, IT SAYS THE IMPORTER OF RECORD, CORNING MOBILE

 5    ACCESS, INC., WHICH IS THE U.S. ENTITY.

 6         THE SECOND PAGE OF THIS DOCUMENT, YOUR HONOR, PURPORTS TO

 7    SHOW THAT AT LEAST SOME OF THE PRODUCTS THAT WERE ASSOCIATED

 8    WITH THIS WERE DAS PRODUCTS.

 9         I CAN'T READ SOME OF THE NON-ENGLISH LANGUAGE THAT'S ON

10    THERE, BUT MY UNDERSTANDING IS THIS WOULD INDICATE THAT -- THE

11    FIRST PAGE IS JUST A FORM.  I DON'T THINK IT SAYS WHAT PRODUCTS

12    ARE ASSOCIATED.  THE SECOND WOULD INDICATE THAT AT LEAST SOME

13    OF THE PRODUCTS BEING IMPORTED ARE DAS PRODUCTS.

14         AND THEN THE THIRD PAGE WAS, I BELIEVE, A NAME CHANGE

15    FORM.  SO WHEN CORNING ACQUIRED MOBILE ACCESS AND IT CHANGED

16    ITS NAME, THIS DOCUMENT WAS SUBMITTED TO THE CUSTOMS AND BORDER

17    PROTECTION, AND IT HAS, UNDER 2A, THE SAME IRS NUMBER

18    IDENTIFYING IT AS THE SAME ENTITY.  SO THERE WAS A MOBILE

19    ACCESS, INC., WHICH WAS A U.S. COMPANY THAT PREVIOUSLY WAS THE

20    ENTITY THAT WAS IMPORTING, THAT'S THE NAME CHANGE.

21         SO WE BELIEVE THAT TO THE EXTENT IMPORTATION IS AN ISSUE,

22    AND FRANKLY, WE THINK IT SHOULD NOT BE --

23              THE COURT:  IT'S AT LEAST DISPUTED.

24              MR. HUNT:  IT'S AT LEAST DISPUTED FOR PURPOSES OF

25    SUMMARY JUDGMENT.

1          FRANKLY, YOUR HONOR, WE'RE DONE.  THAT'S THE ONLY ISSUE

2     THEY MOVED FOR SUMMARY JUDGMENT ON.

3          THE COURT:  CAN I ASK YOU, MR. HUNT, ABOUT -- AND I

4     RECOGNIZE THAT YOU'RE THE PARTY OPPOSING SUMMARY JUDGMENT HERE,

5     SO IN SOME SENSE ALL YOU NEED TO SHOW IS A DISPUTED ISSUE IN

6     ORDER TO MOVE ON.

7          MR. HUNT:  CORRECT.

8          THE COURT:  AT THIS STAGE ANYWAY.

9          IN THE BRIEF CITATION THAT I PROVIDED IN MY ORDER SETTING

10    THIS ISSUE FOR HEARING TODAY, I BELIEVE THERE IS A DISCUSSION

11    OF A TRANSFER PRICING MEMO.

12         MR. HUNT:  YES.

13         THE COURT:  AND THE SO-CALLED FLASH TITLE TRANSFER

14    THAT TAKES PLACE.

15         MR. HUNT:  CORRECT.

16         THE COURT:  AS I READ IT, WHAT HAPPENS HERE IS THAT

17    THE CHINESE MANUFACTURER PASSES TITLE TO THE PLAINTIFF IN CHINA

18    AND THAT, UPON ITS ENTRY INTO THE UNITED STATES, AT SOME POINT

19    BEFORE THE UNIT OR SYSTEM IS DELIVERED TO THE CUSTOMER, THE

20    U.S. PARENT TAKES FLASH TITLE TO THAT ENTITY BEFORE IT'S

21    ULTIMATELY TRANSFERRED TO THE CUSTOMER LOCATION.

22         SO IF THAT -- IF THAT DESCRIPTION IS CORRECT, AND IF THAT

23    WERE THE ONLY EVIDENCE IN THE RECORD OF THIS CHAIN OF TITLE,

24    WOULD THAT NOT SUGGEST THAT THE PLAINTIFF IS, IN FACT,

25    IMPORTING ONE OR MORE UNITS SUCH THAT SECTION 287(A) IS

```
 1        TRANSFERRED?  TELL ME -- OR TRIGGERED?

 2               MR. HUNT:  I DON'T THINK SO.

 3               THE COURT:  HELP ME OUT.

 4               MR. HUNT:  NUMBER ONE, I THINK THOSE FACTS WOULD BE

 5        DISPUTED.  I THINK THERE IS SOME TESTIMONY ABOUT FLASH TITLE.

 6        I BELIEVE THAT THAT DOES NOT APPLY TO ALL THE PRODUCTS THAT

 7        COME IN, AND I'M NOT PREPARED TO SAY WHAT PERCENTAGE, IF IT'S

 8        SIGNIFICANT, THAT TITLE ACTUALLY TRANSFERS AT OTHER TIMES PRIOR

 9        TO BEING DELIVERED TO THE FINAL LOCATION AND THEN THIS FLASH

10        TITLE.

11            I DO KNOW THAT CORNING WIRELESS, INC., THE U.S. ENTITY,

12        DOES HAVE A WAREHOUSE FOR THESE PRODUCTS AND DOES TAKE

13        POSSESSION AND TITLE AND WAREHOUSES THEM, AS WELL AS

14        TRANSACTIONS IN WHICH THERE IS FLASH OR MOMENTARY TRANSACTION.

15               THE COURT:  SO YOU'RE SAYING THERE ARE AT LEAST

16        CERTAIN SITUATIONS, CIRCUMSTANCES, OR CERTAIN SYSTEMS FOR WHICH

17        TITLE IS TRANSFERRED TO THE U.S. PARENT BEFORE IT EVER TOUCHES

18        OUR SHORES?

19               MR. HUNT:  THAT I DON'T KNOW WHETHER THERE IS

20        ACTUALLY A RECORD OF WHEN THAT TITLE WOULD TRANSFER.

21               THE COURT:  OKAY.

22               MR. HUNT:  I THINK THE TESTIMONY THAT WAS CITED BY

23        THE DEFENDANTS WAS THAT AT LEAST IN SOME INSTANCES, FLASH TITLE

24        TAKES PLACE AT THE TIME.

25               WHEN TITLE TAKES -- TRANSFERS FOR OTHER INSTANCES, IF
```

1    THERE'S EVEN A RECORD OF TITLE TRANSFERRING AT ALL, I DON'T

2    KNOW THE ANSWER TO THAT.

3         BUT I DO BELIEVE THAT THERE ARE INSTANCES IN WHICH TITLE

4    ISN'T A FLASH TITLE TRANSFER AT THE LOCATION AND, IN FACT, THE

5    U.S. ENTITY HAS TITLE AND ACTUALLY WAREHOUSES THE PRODUCTS IN

6    THE UNITED STATES.

7         I DON'T THINK THERE'S -- I'M NOT AWARE OF ANY EVIDENCE

8    THAT'S BEEN GENERATED BY EITHER SIDE THAT WOULD SUGGEST IN

9    THOSE INSTANCES WHEN AND WHERE TITLE PASSES.

10        THE COURT:  ALL RIGHT.  AT A MINIMUM, THE DOCUMENT

11   YOU HANDED TO ME SUGGESTS THAT THE U.S. ENTITY, WHICH IS NOT A

12   PARTY TO THIS LITIGATION, IS IMPORTING THE DAS SYSTEMS WHICH

13   YOU BELIEVE INFRINGE --

14        MR. HUNT:  ARE COVERED --

15        THE COURT:  PRACTICE YOUR PATENT.

16        MR. HUNT:  THAT'S CORRECT.  THAT'S CORRECT.

17        AND AS I THINK BOTH PARTIES HAVE NOTED -- TO YOUR HONOR'S

18   QUESTION WHETHER OR NOT THE FLASH TITLE TRANSFER SCENARIO ALONE

19   CONSTITUTES IMPORTATION, I DON'T THINK EITHER SIDE HAS PROVIDED

20   THE COURT OR FOUND ANY LAW AS TO WHAT FACTORS MAY BE RELEVANT

21   TO IMPORTATION.

22        THE COURT:  I CERTAINLY DIDN'T FIND ANY, WHICH MAY

23   EXPLAIN WHY I ASKED YOU ALL THAT QUESTION.

24        MR. HUNT:  CORRECT.

25        SO TO SUGGEST THAT THAT IS EVIDENCE OF IMPORTATION,

1    THERE'S NO AUTHORITY THAT WOULD SUGGEST THAT IT HAS ANYTHING TO

2    DO WITH IMPORTATION, AND ESPECIALLY IN LIGHT OF THE DOCUMENTS

3    THAT WE HAVE ABOUT IMPORTATION.

4        I WOULD SUBMIT THAT THERE IS, AT THE VERY LEAST, A

5    DISPUTED ISSUE OF FACT, AND I DON'T THINK THERE'S ANY GUIDANCE

6    FROM CONTROLLING AUTHORITY THAT THE COURT CAN GO ON TO SAY THAT

7    HERE ARE FACTORS, OR THAT TRANSFER OF TITLE IN THE U.S. WOULD

8    EVEN BE A FACTOR FOR IMPORTATION.

9            THE COURT:  OKAY.  MY LAST QUESTION, MR. HUNT, BEFORE

10   I INVITE A RESPONSE FROM THE DEFENDANTS, IF I WERE TO FIND THAT

11   THIS HAS AT LEAST ONE OR MORE DISPUTED SUBSIDIARY ISSUES, THIS

12   QUESTION, PRESUMABLY THEN I WOULD INSTRUCT THE JURY ON THE

13   QUESTION OF WHAT SYSTEMS ARE IMPORTED AND WHAT ARE NOT, OR

14   WHETHER ANY SYSTEMS ARE IMPORTED, SOMETHING ALONG THOSE LINES,

15   AND THEN STRUCTURE THE INSTRUCTION TO THEM SO THAT IF THEY

16   FOUND THAT THE ANSWER WAS YES, THERE ARE AT LEAST CERTAIN

17   SYSTEMS THAT ARE IMPORTED, BUT THERE ARE OTHERS THAT ARE NOT,

18   FOR THOSE THAT ARE NOT, THE 287 BAR DOESN'T APPLY AND PROFITS

19   ARE AVAILABLE.

20       I'M JUST TRYING TO THINK THROUGH HOW THIS WOULD WORK.

21           MR. HUNT:  WELL, THE INSTRUCTION, YOUR HONOR, I THINK

22   WOULD FIRST HAVE TO BE, OF COURSE, UNDER SOME OF THE CASES THAT

23   YOUR HONOR HAS DECIDED, THAT IT'S THE DEFENDANTS WHO HAVE TO

24   FIRST ESTABLISH THAT THERE HAS BEEN A SALE, AN IMPORTATION.

25       AND THINKING THROUGH THE LAW -- AND, AGAIN, IT HASN'T BEEN

```
 1    BRIEFED -- BUT I THINK IF THEY CAN SHOW THAT SOME

 2    NON-INSUBSTANTIAL OR SUBSTANTIAL NUMBER OF THOSE INSTANCES

 3    OCCURRED, THEN THE BURDEN WOULD SHIFT TO US AND I BELIEVE --

 4    WE'RE NOT CONTESTING THAT THE PRODUCTS HAVE BEEN MARKED.

 5          SO AS I AT LEAST INITIALLY THINK IT THROUGH, YOUR HONOR,

 6    IT WOULD BE AN INSTRUCTION THAT THE DEFENDANTS HAVE THE BURDEN

 7    TO PROVE SOME NON-SUBSTANTIAL NUMBER OF PRODUCTS HAVE BEEN SOLD

 8    OR IMPORTED, AND IF SO, THEN THAT WOULD IMPACT THE ABILITY TO

 9    SEEK PRE-FILING DAMAGES.

10          THE COURT:  ALL RIGHT.

11          MR. HUNT:  AND I DON'T -- I KNOW WE HAVE A LOT OF

12    THINGS TO COVER.  WHEN I SAID WE WERE DONE, OR I'M DONE, I

13    DIDN'T MEAN TO CUT OFF THE WHOLE SECOND HALF OF THE ISSUE ABOUT

14    THE SALE.

15          BUT, AGAIN, THERE WAS LITTLE OR NO INFORMATION PROVIDED,

16    NOR ANY NOTICE, CERTAINLY NO FAIR NOTICE IN THE MOTION, THAT WE

17    WOULD HAVE TO ADDRESS SALES.

18          GOING ALL THE WAY BACK TO THE SUPREME COURT CASE THAT THE

19    FEDERAL CIRCUIT RECENTLY CITED --

20          THE COURT:  YOU'RE TALKING ABOUT MARVEL?

21          MR. HUNT:  RIGHT.  AGAIN, THOSE, I THINK, ARE ALL

22    271.  THE CASE THAT -- MARVEL WAS A 271 CASE.  IT CITED A FEW

23    OTHER CASES THAT WERE EITHER 271 OR JURISDICTION TYPE

24    QUESTIONS.

25          NOTHING THAT WE FOUND WAS ON POINT TO 287, SO I'M NOT SURE
```

1    THEY'RE COMPLETELY RELEVANT.  BUT TO THE EXTENT THAT THEY ARE,

2    ALL OF THESE CASES ARE UNIFORM IN THEIR DISCUSSION THAT CHANGE

3    OF TITLE AND LOCATION OF CHANGE IN TITLE IS NOT NECESSARILY THE

4    ISSUE TO BE ADDRESSED FOR SALE.  IT'S WHERE DID THE PRODUCT --

5    WHERE WAS THE PRODUCT TESTED?  WHERE WAS IT DEVELOPED?  WHERE

6    WAS THE TRANSACTION ACTUALLY OCCURRING?  WHERE WAS MONEY

7    CHANGING HANDS?

8          THERE WAS NO OPPORTUNITY OR NEED FOR US TO ADDRESS ANY OF

9    THAT IN SUMMARY JUDGMENT, SO WE THINK IT WOULD BE EQUALLY

10   INAPPROPRIATE FOR THE COURT TO NOW DEVELOP NEW EVIDENCE ON NEW

11   CASE LAW THAT WE HAVEN'T HAD A CHANCE TO REBUT OR THAT HASN'T

12   BEEN PRESENTED.

13            THE COURT:  ALL RIGHT.  I'LL GIVE YOU A CHANCE FOR

14   REBUTTAL IF YOU NEED IT.

15            MR. HUNT:  THANK YOU.

16            THE COURT:  GOOD AFTERNOON, MS. LEE.

17            MS. LEE:  GOOD AFTERNOON.

18         THE COURT DOESN'T NEED TO RECONSIDER ITS ORDER FINDING

19   THAT THERE WAS SUFFICIENT EVIDENCE THAT WAS PRESENTED ON

20   SUMMARY JUDGMENT INDICATING THAT THERE HAS BEEN SALES, OFFERS

21   FOR SALE, AND IMPORTATION.

22         THE COURT CORRECTLY OBSERVED THAT THERE WAS EXACTLY THAT

23   EVIDENCE AND THAT IT WAS RAISED IN THE DEFENDANTS' MOTION FOR

24   SUMMARY JUDGMENT, AS WELL AS IN THE REPLY BRIEFING, AND THEN

25   AGAIN AT THE HEARING.

1          THAT EVIDENCE INCLUDED NOT ONLY THE TRANSFER PRICING STUDY

2     THAT YOUR HONOR INDICATED JUST A MOMENT AGO, BUT ALSO THE SWORN

3     TESTIMONY OF CORNING'S 30(B)(6) WITNESS THAT DESCRIBES, AT

4     LEAST IN, AS A REGULAR COURSE OF PRACTICE, THE PURCHASE ORDERS

5     ISSUING FROM THE UNITED STATES, THOSE ISSUE -- THOSE PURCHASE

6     ORDERS BEING FULFILLED BY CORNING ISRAEL, AND THEN THE PRODUCTS

7     BEING SHIPPED WHILE STILL IN CORNING ISRAEL'S -- HAVING TITLE,

8     DELIVERED IN THE UNITED STATES TO THE UNITED STATES CUSTOMERS,

9     TO A UNITED STATES ENTITY, CORNING U.S., BY FLASH TITLE WHEN IT

10    GOES TO THE CUSTOMER.

11         THE --

12              THE COURT:  CAN I STOP YOU THERE, MS. LEE --

13              MS. LEE:  YES.

14              THE COURT:  -- AND JUST HAVE YOU WALK ME THROUGH THAT

15     EVIDENCE IN A LITTLE BIT MORE DETAIL, BECAUSE I'VE FOUND THAT

16     THE PAPERS THAT WERE SUBMITTED AND THIS CONVERSATION TODAY IS

17     FAR MORE THAN I HAD TO WORK WITH IN CRAFTING MY ORDER, SO I

18     WANT TO TAKE ADVANTAGE OF THIS OPPORTUNITY.

19         SO AS I UNDERSTAND THE TRANSFER PRICING MEMO OR STUDY, I

20     THINK YOU'VE CHARACTERIZED IT AS A STUDY, AT LEAST THE WAY THAT

21     EVIDENCE SUGGESTS THIS WHOLE PROCESS WORKS, AND THE TESTIMONY

22     THAT YOU'VE CITED ALSO SUGGESTS THIS WORKS, IS THERE'S A

23     PURCHASE ORDER CUT BY THE U.S. CUSTOMER TO CORNING, THE PARENT,

24     THE U.S. ENTITY.  THAT'S THE FIRST STEP IN THIS PROCESS.  HEY,

25     WE WANT A DAS SYSTEM.  RIGHT?

```
 1              MS. LEE:  CORRECT, FROM THE PARENT -- CUT FROM THE

 2    PARENT IN THE UNITED STATES TO THE ENTITY, THE PLAINTIFF IN --

 3              THE COURT:  WELL, THAT'S THE SECOND STEP, RIGHT?  SO

 4    FIRST THE P.O. GETS CUT FROM THE CUSTOMER --

 5              MS. LEE:  YES, FROM THE CUSTOMER --

 6              THE COURT:  -- TO THE U.S. ENTITY --

 7              MS. LEE:  -- TO THE U.S. ENTITY, THAT'S CORRECT.

 8              THE COURT:  THEN THERE'S A P.O. CUT FROM THE U.S.

 9    PARENT OVER TO ISRAEL.

10              MS. LEE:  CORRECT.

11              THE COURT:  OKAY.  NOW, AT THAT POINT THE ISRAELI

12    ENTITY ITSELF CUTS A PURCHASE ORDER TO -- I THINK IT'S SANMINA.

13              MS. LEE:  THAT'S RIGHT, CORRECT, THE MANUFACTURER IN

14    CHINA.

15              THE COURT:  IN CHINA.  AND SO AT THAT -- AND FROM

16    THERE THE PROCESS OF MANUFACTURE COMMENCES OR CONTINUES, AND AT

17    SOME POINT A DAS IS READY FOR SHIPMENT TO THE UNITED STATES IN

18    CHINA.

19              MS. LEE:  CORRECT.

20              THE COURT:  AND THE STUDY SUGGESTS OR SAYS THAT AT

21    SOME POINT BEFORE THAT SYSTEM LEAVES THE CHINESE SHORE, THERE

22    IS A TRANSFER OF TITLE FROM SANMINA TO THE ISRAELI ENTITY, THE

23    PLAINTIFF IN THIS CASE.

24              MS. LEE:  THAT'S CORRECT, YOUR HONOR.

25              THE COURT:  OKAY.  THE SYSTEM THEN GETS LOADED,
```

1      PRESUMABLY ON A SHIP, TRUCKS ITS WAY OVER HERE TO OAKLAND OR

2      LONG BEACH OR WHEREVER THEY LAND --

3              MS. LEE:  CORRECT.

4              THE COURT:  -- AND AT SOME POINT AFTER THE SYSTEM

5      HITS THE SHORE AND BEFORE IT'S DELIVERED TO LEVIS, OR WHEREVER

6      IT'S GOING, THERE'S A FLASH TITLE TRANSFER THAT TAKES PLACE

7      THAT PUTS TITLE IN THE HANDS OF THE U.S. ENTITY, CORRECT, THE

8      PARENT?

9              MS. LEE:  THAT'S CORRECT.  WHILE IN THE

10     UNITED STATES, THAT FLASH TITLE OCCURS.

11          BASICALLY, YOU KNOW, A SPLIT SECOND BEFORE THE --

12             THE COURT:  CUSTOMER TAKES IT.

13             MS. LEE:  CUSTOMER TAKES POSSESSION.

14             THE COURT:  SO MAYBE IT'S SUNNYVALE, MAYBE IT'S

15     SAN JOSE, BUT NOT AT SANTA CLARA.

16             MS. LEE:  THAT'S CORRECT.  THAT'S RIGHT.

17             THE COURT:  OKAY.

18             MS. LEE:  AND THAT'S WHEN -- THAT'S WHEN THE FLASH

19     TITLE OCCURS, SO THAT TRANSFER OF TITLE, OR THE DELIVERY, WILL

20     OCCUR AND IT OCCURS IN THE UNITED STATES.

21          AND THAT FALLS SQUARELY WITHIN WHAT'S CONTEMPLATED AT

22     LEAST IN OTHER PORTIONS OF THE PATENT ACT AS WE'VE POINTED OUT

23     IN OUR SUBMISSION TODAY.

24             THE COURT:  IT SEEMS LIKE THAT'S THE ONE THING YOU

25     ALL AGREE, THERE IS NO CLEAR CASE FROM THE FEDERAL CIRCUIT OR

1      EVEN A DISTRICT COURT ON THIS.

2              MS. LEE:  WE HAVE NOT BEEN ABLE TO FIND ANYTHING --

3              THE COURT:  I COULDN'T FIND ANYTHING.

4              MS. LEE:  -- ON 287 IN PARTICULAR.

5      BUT WE THINK THAT THE DISCUSSION OF IMPORTATION AND SALE

6  IN THE CONTEXT OF OTHER SECTIONS OF THE PATENT ACT IS

7  INSTRUCTIVE.

8      AND WITH RESPECT TO THE DOCUMENTS THAT COUNSEL PROVIDED

9  TODAY, THESE DOCUMENTS, IF THE COURT'S EVEN INCLINED TO LOOK AT

10  THEM, THEY'RE DATED 2014, BEFORE THE LAWSUIT WAS FILED.

11      THEY WERE RESPONSIVE TO OUR REQUESTS IN DISCOVERY FOR

12  DOCUMENTATION REGARDING DISTRIBUTION AND SALES OF THE PRODUCTS.

13  THEY WERE NEVER PRODUCED.

14      EVEN IF THE COURT'S WILLING TO CONSIDER THESE DOCUMENTS,

15  THESE DOCUMENTS DON'T CREATE A GENUINE ISSUE OF MATERIAL FACT.

16      FIRST OF ALL, THE NAME THAT WAS GIVEN ON THESE DOCUMENTS

17  TO CUSTOMS DOESN'T CONTROL, YOU KNOW, WHO IS THE IMPORTER,

18  WHO'S DOING THE SALES HERE FOR PURPOSES OF THE PATENT ACT UNDER

19  THE CASES THAT WE'VE CITED, INCLUDING UNDER LARGON, WHICH IS A

20  CASE FROM THIS DISTRICT.

21      IN ADDITION, THESE -- THESE DOCUMENTS, OR THESE TWO

22  DOCUMENTS DON'T CONTRADICT ANY OF THE EVIDENCE THAT WAS

23  PROVIDED ON SUMMARY JUDGMENT WITH RESPECT TO THE SUPPLY CHAIN

24  FROM -- GOING FROM -- STARTING FROM THE UNITED STATES AND

25  ENDING UP BACK IN THE UNITED STATES.

```
 1          WHAT THIS SHOWS AT MOST IS THAT IN SIX INSTANCES OF A DAS,

 2     WE DON'T EVEN KNOW IF IT PERTAINS TO THE MA 1000, 2000, OR THE

 3     ONE PRODUCT, WHETHER THAT -- WHETHER THOSE ACTUALLY INVOLVE A

 4     PROCESS DIFFERENT FROM WHAT'S BEING DESCRIBED IN THE TRANSFER

 5     PRICING MEMO.  ALL WE KNOW IS THAT ONE ENTITY'S NAME WAS PUT

 6     THERE.

 7          AND I THINK, AS COUNSEL POINTED OUT, INCLUDING IN THE

 8     MARVEL CASE, COURTS WILL CONSIDER THE CIRCUMSTANCES THAT

 9     SURROUND THESE SORTS OF SALES OR IMPORTATION TO DETERMINE WHERE

10     DID THOSE OCCUR, AND THAT WILL TAKE INTO ACCOUNT THINGS LIKE

11     THE FACT THAT THE PURCHASE ORDER ISSUED IN THE UNITED STATES,

12     THE FACT THAT PERFORMANCE, INCLUDING DELIVERY AND THE PAYMENT,

13     ISSUED FROM THE UNITED STATES.

14          THOSE ARE ALL RELEVANT AND KEY CONSIDERATIONS IN

15     DETERMINING WHETHER A SALE OR AN IMPORTATION HAS OCCURRED, AND

16     WE THINK THAT IT'S DISPOSITIVE HERE.

17          THESE DOCUMENTS THAT WEREN'T PRODUCED IN DISCOVERY, OR ON

18     SUMMARY JUDGMENT, DON'T CONTRADICT THE FACT THAT THAT IS HOW,

19     HOW AT LEAST CERTAIN INSTANCES, AS COUNSEL POINTED OUT, AT

20     LEAST CERTAIN INSTANCES, IF NOT ALL OF THE INSTANCES, WERE

21     IMPORTED AND SOLD.  THAT IS WHAT TRIGGERS THE OBLIGATIONS UNDER

22     SECTION 287.

23              THE COURT:  WELL, YOU'VE JUST PUT YOUR FINGER ON WHAT

24       I THINK IS AN IMPORTANT ISSUE AS WELL, WHICH IS IT MAY BE THAT

25        FOR CERTAIN SHIPMENTS, THERE'S NO QUESTION IT'S THE PLAINTIFF
```

1     THAT'S DOING THE IMPORTING AND, THEREFORE, 287 APPLIES.

2          THE CONCERN I HAVE IS WHETHER THE RECORD HERE IS AT LEAST

3     MIXED SUCH THAT THE TRIER NEEDS TO SORT THROUGH ALL OF THAT ON

4     A SYSTEM BY SYSTEM BASIS.

5          MS. LEE:  AND I DON'T THINK THAT IT IS, YOUR HONOR.

6     I THINK WE HAVE THE UNCONTROVERTED TESTIMONY OF THEIR 30(B)(6)

7     WITNESS DESCRIBING THE MANNER IN WHICH TITLE AND THE SUPPLY

8     CHAIN OCCURS.

9          WE HAVE THEIR TRANSFER PRICING MEMO, WHICH WE KNOW NOW

10    THAT THEY HAVE RELIED UPON IN A VERY IMPORTANT CONTEXT IN

11    DETERMINING THEIR TRANSFER PRICING, AND IT'S IMPORTANT THAT

12    THEY BE ACCURATE, AND THAT IS NOT CONTRADICTED.

13         THERE'S NOT A MATERIAL DISPUTE HERE AS TO WHAT THE SUPPLY

14    CHAIN IS, AND THIS DOCUMENT DOESN'T CREATE THAT DISPUTE OF

15    FACT.

16         AND I THINK, YOU KNOW, EVEN IF YOUR HONOR IS WRESTLING

17    WITH THIS ISSUE, I THINK IT'S -- YOU KNOW, IT'S WORTH NOTING

18    THAT YOUR HONOR'S DECISION IS ALSO CONFIRMED BY THE FACT OF THE

19    COMMSCOPE LICENSE WHICH, AS WE POINTED OUT IN OUR SUMMARY

20    JUDGMENT PAPERS, ALSO ESTABLISHES THAT CORNING HAS LICENSED THE

21    '837 PATENT TO A DAS COMPETITOR; THAT COMPETITOR HAS MADE AND

22    SOLD SYSTEMS IN THE UNITED STATES THAT ARE COVERED BY THE '837

23    PATENT AS INDICATED IN THE REPORT, THE EXPERT REPORT THAT WAS

24    FILED ALONG WITH THE MOTION FOR SUMMARY JUDGMENT; THEY HAVEN'T

25    BEEN REQUIRED TO MARK, AS REFLECTED BY THE LICENSE ITSELF; AND

1     THEY, IN FACT, HAVE NOT MARKED THOSE PRODUCTS AS REFLECTED BY

2     THE RESPONSES TO REQUESTS FOR ADMISSION AS INDICATED IN THE

3     BRIEFING.

4          SO THAT IS A SEPARATE AND INDEPENDENT BASIS ON WHICH TO

5     FIND THAT THE PRE-SUIT DAMAGES ARE BARRED, BUT WE DON'T THINK

6     YOU EVEN NEED TO GET THERE.

7          AS YOUR HONOR OBSERVED IN HIS ORDER, THERE IS AMPLE

8     EVIDENCE HERE AS DESCRIBED IN THE SUPPLY CHAIN AND THE

9     DOCUMENTS SUPPORTING THAT ON SUMMARY JUDGMENT, THAT THERE HAS

10    BEEN A SALE, THERE HAS BEEN AN IMPORTATION, AND ALTHOUGH THERE

11    ISN'T CASE LAW THAT ADDRESSES THE DEFINITION OF EITHER OF THOSE

12    IN THE CONTEXT OF 287, CERTAINLY IN THE CONTEXT OF THE PATENT

13    ACT GENERALLY, COURTS ARE LOOKING TO WHAT ARE THE MATERIAL

14    FACTS AND THE MATERIAL FACTS ARE HERE.

15         AND WITH RESPECT TO THE MARVEL CASE, THAT CASE IS NOT ON

16    ALL FOURS WITH THIS CASE.  IN THAT CASE, THE ISSUE WAS THAT THE

17    PRODUCTS DIDN'T EVER ACTUALLY MAKE IT TO THE UNITED STATES.

18         HERE THE PRODUCTS MADE IT TO THE UNITED STATES.  THEY WERE

19    SENT THERE BY CORNING ISRAEL, THE PLAINTIFF, AT THE -- YOU

20    KNOW, BASED ON THE PURCHASE ORDER THAT WAS ISSUED FROM THE

21    UNITED STATES.  THEY GOT PAID FROM A UNITED STATES ENTITY.

22    THEY GOT -- THEY MADE THE DELIVERY TO THE UNITED STATES.

23         ALL OF THAT IS MORE THAN ENOUGH EVIDENCE TO SUPPORT YOUR

24    HONOR'S RULING AND IS CONSISTENT WITH YOUR HONOR'S RULING.

25           THE COURT:  ONE LAST QUESTION FOR YOU, MS. LEE, WHICH

1      IS I HAD, I THINK IN ONE OF MY QUESTIONS, SUGGESTED THAT

2      PERHAPS THE RIGHT WAY TO LOOK AT THIS IS ON A SYSTEM BY SYSTEM

3      BASIS, OR PARSING INDIVIDUAL SYSTEMS.

4          DOES 287(A) WORK THAT WAY?  DOES IT INSTEAD LOOK AT SORT

5      OF THE TOTALITY OF THE MIX OF STUFF IN THE MARKETPLACE?

6          BECAUSE IF IT'S MORE OF A MIXED QUESTION, RIGHT, THEN YOUR

7      POINTING TO THE EXCLUSIVE LICENSEE MIGHT BE ENOUGH TO UNDERCUT

8      THIS ENTIRE ISSUE, REGARDLESS OF WHAT THE PLAINTIFF ITSELF IS

9      DOING, RIGHT?

10         MS. LEE:  CORRECT, YOUR HONOR.  IT'S NOT A SYSTEM BY

11     SYSTEM BASIS BECAUSE WE'RE NOT BASING DAMAGES ON THE

12     IMPORTATION OF CORNING PRODUCTS.

13         THE MARKING --

14         THE COURT:  RIGHT.  IT'S OBVIOUSLY YOUR PRODUCTS THAT

15     ARE AT ISSUE.

16         MS. LEE:  RIGHT, IT'S OUR PRODUCTS THAT ARE AT ISSUE.

17         THE MARKING STATUTE IS TRIGGERED WHEN THERE ARE SALES,

18     OFFERS FOR SALE, IMPORTATION, ET CETERA, OF THE ALLEGEDLY

19     PATENTED PRODUCT THAT OCCUR IN THE UNITED STATES, AND WE HAVE

20     THAT HERE.

21         EVEN IF 50 PERCENT OF THE SALES OCCURRED BY THE WAY THAT

22     THEY'RE DESCRIBED BY THE PLAINTIFF'S TRANSFER PRICING MEMO,

23     THAT'S STILL ENOUGH TO TRIGGER THE DUTY TO MARK, AND THEY

24     HAVEN'T DONE THAT.  THERE'S NO DISPUTE THAT THEY HAVEN'T MARKED

25     THE PRODUCTS, THERE'S NO DISPUTE HERE THAT THEY DIDN'T PROVIDE

1    ACTUAL NOTICE, AND THERE'S NO DISPUTE THAT THEIR LICENSEE

2    DIDN'T DO EITHER OF THOSE THINGS, EITHER.

3         IT'S ENTIRELY APPROPRIATE, ON THE BASIS OF THE COMMSCOPE

4    LICENSE AND THE SUPPLY CHAIN AS DESCRIBED IN OUR SUMMARY

5    JUDGMENT MOTION, TO BAR PRE-SUIT DAMAGES.

6         THE COURT:  I SUGGESTED, OR SAID, I HAD ONE LAST

7    QUESTION.  I ACTUALLY HAVE ANOTHER --

8         MS. LEE:  OF COURSE.

9         THE COURT:  -- SO I APOLOGIZE FOR THAT.

10        THE OTHER QUESTION I HAD IS, IS THE RECORD AT ALL CLEAR

11   ABOUT HOW THE VOLUME OF SALES COMPARES FOR THE LICENSEES AS

12   COMPARED TO THE PATENTEE?  IN OTHER WORDS, YOUR LICENSEE, DOES

13   IT SELL A COUPLE OF THESE?  A HUNDRED OF THESE?

14        MS. LEE:  WELL, THERE --

15        THE COURT:  THEIR LICENSEE, I SHOULD SAY.

16        MS. LEE:  I DON'T BELIEVE THAT THERE HAS BEEN ANY

17   PRODUCTION FROM CORNING THAT REFLECTS THE VOLUME OF COMMSCOPE'S

18   SALES.

19        HOWEVER, AS REFLECTED IN THE SUMMARY JUDGMENT RECORD AND

20   MICHELE RILEY'S REPORT, THERE IS SOME DISCUSSION AS TO HOW MUCH

21   MARKET SHARE COMMSCOPE HAS, AND THAT IS RELEVANT TO THE

22   CONSIDERATION OF HOW SHE'S CALCULATED DAMAGES AND COMMSCOPE'S

23   MARKET SHARE IS SIGNIFICANT.

24        THE COURT:  IT'S NOT ZERO.

25        MS. LEE:  LARGER -- IT'S NOT ZERO, AND IT'S LARGER

```
1    THAN CORNING'S.

2           THE COURT:  OKAY.  I THINK YOU'VE ANSWERED MY

3    QUESTIONS.  THANK YOU.

4        MR. HUNT, ANYTHING FURTHER ON THIS?

5           MR. HUNT:  YES.  THANK YOU, YOUR HONOR.

6        COMMSCOPE'S MARKET SHARE IS SIGNIFICANT, YOUR HONOR.  IT

7    SHOULDN'T MATTER.

8        IN FACT, MS. LEE SAYS COMMSCOPE DOESN'T MATTER TO THE

9    LICENSEE, AND THEN IT DOES.

10       IT DOESN'T MATTER FOR TWO REASONS.  IT WASN'T ADDRESSED AT

11   ALL IN THE SUMMARY JUDGMENT.  WHY WE ARE TWO WEEKS FROM TRIAL

12   AND WITHOUT AN OPPORTUNITY TO EVEN ADDRESS THE ISSUE ON THE

13   FACTS AND BEING NOW SUBJECTED TO A BRAND NEW SUMMARY JUDGMENT

14   MOTION.

15       BUT BEYOND THAT, THERE'S NO EVIDENCE THAT COMMSCOPE IS

16   COVERED BY THE PATENT.  WHERE IS THE EVIDENCE THAT IT'S

17   ACTUALLY -- THESE PRODUCTS ARE ACTUALLY COVERED?  THERE'S A

18   LICENSE.  WE DON'T DISPUTE THAT THERE'S A LICENSE AGREEMENT.

19       BUT THERE'S NO EVIDENCE IN THE RECORD THAT ANY OF THE

20   PRODUCTS ARE COVERED BY THE PATENT.

21           THE COURT:  SO THE RFA'S, OR THE RESPONSES MORE

22    PROPERLY, WERE NOT SPECIFIC IN TERMS OF IDENTIFYING OR

23    ADMITTING THAT COMMSTOCK -- IS IT COMM --

24           MR. HUNT:  COMMSCOPE.

25           THE COURT:  -- SCOPE, THANK YOU.
```

1          MR. HUNT:  I DON'T BELIEVE THAT THERE IS ONE.  I

2   COULD BE PROVEN WRONG, BUT I DON'T BELIEVE THAT IN THE

3   SUBMISSION THAT WAS LAST NIGHT THERE WAS ANY EVIDENCE THAT

4   HERE'S EVIDENCE OF RECORD THAT COMMSCOPE INFRINGES THE '837

5   PATENT.  SO COMMSCOPE SHOULDN'T BE THE ISSUE.

6          THE COURT:  OKAY.

7          MR. HUNT:  I WOULD LIKE TO ALSO ADDRESS THE FACT THAT

8   YOUR HONOR SAID SOMETHING ABOUT, IN SOME SMALL INSTANCES, THERE

9   SEEMS TO BE NO DISAGREEMENT THAT THE PLAINTIFF IMPORTED THE

10  PRODUCT.

11      WE ABSOLUTELY DISAGREE WITH THAT.

12          THE COURT:  I DON'T WANT TO -- IF I SAID THAT, I

13  APOLOGIZE, BECAUSE I UNDERSTAND YOU DISAGREE.

14          MR. HUNT:  I THINK THERE ARE TWO FACTS THAT ARE NOT

15  DISPUTED, AND ONLY TWO, AS IT RELATES TO THIS TRANSACTION.  ONE

16  IS THAT A PURCHASE ORDER FROM THE U.S. ENTITY EMANATES FROM THE

17  UNITED STATES.  THAT'S WHERE THEY ARE.  NO ONE WOULD EXPECT

18  THEM TO GET ON A BOAT AND GO SOMEWHERE ELSE TO ISSUE A P.O.

19  WHEN IT ISSUES IT OVERSEAS.

20      THE OTHER ISSUE OF FACT WHICH IS NOT DISPUTED IS THAT AT

21  LEAST IN SOME INSTANCES, THE PLAINTIFF IS THE TITLE OWNER AT

22  THE TIME IT IS ENTERING THE COUNTRY.

23      THERE'S NO LAW OR SUGGESTION THAT THAT EQUALS IMPORTATION.

24  WE NOW HAVE COUNTER EVIDENCE.  IN FACT, THE EVIDENCE THAT WE'VE

25  SUBMITTED TODAY DOES MENTION THE MA 1000 PRODUCT, WHICH IS A

1    DAS THAT WE CONTEND IS COVERED.

2         WE COULD GO BACK AND TRY AND FIND ALL THE IMPORTATION

3    RECORDS, BUT I THINK THAT'S NOT NECESSARY FOR THE DAY.

4         SO I THINK THOSE ARE THE ONLY TWO FACTS THAT ARE RELEVANT

5    THAT ARE UNDISPUTED THAT TIE THE TRANSACTIONS TO THE

6    UNITED STATES.

7              THE COURT:  OKAY.  THANK YOU.

8         I'M GOING TO TAKE THIS MATTER UNDER SUBMISSION.  I AM

9    STRUCK BY HOW LITTLE CASE LAW THERE IS ON WHAT I WOULD THINK

10   WOULD BE A MORE COMMON ISSUE.

11        I WANT TO GO BACK AND READ THE CASES IN LIGHT OF YOUR

12   COMMENTS.  YOU'VE GIVEN ME SOMETHING TO THINK ABOUT.  SO I WILL

13   GET AN ORDER OUT ASAP BECAUSE TIME IS RUNNING SHORT.

14        IN THAT SAME SPIRIT, WHY DON'T WE TURN TO OTHER ISSUES

15   THAT WE NEED TO COVER THIS AFTERNOON.

16        LET ME FIRST, OR NEXT, ASK ABOUT WHETHER OR NOT ANY

17   FURTHER AMENDMENTS TO THE PLEADINGS OR CONTENTIONS ARE

18   APPROPRIATE.

19        MR. HUNT, IN YOUR SECTION OF THE STATEMENT, YOU SUGGESTED

20   YOU SOUGHT LEAVE TO AMEND YOUR CONTENTIONS.  IS THAT CORRECT?

21             MR. HUNT:  WELL, THE -- I THINK THE ISSUE THAT THE

22   COURT IS ADDRESSING HAS BEEN RAISED BOTH IN JURY INSTRUCTIONS

23   AND ELSEWHERE CONCERNING AN AKAMAI POSITION, AND I KNOW THE

24   DEFENDANTS HAVE SOMEHOW SUGGESTED THAT A JOINT ENTERPRISE

25   INFRINGEMENT CASE WASN'T MENTIONED IN CONTENTIONS, AND OF

1      COURSE WHAT WE'VE SAID IS THAT CASE CAME OUT THREE OR FOUR

2      WEEKS AGO.

3           YOUR HONOR HAS GRANTED US LEAVE TO TAKE SOME DISCOVERY,

4      WHICH HAS JUST BEEN COMPLETED IN THE LAST FEW DAYS, AND THAT

5      THOSE TWO SCENARIOS, TO US, MORE THAN CLEARLY SUGGEST WE SHOULD

6      BE ABLE TO ADVANCE A JOINT ENTERPRISE UNDER AN AKAMAI THEORY,

7      THE ONLY POINT BEING THAT IF THE COURT SOMEHOW BELIEVES THAT

8      CONTENTIONS OR OTHER FILINGS NEED TO BE AMENDED TO COMPORT WITH

9      WHAT WE THINK THE EVIDENCE WILL SHOW, WE'D BE WILLING TO DO SO.

10          THE COURT:  ALL RIGHT.  I THINK I HAVE IT.

11        MR. PLATT, GOOD AFTERNOON.

12          MR. PLATT:  GOOD AFTERNOON.

13        SO WITH RESPECT TO THE JOINT ENTERPRISE THEORY, I THINK

14     YOU'LL RECALL BACK WHEN THIS CASE FIRST STARTED, WE FILED A

15     MOTION TO STRIKE THEIR INFRINGEMENT CONTENTIONS BASED ON THEIR

16     FAILURE TO IDENTIFY WHO THE DIRECT INFRINGERS WERE AND INDIRECT

17     INFRINGERS WERE.

18          THE COURT:  I REMEMBER THAT, YEAH.

19          MR. PLATT:  AND I THINK THE WORD WAS SOMETHING ALONG

20     THE LINES OF THEY'LL BE STUCK WITH IT IF THAT'S WHAT THEY WANT

21     TO CLAIM.

22        AND THE FACT OF THE MATTER IS THAT EVEN -- AKAMAI IS A,

23     YOU KNOW, INDIRECT INFRINGEMENT CASE.  IT'S A METHOD PATENT

24     CASE.  IT'S NOT DEALING WITH -- YOU KNOW, THERE WAS JOINT

25     INFRINGEMENT BEFORE AKAMAI, AND IF THAT WAS A THEORY THAT THEY

1    WERE GOING TO PURSUE, THEN IT SHOULD HAVE BEEN RAISED EARLY ON.

2        THEY AMENDED THEIR INFRINGEMENT CONTENTIONS AT THE END.

3    THEY SHOULD HAVE ADDED IT IN THERE.

4        THEIR JOINT ENTERPRISE THEORY IS BASED ON THIS IDEA THAT,

5    YOU KNOW, REACH SELLS EQUIPMENT TO VALUE ADDED RESELLERS THAT

6    THEN SELL IT ON.

7        THEY'VE KNOWN ABOUT THE VALUE ADDED RESELLERS SINCE DAY

8    ONE.  THEY, IN FACT, WORK WITH -- CORNING SELLS ITS OWN

9    EQUIPMENT THAT SAME WAY WORKING WITH VARS.

10       SO WE THINK THIS IS SOMETHING THAT SHOULD HAVE BEEN RAISED

11   EARLY ON.  WE HAVE NOT HAD NOTICE OF IT AND NOT HAD AN ABILITY

12   TO PURSUE THAT THEORY.

13       THE OTHER THING I WOULD ADD IS THAT --

14       THE COURT:  YOU MEAN TAKE DISCOVERY, GATHER

15   DOCUMENTS, ALL THAT STUFF?

16       MR. PLATT:  RIGHT.  AND WHILE WE'RE ON THOSE LINES,

17   IF WE'RE GOING TO REOPEN THE PLEADINGS AND EVERYTHING LIKE

18   THAT, THEN WE THINK THAT THERE IS SOMETHING THAT WE HAVE BEEN

19   LITIGATING ALL ALONG, WHICH IS THE '504 PATENT INVALIDITY, AND

20   WE UNDERSTAND THE COURT'S GRANTED SUMMARY JUDGMENT ON THAT WITH

21   RESPECT TO NON-INFRINGEMENT, BUT IF WE'RE GOING TO REOPEN THE

22   PLEADINGS, OUR VIEW IS THAT WE OUGHT TO BE ABLE TO PLEAD A

23   COUNTERCLAIM FOR INVALIDITY OF THE '504 PATENT.

24       THE COURT:  OKAY.  I THINK I HAVE IT, MR. PLATT.

25       MR. HUNT, ANYTHING ELSE ON THIS POINT?

```
 1              MR. HUNT:  WE CERTAINLY DON'T THINK IT'S APPROPRIATE

 2     TO ADD A COUNTERCLAIM ON THE '504 WHEN THEY'VE HAD A DEFENSE OF

 3     INVALIDITY ON THE '504 FROM DAY ONE.

 4              THE COURT:  OKAY.

 5         ALL RIGHT.  WELL, ON THIS ISSUE OF AMENDMENTS, LET ME

 6     SIMPLY RULE NOW.

 7         I'M DENYING ANY PERMISSION TO AMEND ANY CONTENTIONS, ANY

 8     AMENDMENTS TO ADD COUNTERCLAIMS.  WE HAVE A COMPLICATED ENOUGH

 9     CASE TO TRY IN A WEEK AND A HALF, AND I'D LIKE TO KEEP IT AS

10     SIMPLE AS I CAN, SO THE PARTIES ARE GOING TO STAND ON THE

11     PLEADINGS THAT ARE IN THE RECORD RIGHT NOW.

12         IF YOU BELIEVE THAT THOSE PLEADINGS SUPPORT OR JUSTIFY

13     CERTAIN INSTRUCTIONS OR CERTAIN TESTIMONY, I'LL TAKE IT UP IN

14     DUE COURSE, BUT I'M NOT GOING TO LET YOU FILE ANYTHING NEW AT

15     THIS POINT.  I THINK WE'VE ALL GOT ENOUGH WORK TO DO.

16         SO WITH THAT, LET'S TURN TO ANOTHER CASE MANAGEMENT ISSUE,

17     WHICH IS IN THE JOINT STATEMENT, THE PARTIES SUGGESTED AT SOME

18     POINT THAT THERE PERHAPS WAS ONGOING DISCOVERY, AND I JUST WANT

19     TO CONFIRM THAT AT THIS POINT, IS ALL DISCOVERY DONE?  ARE WE

20     DONE PRODUCING DOCUMENTS, TENDERING WITNESSES, ALL THAT?

21         MR. HUNT?

22              MR. HUNT:  I THINK THAT WE ARE DONE WITH DISCOVERY.

23     WE ARE NOT NECESSARILY DONE WITH INFORMING THE COURT HOW THAT

24     HAS PROCEEDED.

25              THE COURT:  OKAY.  WELL, THAT MAY COME UP, I SUSPECT,
```

1    SHORTLY.

2         BUT IS THAT RIGHT, MR. PLATT?  THERE ARE NO MORE

3    WITNESSES, NO MORE DOCUMENTS TO BE PRODUCED?

4         MR. PLATT:  NO.  THE ONLY CAVEAT I WOULD ADD IS THAT

5    DOCUMENTS LIKE THIS ARE PRODUCED FOR THE FIRST TIME NOW AND,

6    YOU KNOW, WE DON'T HAVE THE REST OF THE DOCUMENTS, WE HAVEN'T

7    HAD A CHANCE -- WE'VE ASKED FOR THESE IN DISCOVERY, DIDN'T GET

8    THEM, AND, YOU KNOW, DEPENDING ON THE COURT'S RULING, THAT MAY

9    BE SOMETHING THAT WE NEED TO PURSUE.

10        THE COURT:  ALL RIGHT.  I APPRECIATE THAT UPDATE.

11        LET ME NEXT TURN TO THE QUESTION OF BIFURCATION.  MY READ

12   OF THE DOCKET IS THAT THE REQUEST FOR BIFURCATION HAS BEEN

13   WITHDRAWN.

14        CORRECT?

15        MR. HUNT:  THAT'S CORRECT, YOUR HONOR.

16        THE COURT:  OKAY.  THEN I'LL MOVE ON.  I DON'T HAVE

17   TO SAY ANYTHING MORE ABOUT THAT.

18        THE NEXT SUBJECT I WANTED TO TALK ABOUT BEFORE WE GET TO

19   SOME OF THE MOTIONS AND SO FORTH HAS TO DO WITH HOW THE TRIAL

20   IS GOING TO BE MANAGED.

21        I THINK YOU RAISE MANY OF THESE ISSUES IN SECTION 12 OF

22   YOUR JOINT STATEMENT.  LET ME JUST TURN TO THAT FOR A MOMENT.

23        BY NOW I SUSPECT THAT YOU HAVE SEEN THAT I HAVE SET THE

24   DAY FOR JURY SELECTION ON THE THURSDAY BEFORE, AND LET ME JUST

25   BE TRANSPARENT ABOUT WHY I DID THAT.  UNFORTUNATELY, I NEED TO

```
1    BE OUT OF TOWN ON MONDAY AND TUESDAY OF THE WEEK OF

2    OCTOBER 5TH, SO I WILL RETURN TUESDAY AFTERNOON, WHICH MEANS WE

3    CAN'T HAVE TRIAL ON MONDAY OR TUESDAY OF THAT WEEK, SO I WANTED

4    TO AT LEAST TAKE ADVANTAGE OF THE WEEK BEFORE TO GET SOME WORK

5    DONE AND NOT LET THINGS SLIP TOO MUCH.

6         THE OTHER CONSTRAINT OR CHALLENGE WE HAVE, OF COURSE, IS

7    THAT MONDAY, THE 12TH, IS A FEDERAL HOLIDAY AND BY LAW I'M NOT

8    PERMITTED TO HOLD A JURY TRIAL IN THIS COURTHOUSE.

9         SO I'M STILL CONFIDENT WE CAN COMPLETE THIS TRIAL IN A

10   REASONABLE AMOUNT OF TIME, AND WE'RE GOING TO TALK A BIT ABOUT

11   THAT, BUT I WANTED TO JUST EXPLAIN TO YOU WHY I MADE THAT

12   DECISION.

13        WITH RESPECT TO JURY SELECTION, LET'S TALK ABOUT HOW THAT

14   SHOULD AND COULD WORK HERE.

15        I BELIEVE YOU HAVE JOINTLY PROPOSED A QUESTIONNAIRE;

16   CORRECT?  THAT'S A JOINT REQUEST TO THE COURT?  YOU HAVE

17   DIFFERENT QUESTIONS YOU WANT IN THE MIX, BUT THE IDEA OF A

18   QUESTIONNAIRE IS SOMETHING YOU AGREE ON, RIGHT?

19             MR. HUNT:  THAT'S CORRECT.

20             MR. PLATT:  THAT'S CORRECT.

21             THE COURT:  I AM OPEN TO THAT.  I WILL CONFESS, I DID

22   MY FIRST JURY QUESTIONNAIRE ONLY RECENTLY AND IT SEEMED TO WORK

23   WELL, SO I LIKE THE IDEA.

24        AS FAR AS WHAT QUESTIONS TO INCLUDE, IT LOOKS LIKE

25   EVERYONE AGREES THAT THE PLAINTIFF'S PROPOSED QUESTIONS ARE
```

```
1        GOOD AND FAIR.

2            THE ONLY QUESTION IS WHETHER WE OUGHT TO ADD SOME

3    QUESTIONS FROM THE DEFENDANTS.  IS THAT RIGHT?

4            MR. PLATT:  THAT'S CORRECT, YOUR HONOR.

5            THE COURT:  OKAY.  LET ME JUST TURN TO THAT FOR A

6    MOMENT.

7            OKAY.  SO, MR. PLATT, THE ADDITIONAL QUESTIONS YOU'VE

8    PROPOSED HAVE TO DO WITH OPINIONS ABOUT U.S. GOVERNMENT

9    REGULATION, OPINIONS ABOUT MULTINATIONAL COMPANIES, THINGS LIKE

10   THAT.

11           MR. PLATT:  THAT'S CORRECT.

12           THE COURT:  OKAY.

13           MR. PLATT:  AND WITH RESPECT TO THESE QUESTIONS, YOU

14   KNOW, OUR VIEW IS THAT A JURY QUESTIONNAIRE IS GOING TO BE MORE

15   PROBATIVE OF TRYING TO GET AT WHETHER THERE'S ANY TYPE OF

16   NATIONALITY BIAS OR ANYTHING LIKE THAT, THAT IT'S MORE

17   LIKELY -- I THINK PROSPECTIVE JURORS ARE MORE LIKELY TO BE MORE

18   CANDID ON THE JURY QUESTIONNAIRE COMPARED TO WHEN THEY'RE

19   SITTING IN A ROOM OF PEERS ADMITTING TO SOME TYPE OF

20   NATIONALITY BIAS.

21           THE COURT:  THIS CASE IS INTERESTING, RIGHT, BECAUSE

22   IT COULD CUT -- I'M NOT SURE WHICH WAY IT CUTS GIVEN THE

23   IDENTITY OF THE PARTIES.

24       ALL RIGHT.  WELL --

25           MR. PLATT:  AND I WOULD SAY -- I'M SORRY.
```

```
 1              THE COURT:  GO AHEAD, PLEASE.

 2              MR. PLATT:  I WAS JUST GOING TO SAY, WE TRIED TO KEEP

 3     IT NEUTRAL BETWEEN THAT -- WE DIDN'T TALK ABOUT ASIAN COMPANIES

 4     VERSUS ISRAELI COMPANIES AND WE TRIED TO KEEP IT NEUTRAL.

 5              THE COURT:  AND I BELIEVE REACH IS AN AMERICAN

 6     COMPANY.  ARE THEY THE ONLY AMERICAN COMPANY IN THIS CASE?

 7              MR. PLATT:  THAT'S RIGHT.

 8              THE COURT:  OKAY.  WELL, I'M GOING TO GIVE YOU THE

 9     QUESTIONNAIRE.  I'M GOING TO ALLOW THE ADDITIONAL QUESTIONS.

10         I HAVE SOME ADDITIONAL QUESTIONS OF MY OWN THAT, FRANKLY,

11     I THINK WOULD BE THE MOST HELPFUL FOR THE COURT, AND THESE ARE

12     QUESTIONS THAT GET AT WHETHER THERE IS A TRUE HARDSHIP FOR ANY

13     PARTICULAR PROSPECTIVE JUROR.

14         SO LET ME JUST GIVE YOU THE QUESTIONS I WOULD LIKE ADDED

15     TO THE QUESTIONNAIRE.  THESE QUESTIONS ARE AS FOLLOWS, AND THE

16     TRANSCRIPT WILL REFLECT THIS.

17         I WOULD LIKE ADDED TO THE QUESTIONNAIRE A QUESTION THAT

18     ASKS, "HOW IS YOUR HEALTH?" WITH FOLLOW-UP QUESTIONS THAT READ

19     AS FOLLOWS:  "IS SITTING FOR LONG PERIODS OF TIME DIFFICULT FOR

20     YOU?"  "DO YOU FIND IT DIFFICULT TO SEE OR HEAR?"  "DO YOU HAVE

21     ANY CHRONIC DISEASES?"  "DO YOU TAKE ANY MEDICATIONS

22     REGULARLY?"  "DO THEY MAKE YOU TIRED OR DROWSY OR MIGHT THEY

23     INTERFERE WITH YOUR ABILITY TO CONCENTRATE FOR LONG PERIODS OF

24     TIME?"

25              ANOTHER QUESTION I WOULD LIKE ADDED IS:  "IS THERE ANY
```

 1    REASON WHY YOU SHOULD NOT SERVE ON THIS JURY, WHY YOU WOULD BE

 2    UNABLE TO DO SO, OR WHY JURY DUTY WOULD PRESENT A SERIOUS

 3    HARDSHIP?"  YES/NO.  "IF YES, PLEASE EXPLAIN."

 4          ANOTHER QUESTION I WOULD LIKE ADDED TO THE QUESTIONNAIRE

 5    IS:  "WHY WOULD YOU BE A GOOD JUROR IN A CASE LIKE THIS?"

 6          I WOULD LIKE A QUESTION ADDED THAT READS:  "WHAT ELSE

 7    SHOULD WE KNOW ABOUT YOU?"

 8          I WOULD LIKE A QUESTION THAT ASKS:  "PLEASE CIRCLE ANY OF

 9    THE FOLLOWING WITH WHOM YOU ARE ACQUAINTED," AND THEN A LISTING

10    OF VARIOUS INDIVIDUALS, AND I'D LIKE THE VARIOUS INDIVIDUALS TO

11    INCLUDE ALL OF THE PEOPLE WHO ARE LISTED ON YOUR PROSPECTIVE

12    WITNESS LIST, AS WELL AS ANY ATTORNEYS THAT ARE GOING TO APPEAR

13    IN COURT.  HECK, THROW MY NAME IN THERE, TOO.  MAYBE THEY KNOW

14    ME.  I DON'T KNOW.

15          AT LEAST THIS WILL GET US MORE INFORMATION THAT MAY BE

16    USEFUL FOR DISMISSALS BEFORE WE EVEN HAVE TO GET TO THE VOIR

17    DIRE ITSELF.

18          ANY OBJECTION TO THOSE ADDITIONAL QUESTIONS THAT I'VE

19    PROPOSED?

20               MR. PLATT:  NO, YOUR HONOR.

21               MR. HUNT:  NO, YOUR HONOR.

22               THE COURT:  ALL RIGHT.  NOW, AS FAR AS HOW THE

23    QUESTIONNAIRE IS GOING TO BE, EVERY JUDGE I KNOW LIKES TO DO

24    THIS DIFFERENTLY, AND I DON'T PRETEND TO HAVE FIGURED THIS ALL

25    OUT, BUT WHAT I HAVE FOUND WORKED WELL FOR ME IN THE PAST IS

1    THAT ON THURSDAY, THE 1ST, WHICH IS WHEN WE'RE GOING TO DO JURY

2    SELECTION, THE PROSPECTIVE JURORS WILL BE SUMMONED, AND I'M

3    THINKING FOR A TRIAL LIKE THIS, WE PROBABLY DON'T NEED MORE

4    THAN 35 JURORS TO COME IN.  I DON'T IMAGINE THERE ARE GOING TO

5    BE A LOT OF PROBLEMS WITH A CASE LIKE THIS.

6         I BELIEVE THEY WILL BE TOLD TO ARRIVE HERE EITHER AT 8:00

7    OR 8:30 DOWNSTAIRS TO GET CHECKED IN BY OUR JURY COORDINATOR,

8    AND THEN OUR COORDINATOR WILL TAKE COPIES OF THE QUESTIONNAIRE

9    THAT YOU WILL SUPPLY AND HAND THEM OUT TO PEOPLE SO THAT THEY

10   CAN COMPLETE THEM.

11        THERE WILL ALSO BE SOME INTRODUCTORY REMARKS PRESENTED TO

12   THEM AND OTHER ORIENTATION THAT'S PROVIDED.

13        ONCE THE QUESTIONNAIRE IS COMPLETE, THEY'LL THEN RETURN

14   THE QUESTIONNAIRE BACK TO THE COORDINATOR.

15        ONCE THE COORDINATOR HAS ALL OF THE QUESTIONNAIRES, THE

16   COORDINATOR WILL CONTACT YOU, AND LET ME KNOW, THAT THE

17   QUESTIONNAIRES ARE AVAILABLE FOR REVIEW.

18        AND THEN WHAT I WOULD PROPOSE TO DO IS THEN ALLOW THE

19   PROSPECTIVE JURORS TO GO ABOUT THEIR, YOU KNOW, BUSINESS, THEY

20   CAN EITHER GO TO THE COFFEE SHOP OR MAKE PHONE CALLS, WHATEVER

21   THEY WANT TO DO, AND WE TAKE SOMETHING LIKE, I DON'T KNOW, AN

22   HOUR, AN HOUR AND A HALF TO MAKE COPIES AND THEN REVIEW THOSE

23   QUESTIONNAIRES.

24        I WANT TO GIVE YOU AT LEAST SOME TIME TO PROCESS THIS

25   STUFF FOR IT TO BE USEFUL, BUT AT THE SAME TIME, I DON'T WANT

1    TO PUT US AT RISK OF HAVING THE PROCESS TAKE SO LONG THAT WE

2    DON'T GET IT DONE ON THURSDAY.

3         SO I'M ESTIMATING HERE, BUT I'M THINKING MAYBE TWO HOURS

4    WOULD BE ENOUGH TIME TO GET COPIES MADE AND FOR YOU TO REVIEW

5    THEM, WHICH WOULD PROBABLY PUSH US INTO LUNCHTIME OR JUST AFTER

6    LUNCH.

7         AT THAT POINT, ONCE YOU'VE HAD A CHANCE AND I'VE HAD A

8    CHANCE TO GO THROUGH THEM ALL, THE LAWYERS AND I, AND YOUR

9    CLIENTS IF THEY WISH TO PARTICIPATE, WILL MEET BACK IN CHAMBERS

10   WITH A COURT REPORTER AND WE'LL GO THROUGH AND SEE IF WE CAN

11   STRIKE SOME NUMBER OF JURORS ON HARDSHIP GROUNDS, AND PERHAPS

12   EVEN ON CAUSE GROUNDS; AND IF WE CAN GO THROUGH THAT EXERCISE,

13   I CAN LET YOU MAKE YOUR RECORD SO IF YOU HAVE OBJECTIONS TO

14   WHAT I'M PROPOSING TO DO, YOU MAKE YOUR RECORD; AND THEN WE

15   HAVE A SMALLER SET OF PEOPLE TO DEAL WITH HERE IN THE COURTROOM

16   FOR THE ACTUAL IN-PERSON VOIR DIRE, WHICH PROBABLY WILL TAKE

17   PLACE AROUND 2:00 O'CLOCK, GIVE OR TAKE.

18        WE'LL DO THE IN-PERSON VOIR DIRE HERE, I'LL ASK MY

19   ADDITIONAL QUESTIONS OF THE POOL, I'LL INVITE EACH OF YOU TO

20   ASK YOUR QUESTIONS.  I'M THINKING 30 MINUTES IS PROBABLY ENOUGH

21   FOR EACH SIDE.

22        AND THEN WE'LL FIGURE OUT WHAT ADDITIONAL DISMISSALS FOR

23   CAUSE MAKE SENSE, PERHAPS A HARDSHIP OR TWO MORE IS IDENTIFIED,

24   BUT IT'LL REALLY BE CAUSE FOCUSSED, AND THEN WE'LL GO THROUGH

25   AND DO THE PROCESS OF PEREMPTORIES, THREE PEREMPTORIES PER

```
1    SIDE, AND WITH THAT WE'LL HAVE OUR FINAL JURY TO WORK WITH AND

2    I CAN ANNOUNCE IT AND SEND EVERYBODY HOME.

3          DOES THAT GENERALLY SOUND REASONABLE?  ANY QUESTIONS ABOUT

4    THAT?  NO?

5          MR. LANIER, PLEASE.

6            MR. LANIER:  PASSES.  YOU'RE DONE FOR GOOD IF YOU

7     PASS?

8            THE COURT:  CORRECT.  BECAUSE OF THE WAY I DO IT,

9     PASSES ESSENTIALLY COUNT AGAINST YOUR QUOTA OF THREE.

10          AND LET ME EXPLAIN A BIT MORE THE MECHANICS OF THE ACTUAL

11    SELECTION BECAUSE I PROBABLY SHOULD SAY MORE ABOUT THAT IF I

12    HAVEN'T ALREADY.

13          LET'S ASSUME WE HAVE 35 WHO COME IN AT 8:00 O'CLOCK OR

14    8:30 AND, THROUGH THE QUESTIONNAIRE, I'M ABLE TO ELIMINATE FIVE

15    OF THEM BECAUSE OF HARDSHIP.  THAT LEAVES US WITH 30, WHICH IS

16    A NICE NUMBER.

17          THOSE FOLKS WILL THEN BE SEATED 1 TO 7 IN THE FRONT ROW OF

18    MY JURY BOX, 8 TO 14 IN THE SECOND ROW, AND THE REMAINING 12

19    WILL SIT IN THE FRONT ROW AND PERHAPS THE SECOND OF MY GALLERY.

20          MY PRESUMPTION IS THAT THE FIRST NINE PEOPLE -- AND I WANT

21    TO SET A JURY OF NINE FOR THIS CASE -- WILL BE OUR JURY FOR THE

22    CASE, SO THAT OUR INQUIRY WILL BE FOCUSSED ON WHETHER ANY OF

23    THOSE NINE PEOPLE ARE A PROBLEM.

24          AT THE SAME TIME, RATHER THAN DISMISS PEOPLE AND BACKFILL

25    AND HAVE TO RESTART THE PROCESS WITH EACH NEW JUROR, I JUST
```

1    LIKE TO VOIR DIRE THE ENTIRE GROUP OF WHAT WILL THEN BE 30, AND

2    SO YOU'LL HAVE ANSWERS TO ALL OF OUR QUESTIONS FOR ALL 30 OF

3    THOSE PEOPLE WHEN WE GO BACK INTO THE CONFERENCE ROOM FOR OUR

4    FINAL ARGUMENTS ON CAUSE, ANY HARDSHIPS, AND THEN PEREMPTORIES.

5         SO THAT'S THE WAY I LIKE TO DO IT.  AND WHAT WE'LL END UP

6    WITH IS LET'S SAY AFTER ALL THAT IS SAID AND DONE, WE'LL END UP

7    WITH, I'M GOING TO GUESS, 15 OR 20 PEOPLE WHO ARE ELIGIBLE TO

8    BE SEATED AS JURORS.

9         AS I SAID, I'M GOING TO TAKE THE FIRST NINE PEOPLE ON THAT

10   LIST AND THAT'S YOUR JURY.

11        SO DOES THAT MAKE SENSE?  ALL RIGHT.

12        SO THAT'S HOW JURY SELECTION IS GOING TO WORK, AND AS I

13   SAID, I'M PRETTY CONFIDENT -- I'M VERY CONFIDENT THAT WILL BE

14   DONE ON THURSDAY, THE 1ST, WHICH MEANS THE NINE WHO WILL SERVE

15   WILL BE TOLD THEY NEED TO RETURN ON WEDNESDAY, THE 7TH, FOR

16   OPENING STATEMENTS.

17        NOW, LET ME JUST TURN TO THAT.

18        BECAUSE WE ARE NOT BIFURCATING ANY EQUITABLE DEFENSES, I

19   THINK IT'S REASONABLE TO GIVE EACH OF YOU AN HOUR FOR OPENINGS

20   AND AN HOUR AND A HALF FOR CLOSINGS.

21        IS THERE ANY OBJECTION TO THAT?  YOU DON'T HAVE TO USE ALL

22   THAT TIME, BUT THAT SEEMS REASONABLE TO ME.

23             MR. PLATT:  YES, YOUR HONOR.

24             THE COURT:  OKAY.  AND WITH THE SCHEDULE THAT WE'RE

25    KEEPING, THAT MEANS THAT WE WILL -- I WILL -- I WILL

1    PREINSTRUCT WITH SOME INSTRUCTIONS AT 9:00 O'CLOCK AT THE VERY

2    BEGINNING OF THAT DAY ON WEDNESDAY, WE'LL THEN SHOW THE PATENT

3    VIDEO FROM THE FJC IMMEDIATELY THEREAFTER, AND THEN WE'LL TURN

4    TO THE OPENINGS, AND THAT TELLS ME THAT WE'LL PROBABLY HAVE

5    WITNESS TESTIMONY BEGINNING LATE THAT MORNING.

6         I WOULD LIKE TO HAVE THE PARTIES HERE EACH TRIAL DAY AT

7    8:00 A.M. TO ADDRESS ANY PRELIMINARY ISSUES.

8         I'D LIKE TO BEGIN WITH THE JURY AT 9:00 SHARP, AND WE'RE

9    GOING TO RUN FROM 9:00 TO 4:30 WITH AN HOUR FOR LUNCH AND TWO

10   15 MINUTE BREAKS, ONE IN THE MORNING AND ONE IN THE AFTERNOON.

11        ON AVERAGE, THAT TRANSLATES, TO ME, TO SOMETHING LIKE

12   FIVE-ISH HOURS ON THE CLOCK A DAY IF YOU DO THE MATH AND FIGURE

13   SOME TIME GETS WASTED THROUGH NO FAULT OF ANYBODY IN THE ROOM,

14   OF COURSE.

15        THAT TELLS ME THAT IF I ALLOCATED SOMETHING LIKE 12 HOURS

16   A SIDE FOR WITNESS EXAMINATIONS, WE CAN GET THIS CASE DONE IN

17   TWO WEEKS.  THAT'S MY BEST GUESS.

18        ANY OBJECTION TO THAT?  SO I'M TALKING AN HOUR AND A HALF

19   FOR OPENINGS, AN HOUR FOR CLOSE, 12 HOURS FOR DIRECTS AND

20   CROSSES.

21        NOW, THERE'S ONE IMPORTANT TWEAK THAT I THINK YOU ALL

22   SHOULD UNDERSTAND, WHICH IS, AS I THINK SOME OF YOU KNOW, I

23   LIKE -- AND AGAIN WILL IN THIS CASE -- TO ALLOW JURORS TO ASK

24   QUESTIONS OF WITNESSES.

25        THE WAY IT WORKS, FOR THOSE OF YOU WHO HAVEN'T SEEN ME DO

```
1    THIS, IS AT THE CONCLUSION OF THE EXAMINATIONS, THE JURY IS --

2    THE JURORS WILL BE INVITED TO SUBMIT PROPOSED QUESTIONS IN

3    WRITING TO ME.  THEY HAVE FORMS.

4        I'LL REVIEW THEM VERY QUICKLY WITH COUNSEL AT SIDE-BAR.

5    I'LL ENTERTAIN OBJECTIONS -- THERE USUALLY AREN'T VERY MANY

6    BECAUSE WE ALL WANT TO KNOW THE ANSWERS TO THEIR QUESTIONS --

7    AND THEN I'LL ASK THE QUESTIONS OF THE WITNESS ON BEHALF OF THE

8    JURY.

9        IN THIS CASE, I THINK IT IMPORTANT THAT THAT TIME THAT WE

10   SPEND ON JURY QUESTIONS WILL BE COUNTED AGAINST YOUR BUDGETS,

11   AND WHAT I'LL DO HERE IS, BECAUSE IT'S THE JURY ASKING THE

12   QUESTION, I'LL COUNT HALF OF THAT TIME AGAINST THE PLAINTIFF

13   AND HALF AGAINST DEFENDANTS.

14       YOU KNOW, WHETHER THE JURY TAKES ME UP ON THE OFFER

15   DEPENDS ON THE CASE AND THE MIX OF PEOPLE.  I'VE HAD SOME

16   JURORS ASKS HOURS AND HOURS OF QUESTIONS.  I'VE HAD SOME JURIES

17   ASK NO QUESTIONS.

18       BUT I THINK THAT'S THE FAIR WAY TO GO ABOUT IT, SO THAT'S

19   WHAT I'M GOING TO DO IN THIS CASE.

20       SO THAT'S THE BASICS OF HOW I SEE THE MECHANICS OF THE

21   TRIAL ITSELF GOING.

22       IF WE COULD, I JUST WANT TO TURN TO THE SECTION 12 ISSUES

23   THAT YOU RAISE, BECAUSE THERE MAY BE ONE OR TWO THAT I DIDN'T

24   QUITE RESOLVE FOR YOU.

25       SO FOR VOIR DIRE, LET ME JUST BE CLEAR, I'M GOING TO GIVE
```

1    YOU 30 MINUTES A SIDE TO ASK WHATEVER QUESTIONS YOU WANT ON TOP

2    OF THE QUESTIONS I ASK.

3         TIME LIMITS.  WE'VE TALKED ABOUT AN HOUR FOR OPENING, AN

4    HOUR AND A HALF FOR CLOSE, AND 12 HOURS FOR EACH SIDE TO DO

5    DIRECTS AND CROSSES AND REBUTTALS.

6         ON ADMISSIONS OF TRIAL EXHIBITS, I WOULD LIKE EACH EXHIBIT

7    TO BE USED WITH A WITNESS, WHICH I THINK IS THE ONLY

8    SIGNIFICANT ISSUE DIVIDING THE PLAINTIFFS FROM THE DEFENDANTS

9    ON THIS POINT.

10        WE'VE TALKED ABOUT JURY INSTRUCTIONS.  I WILL GIVE THE

11   PREINSTRUCTIONS, AND YOU CAN LOOK AT MY MOST RECENT TRIAL,

12   WHICH WAS GOOD VERSUS MOBILEIRON.  I USE THE SAME SET OF

13   PREINSTRUCTIONS IN EVERY CASE ALMOST, AND IN EVERY PATENT CASE

14   CERTAINLY.  THESE ARE THE STANDARD NINTH CIRCUIT MODEL

15   INSTRUCTIONS THAT BASICALLY TELL THEM WHAT'S GOING ON.

16             MR. HUNT:  YOUR HONOR, I APOLOGIZE.

17             THE COURT:  MR. HUNT.

18             MR. HUNT:  COULD I ADDRESS THE ISSUE OF THE EXHIBITS?

19    BECAUSE WE'VE HAD SOME DISCUSSIONS ABOUT THEM.

20             THE COURT:  SURE, YEAH.

21             MR. HUNT:  ESPECIALLY IN A CASE LIKE THIS WHERE

22    THERE'S VERY LITTLE TIME, IT SEEMS TO BE AN INCREDIBLY

23    BURDENSOME, POTENTIAL WASTE OF TIME TO HAVE TO SHOW A DOCUMENT

24    TO A WITNESS TO USE IT WHEN IT'S A CLEARLY ADMISSIBLE DOCUMENT.

25             SO I'M QUESTIONING WHY THERE'S A NEED TO HAVE A WITNESS

1    EVEN LOOK AT A DOCUMENT IF THAT'S -- ESPECIALLY IF THAT'S NOT

2    THE WITNESS THAT YOU MAY WANT TO USE THE DOCUMENT WITH.

3            THE COURT:  AND YOU'RE REFERRING TO DOCUMENTS WHOSE

4    ADMISSIBILITY IS NOT CONTESTED?

5            MR. HUNT:  OR SHOULDN'T BE.  THESE ARE DOCUMENTS THAT

6    THE PARTIES PRODUCED.  THEY'RE E-MAILS, THEY'RE LETTERS,

7    THEY'RE PRESENTATIONS.  THEY'RE CLEARLY BUSINESS RECORDS OF THE

8    PARTY AND THEY'RE -- THAT'S THE BULK OF THE EVIDENCE HERE.

9            AND SO IF I'VE GOT 12 HOURS, IF I HAVE TO SPEND TWO HOURS

10   JUST SAYING, "HERE'S A DOCUMENT, HERE'S A DOCUMENT, HERE'S A

11   DOCUMENT" SIMPLY TO GET IT INTO EVIDENCE MAKES NO SENSE TO ME,

12   YOUR HONOR, AND THERE CERTAINLY IS NO REQUIREMENT THAT A

13   DOCUMENT BE MENTIONED BY A WITNESS FOR IT TO BE ADMISSIBLE.

14           THE COURT:  ALL RIGHT.

15           MR. HUNT:  AND SO I WOULD MUCH PREFER, AT LEAST --

16   AND THERE VERY WELL MAY BE SOME DOCUMENTS THAT ARE STILL, OR

17   EXHIBITS THAT THERE STILL ARE LEGITIMATE ISSUES, WHEN IT'S

18   AUTHENTICITY OR SOME OTHER FOUNDATIONAL ISSUE.

19           BUT FOR A BIG BULK OF THE DOCUMENTS, YOUR HONOR, THERE

20   SHOULDN'T BE ANY LEGITIMATE OBJECTION TO THEIR ADMISSIBILITY.

21           THE COURT:  ALL RIGHT.  LET ME HEAR FROM THE OTHER

22   SIDE.

23           BEFORE I DO THAT, LET ME JUST SHARE WITH YOU MY THEORY,

24   AND IT'S -- I DON'T PRETEND IT TO BE ORIGINAL OR NECESSARILY

25   PERSUASIVE.  I, IN MY OWN PRACTICE, STRUGGLED WITH THE NOTION

1    THAT MY JURY WAS LOOKING AT REAMS OF DOCUMENTS THAT THEY NEVER

2    HEARD ABOUT DURING THE TRIAL ITSELF AND IT FELT A LITTLE UNFAIR

3    TO IMPOSE UPON THE JURY THAT TASK OF GOING THROUGH BINDER AFTER

4    BINDER OF DOCUMENTS OR DISK AFTER DISK OF PDF'S WHEN THEY NEVER

5    HEARD ANYTHING ABOUT THAT.

6         BUT I UNDERSTAND WHAT YOU'RE SAYING, MR. HUNT.

7         MR. PLATT, WHAT DO YOU THINK ABOUT THAT?

8         MR. PLATT:  YES, YOUR HONOR.

9         OUR VIEW IS THAT THE DOCUMENTS DO NEED TO BE USED WITH A

10   WITNESS.  AND PART OF THE DIFFICULTY HERE AS WELL IS THAT ON

11   PLAINTIFF'S EXHIBIT LIST, THERE'S A NUMBER OF THESE COMPOSITE

12   EXHIBITS WHICH CONTAIN NUMEROUS, NUMEROUS DOCUMENTS.  AND WHEN

13   I SAY "NUMEROUS," BY OUR COUNT, IT'S ABOUT 35,000 DOCUMENTS.

14   SO WE -- THERE'S NO SORT OF MEANINGFUL WAY FOR US TO GO

15   AND SAY, "WELL, THIS DOCUMENT SHOULD BE ADMISSIBLE, THIS ONE

16   SHOULDN'T."

17        OUR VIEW IS THAT IT SHOULD BE USED WITH A WITNESS AND IT

18   PROVIDES CONTEXT TO THE DOCUMENT SO THAT THE JURY CAN CONSIDER

19   IT RATHER THAN, YOU KNOW, BRINGING IN REAMS AND REAMS AND REAMS

20   OF PAPER.

21        THE COURT:  ALL RIGHT.

22        MR. HUNT, I'LL GIVE YOU ONE LAST WORD ON THIS.

23        MR. HUNT:  YEAH.  ON THAT LAST POINT IS MR. PLATT

24   SAYS THERE'S, LIKE, 35,000 DOCUMENTS.  I THINK IT'S 135,000,

25   AND THE REASON IS BECAUSE, UNDER YOUR COURT'S ORDER, YOU SAID

1        TO PRODUCE DOCUMENTS.

2             THEY LITERALLY PRODUCED MORE DOCUMENTS THE FIRST WEEK OF

3        SEPTEMBER IN THIS CASE THAN THEY HAD PRODUCED IN THE ENTIRETY

4        OF THE LITIGATION.

5             SO -- AND THEY THEN SAID, NOW THREE DAYS LATER, "WHERE'S

6        YOUR EXHIBIT LIST?"

7             SO WHAT WE DID WAS SAID "THESE ARE ALL THE DOCUMENTS THAT

8        RELATE TO THIS PROJECT."

9             NO, WE'RE NOT GOING TO -- AND WE'LL CERTAINLY WORK TO

10       WHITTLE IT DOWN TO A MANAGEABLE NUMBER.

11            BUT EVEN -- AGAIN, MR. PLATT -- THERE'S NO RULE OF

12       EVIDENCE THAT SAYS A DOCUMENT HAS TO BE MENTIONED BY A

13       TESTIFYING WITNESS, AND IT CERTAINLY PRECLUDES OUR ABILITY TO

14       RELY ON DOCUMENTS IN CLOSING AND ELSEWHERE.

15            SO WE THINK IT WOULD BE IMPROPER TO LIMIT IT TO SIMPLY A

16       DOCUMENT THAT A WITNESS ACKNOWLEDGED BY SAYING, "YES, I SEE

17       THAT'S EXHIBIT 12.  I SEE THIS IS EXHIBIT 13.  I SEE THAT'S

18       EXHIBIT 14."

19            I'M NOT SURE WHAT THE PURPOSE OF THAT IS, OTHER THAN TO

20       ALLOW US TO MENTION IT WITH ANOTHER WITNESS OR IN CLOSING.

21                 THE COURT:  ALL RIGHT.

22            MR. PLATT, ANYTHING FURTHER ON THIS ONE?

23                 MR. PLATT:  YEAH.  I MEAN, THE ONLY THING I WOULD

24       SUGGEST IS WE UNDERSTAND THE LOGISTICS OF TRIAL.  IF THERE'S --

25       IF THE PARTIES WANT TO WORK AND EXCHANGE SOME TYPE OF PROPOSED

```
 1     LIST OR SOMETHING LIKE THAT, THAT'S SOMETHING THAT WE'D BE
 2     WILLING TO CONSIDER AND SEE IF WE CAN GET THAT HASHED OUT
 3     BEFORE TRIAL.
 4          THE COURT:  OKAY.  HERE'S WHAT WE'RE GOING TO DO:
 5     I'M GOING TO STAND BY MY REQUIREMENT THAT EACH DOCUMENT BE
 6     USED, BUT I WANT TO PUT OUT A COUPLE OF IMPORTANT CAVEATS.
 7          ONE IS I DO WANT YOU TO SEE IF YOU CAN WORK OUT AT LEAST
 8     SOME SUBSET OF DOCUMENTS THAT YOU AGREE SHOULD BE IN THE RECORD
 9     HERE THAT NEED NOT BE USED WITH A WITNESS.  IF YOU CAN REACH
10     AGREEMENT ON EVEN SOME DOCUMENTS IN THAT CATEGORY, GREAT, I'LL
11     LET YOU INCLUDE THEM.  BUT OTHERWISE I WANT THEM USED WITH A
12     WITNESS.
13          THE SECOND CAVEAT IS IF IT PROVES TO BE A BURDEN, A TRUE
14     DRAIN ON ONE PARTY OR ANOTHER'S TIME, I WILL ENTERTAIN A
15     REQUEST FOR MORE TIME.
16          BUT LET'S SEE HOW THIS PLAYS OUT.  I'M JUST NOT CONFIDENT
17     THAT THIS IS GOING TO BE A MAJOR ISSUE AT THE END OF THE DAY
18     AND I LIKE TO BE ABLE TO PLAN MY TRIAL PRECISELY AND, AT THE
19     SAME TIME, PROTECT THE JURY FROM HAVING TO SLOG THROUGH A BUNCH
20     OF STUFF THEY DON'T EVEN KNOW OR UNDERSTAND.
21          ALL RIGHT.  THE NEXT ISSUE IN SECTION 12 HAS TO DO WITH
22     DEPOSITION TESTIMONY.  AM I RIGHT HERE THAT THE ISSUE HAS TO
23     DO, OR THE DISPUTE HAS TO DO WITH WHETHER THE KOREAN LANGUAGE
24     ORIGINAL RESPONSES OUGHT TO BE INCLUDED?  DO WE REALLY WANT TO
25     PUT THE JURY THROUGH THAT BURDEN?
```

```
1              MR. PLATT:  SO, YOUR HONOR, I CAN ADDRESS THAT

2      BRIEFLY.

3              THE COURT:  TELL ME WHY.

4              MR. PLATT:  SO IF ALL WE'RE GOING TO HAVE THERE IS A

5      WITNESS WHO IS JUST SITTING THERE STONE FACED WITH ENGLISH

6      GOING IN THE BACKGROUND, YOU'RE NOT ABLE TO EVALUATE THE

7      WITNESS'S CREDIBILITY OR HOW THEY'RE ANSWERING THE QUESTION.

8          OUR VIEW IS THAT IN ORDER TO DO THAT, YOU NEED TO SEE THE,

9      THE KOREAN LANGUAGE PORTION OF THE ANSWER.

10         ON THE OTHER HAND, YOU KNOW, I HAD SUGGESTED TO THEM AT

11     ONE POINT IN TIME, TO CORNING THAT THEY COULD ALSO READ IN THE

12     TESTIMONY.  WE DON'T HAVE AN OBJECTION IF THEY WANT TO READ IN

13     THE QUESTION AND ANSWER.

14             THE COURT:  YOU'RE NOT GOING TO MAKE THEM READ

15     KOREAN?

16             MR. PLATT:  NO.  I ONLY KNOW A COUPLE WORDS IN

17     KOREAN.

18             THE COURT:  ALL RIGHT.

19             MR. PLATT:  BUT THAT WOULD BE OUR SUGGESTION.

20         BUT OTHERWISE IF THEY'RE GOING TO PLAY THE VIDEO OF THE

21     WITNESSES, WE THINK THAT THEIR ANSWERS NEED TO BE INCLUDED.

22             THE COURT:  ALL RIGHT.  LET ME -- THANK YOU FOR YOUR

23     COMMENTS, MR. PLATT.

24         LET ME SPARE MR. HUNT.  I APPRECIATE THE SENTIMENTS.  MY

25     OWN EXPERIENCE IS THAT IT'S PAINFUL ENOUGH, WE DON'T NEED TO
```

1    MAKE IT MORE PAINFUL, SO I'M GOING TO SIDE WITH THE PLAINTIFFS

2    ON THIS ONE AND SAY THAT NATIVE LANGUAGE RESPONSES FOR WHICH AN

3    ENGLISH TRANSLATION WAS PROVIDED NEED NOT BE PROVIDED ALONG

4    WITH THE ENGLISH TRANSLATION.  IN OTHER WORDS, IF WE'RE TALKING

5    ABOUT KOREAN HERE, THE KOREAN NEED NOT BE PLAYED.

6           OKAY.  I THINK THAT --

7                MR. PLATT:  SORRY.  JUST ONE POINT OF CLARIFICATION

8    ON THAT.

9                THE COURT:  SURE.

10               MR. PLATT:  WOULD THE JURY BE -- WOULD THE COURT

11   EXPLAIN THAT TO THE JURY?

12               THE COURT:  I'M MORE THAN HAPPY TO ENTERTAIN A

13   REQUEST FOR AN INSTRUCTION, YES.  SO IF YOU WISH TO PROPOSE

14   SOMETHING, I'LL TAKE THAT UP.

15               MR. PLATT:  GREAT.  THANK YOU, YOUR HONOR.

16               THE COURT:  ALL RIGHT.  I THINK THAT GETS US THROUGH

17   SECTION 12, AND WITH THAT, I'D LIKE TO TURN TO THE -- WELL,

18   BEFORE WE GET TO THE MIL'S, ONE OTHER PRELIMINARY OR

19   HOUSEKEEPING MATTER IS THE TRIAL SUBPOENA ISSUE.

20          MR. HUNT, DO YOU WANT TO ADD ANYTHING TO YOUR PAPERS ON

21   THAT?

22               MR. HUNT:  I -- IN A MOMENT.

23          CAN I ASK ANOTHER FOREIGN LANGUAGE ISSUE?

24               THE COURT:  YES, SURE.

25               MR. HUNT:  SO THERE ARE AT LEAST A COUPLE OF

```
1     WITNESSES THAT RESIDE IN THE UNITED STATES WITHIN THE SUBPOENA
2     POWER THAT WE HAVE SUBPOENAED WHOSE DEPOSITION WAS TAKEN IN
3     KOREA --
4              THE COURT:  OKAY.
5              MR. HUNT:  -- WITH AN INTERPRETER.
6              THE COURT:  YEAH.
7              MR. HUNT:  WE HAVE ARRANGED FOR THEIR TRIAL TESTIMONY
8     TO BE IN KOREAN AND TO HAVE AN INTERPRETER, AND THERE'S BEEN
9     SOME DISCUSSION -- I DON'T THINK THIS HAS BEEN RAISED BY THE
10    COURT -- IS THAT WE THINK IT WOULD BE IMPROPER FOR SOMEBODY WHO
11    DEMANDED TO BE -- TO HAVE THEIR TESTIMONY TAKEN IN KOREAN
12    DURING DEPOSITION NOT TO HAVE IT BE IN KOREAN AT TRIAL, OR --
13             THE COURT:  SO THE SCENARIO YOU'RE SAYING IS ONE OR
14    MORE WITNESSES THAT YOU NOTICED UP FOR DEPOSITION OR SUBPOENAED
15    APPEARED, BUT ASKED OR REQUESTED OR REQUIRED THAT THEY BE
16    ALLOWED TO TESTIFY IN KOREAN?
17             MR. HUNT:  CORRECT.
18             THE COURT:  THEY'RE NOW LIKELY TO COME TO TRIAL, AND
19    WHAT YOU'RE WORRIED ABOUT IS THEY'RE SUDDENLY GOING TO SPEAK
20    BEAUTIFUL ENGLISH, OR SUFFICIENT ENGLISH --
21             MR. HUNT:  CORRECT.
22             THE COURT:  -- IN A WAY THAT DRAWS --
23             MR. HUNT:  AND CERTAINLY FOR OUR DIRECT EXAMINATION,
24    AND THE CROSS OF THE WITNESSES WE CALL, WE HAVE AN INTERPRETER
25    WHO IS LICENSED AND DID THE DEPOSITIONS AS WELL.
```

1          AND I KNOW THAT THE DEFENDANTS HAVE SAID THEY'VE SECURED

2     AN INTERPRETER, I ASSUME FOR THE WITNESSES THAT THEY'RE GOING

3     TO CALL.

4          BUT I JUST WANT TO MAKE SURE THAT SOMEBODY DOESN'T SHOW UP

5     AND SAY, "I'M GOING TO SPEAK ENGLISH NOW WHEN, IN FACT, IN THE

6     PAST I REQUIRED THAT MY TESTIMONY BE TAKEN IN KOREAN."

7               THE COURT:  OKAY.  MR. PLATT, DO YOU WANT TO RESPOND

8     ON THAT?

9               MR. PLATT:  YEAH.  I MEAN, I CAN CUT THIS OFF FAIRLY

10    QUICKLY.  OUR WITNESSES THAT DO SPEAK KOREAN -- LET ME BE

11    CLEAR -- THEY SPEAK ALMOST ENTIRELY KOREAN AND WILL BE

12    TESTIFYING IN KOREAN.

13         AT LEAST ONE OF OUR WITNESSES, DR. LEE, WHO HAD HIS

14    DEPOSITION HERE, HE WILL BE TESTIFYING IN ENGLISH, WHICH IS HOW

15    HE TESTIFIED AT HIS DEPOSITION.

16              THE COURT:  ALL RIGHT.  IT SOUNDS LIKE YOU'RE TELLING

17    ME THERE AREN'T ANY PEOPLE THAT FALL IN THE CATEGORY THAT

18    MR. HUNT HAS DESCRIBED.

19              MR. PLATT:  RIGHT.  THAT'S CORRECT.

20              THE COURT:  I THINK THAT TAKES CARE OF IT.

21              MR. PLATT:  I HAD ONE HOUSEKEEPING MATTER WITH

22    RESPECT TO DR. LEE, YOUR HONOR.

23              THE COURT:  PLEASE.

24              MR. PLATT:  HE IS GOING TO COME HERE FOR TRIAL.  IT'S

25    IMPORTANT FOR HIM TO BE HERE.  HE HAD SCHEDULED HIS TRIP TO BE

1    HERE FROM OCTOBER 5TH THROUGH THE 9TH AND HE HAS BEEN TO BE

2    BACK IN KOREA THAT NEXT WEEK BECAUSE THEY'RE UNDERGOING -- IT'S

3    BEEN PUBLICLY ANNOUNCED THAT THEY'RE INVOLVED IN ACQUIRING A

4    HANDSET WIRELESS COMPANY THAT HE HAS TO BE BACK FOR.

5         SO WE WOULD JUST ASK THAT WE BE ABLE TO MAKE SURE THAT, IF

6    WE NEED TO CALL HIM OUT OF ORDER SO THAT HE CAN TESTIFY ON

7    OCTOBER 9TH OR SOME TIME BEFORE THAT --

8         THE COURT:  OKAY.  WELL, OBVIOUSLY I THINK IT'S BEST

9    IF YOU ALL CAN SEE IF YOU CAN WORK THAT OUT.

10        I SHOULD SAY THAT I WANT TO -- IT'S VERY IMPORTANT TO ME

11   THAT YOU BE AS FLEXIBLE AND AS GENEROUS WITH EACH OTHER AS YOU

12   CAN ON THESE KINDS OF ISSUES, BECAUSE WHAT GOES AROUND COMES

13   AROUND.  SO SEE IF YOU CAN WORK IT OUT, AND IF YOU CAN'T, I'LL

14   RULE.  BUT I'LL TELL YOU RIGHT NOW, I'M VERY INCLINED TO ALLOW

15   THAT TYPE OF OUT OF ORDER CALL, BECAUSE I THINK IT'S ONLY FAIR

16   TO BOTH SIDES.

17        ALL RIGHT.  CAN WE TALK ABOUT THE TRIAL SUBPOENAS?

18        MR. HUNT:  YES, YOUR HONOR.

19        THE COURT:  OKAY.

20        MR. HUNT:  SO WE'VE ISSUED SEVERAL TRIAL SUBPOENAS

21   AND THERE WAS AN OBJECTION, AND I THINK THE ONLY OBJECTION THAT

22   WAS RAISED -- WELL, TO BE HONEST WITH YOU, I'M NOT SURE WHAT

23   THE OBJECTION WAS THAT WAS RAISED, OTHER THAN IF SOMEONE SHOWS

24   UP LIVE, THEN THEY HAVE TO ANSWER QUESTIONS.  I'M NOT REALLY

25   SURE.

```
 1          MY UNDERSTANDING IS THERE'S BEEN NO PROCEDURAL OBJECTION

 2     TO THE WITNESSES THAT WE'VE ISSUED SUBPOENAS FOR --

 3               THE COURT:  ALL RIGHT.  PERHAPS --

 4               MR. HUNT:  -- FROM THEIR SIDE.

 5          AND ON OUR SIDE WHERE WE MOVED TO QUASH, I THINK THE ONLY

 6     RESPONSE WAS, WELL, IF SOMEONE SHOWS UP, THEY'RE SHOWING UP.

 7               THE COURT:  ALL RIGHT.  SO, AGAIN, TO BE CLEAR, YOU

 8     ARE -- THE ONLY MOTION I HAVE BEFORE ME IS A MOTION TO QUASH

 9     THAT YOU FILED WITH RESPECT TO A NUMBER OF TRIAL SUBPOENAS THAT

10     THEY SERVED.

11               MR. HUNT:  CORRECT.

12               THE COURT:  AND YOU'RE TELLING ME IN YOUR PAPERS, I

13     THINK, AND NOW HERE TODAY, THAT THOSE WITNESSES DO NOT LIVE

14     HERE IN CALIFORNIA --

15               MR. HUNT:  CORRECT.

16               THE COURT:  -- DO NOT LIVE HERE IN CALIFORNIA OR

17     WITHIN 100 MILES OF THE COURTHOUSE.

18               MR. HUNT:  THAT'S CORRECT.

19               THE COURT:  THEY DON'T WORK HERE, ALL THAT STUFF.

20               MR. HUNT:  SOME OF THEM OBVIOUSLY WE LIKELY WILL CALL

21     AS LIVE WITNESSES AT TRIAL AND OF COURSE THEY'LL BE ABLE TO

22     CROSS-EXAMINE THEM.

23          BUT WE DON'T THINK THAT THAT MEANS THAT THEY ARE NOW

24     SUBJECT TO THE SUBPOENA POWER TO BE CALLED AGAIN IN THE

25     DEFENDANTS' CASE OR OTHERWISE SUBJECT TO THE COURT'S SUBPOENA
```

```
1    POWER.
2              THE COURT:  OKAY.  ALL RIGHT.  I THINK I HAVE IT.
3         MR. PLATT, GO AHEAD.
4              MR. PLATT:  SO WITH RESPECT TO THE MOTION TO QUASH,
5    YOU KNOW, OUR VIEW IS THAT THE MOTION IS GOING TO BE MOOT IF
6    THEY WOULD TELL US WHO'S GOING TO BE HERE LIVE.
7         WE'VE PROPOSED TO THEM SORT OF A SCHEDULE FOR DOING THAT,
8    AT LEAST TELLING US WHO EACH SIDE EXPECTS TO CALL LIVE HERE.
9    YOU KNOW, WE'RE GETTING VERY CLOSE TO TRIAL AND IT WOULD BE
10   VERY HELPFUL FOR I THINK BOTH SIDES TO KNOW WHO'S GOING TO COME
11   LIVE AND WHO'S NOT.
12        SO WE'VE ASKED THEM IF THEY COULD IDENTIFY WHO THOSE FOLKS
13   ARE AND THEN I THINK THAT WOULD --
14             THE COURT:  SO IS THE CONCERN YOU HAVE RIGHT NOW, THE
15   PRINCIPAL CONCERN YOU HAVE RIGHT NOW, MR. PLATT, THAT IN THE
16   DISCLOSURE THAT HAS BEEN MADE UP UNTIL THIS POINT, YOU'RE
17   SIMPLY BEING TOLD THEY MAY BE CALLED AS OPPOSED TO THEY WILL BE
18   CALLED?
19             MR. PLATT:  RIGHT.  I BELIEVE THAT BOTH OF US HAVE
20   IDENTIFIED WHO'S EXPECTED TO BE CALLED.
21             THE COURT:  YEAH.
22             MR. PLATT:  BUT BOTH SIDES HAVE WITNESSES LOCATED
23   OUTSIDE OF THIS DISTRICT.  WHETHER THEY'RE GOING TO TRY AND PUT
24   PEOPLE ON BY DEPOSITION OR BRING THEM LIVE, THAT'S THE PART
25   WE'D LIKE TO KNOW.
```

```
1              THE COURT:  OKAY.  MR. HUNT, DO YOU WANT TO RESPOND
2    TO THAT?
3              MR. HUNT:  YEAH.  I THINK THERE'S AN AGREEMENT IN THE
4    PRETRIAL THAT WE'LL IDENTIFY WITNESSES 24, 48 HOURS BEFORE
5    TRIAL DAY, AND I KNOW WE'RE GETTING CLOSE, BUT WE HAVEN'T MADE
6    THE DECISION YET WHO'S GOING TO BE LIVE.
7              THE COURT:  OKAY.
8              MR. HUNT:  I THINK I WAS ASKED YESTERDAY TO REACH AN
9    AGREEMENT WHERE WE'D TELL THEM YESTERDAY, AND I WAS ON AN
10   AIRPLANE.
11        SO I DON'T HAVE A PROBLEM, YOU KNOW, MAYBE THAT FRIDAY,
12   THE 2ND, OR MONDAY, THE HOLIDAY, SAYING "HERE'S WHO WE'RE
13   LIKELY GOING TO CALL AT TRIAL," BUT WE HAVE ALREADY GIVEN THEM
14   AN EXPECT-TO-CALL VERSUS A NOT-LIKELY-TO-CALL.
15             THE COURT:  SO THE ONLY QUESTION I HAVE ABOUT THAT --
16   IT'S AN INTERESTING ISSUE, BECAUSE IT DOES COME UP FROM TIME TO
17   TIME.  WHETHER I IMPOSE A 72 OR 48 HOUR REQUIREMENT, THERE'S
18   ALREADY A 48 HOUR REQUIREMENT UNDER THE AGREEMENT YOU'VE HASHED
19   OUT.
20        AT SOME POINT YOU WILL PERHAPS INFORM THE OTHER SIDE THAT
21   THERE'S A WITNESS THAT WAS ON YOUR LIST THAT YOU'RE NOT GOING
22   TO CALL, AND THAT BEGS THE QUESTION, WHAT DO THEY GET TO DO?
23   DO THEY GET TO THEN SERVE A SUBPOENA AND BRING THEM IN?
24        WHAT I'M TRYING TO AVOID IS A FIRE DRILL DURING TRIAL OR
25   IN THE IMMEDIATE DAYS BEFORE TRIAL.
```

```
 1            SO I THINK, UNDER THE RULES, THERE ARE CERTAIN WITNESSES

 2      THAT ARE OUTSIDE THE SUBPOENA POWER OF THIS COURT THAT YOU

 3      MAY -- THAT MAY VOLUNTARILY SHOW UP IF THEY WISH, BUT THAT MAY

 4      NOT BE COMPELLED TO SHOW UP, RIGHT?  AND THESE ARE THE PEOPLE

 5      THAT YOU'RE TALKING ABOUT?

 6            MR. HUNT:  CORRECT.  AND I THINK TO ADDRESS THE

 7      COURT'S CONCERN THERE, I DON'T THINK THERE'S A SINGLE WITNESS

 8      FOR THE PLAINTIFF THAT HAS BEEN IDENTIFIED OR DEPOSED OR

 9      IDENTIFIED AS A POTENTIAL WITNESS WHO LIVES WITHIN THE SUBPOENA

10      POWER.  SO ANYONE THAT WE DON'T BRING LIVE I THINK CANNOT BE

11      COMPELLED.

12          AND IF WE ISSUED A SUBPOENA FOR MR. KSHATRIYA --

13            MR. LARSEN:  THAT'S CORRECT, YES.

14            MR. HUNT:  AND ASSUMING THERE'S NO OBJECTION -- THIS

15      IS THE GENTLEMAN I JUST TOOK THE DEPOSITION OF LAST WEEK -- I

16      THINK WE'VE ISSUED SUBPOENAS FOR EVERYBODY THAT WE WILL WANT

17      AND THERE'S BEEN NO OBJECTION TO THOSE.

18            THE COURT:  OKAY.  MR. PLATT, ANY FURTHER WORD ON

19      THIS ONE?

20            MR. PLATT:  NO.  WE'D JUST ASK THAT THEY PROVIDE US

21      WITH WHO THEY EXPECT TO CALL LIVE.

22            THE COURT:  OKAY.

23            MR. PLATT:  WE UNDERSTAND THAT MAY CHANGE AS WE GET

24      CLOSER TO TRIAL, BUT WE'D LIKE TO KNOW NOW.

25            THE COURT:  ALL RIGHT.  LET ME SUGGEST THIS:  FIRST
```

1    OF ALL, AS TO THE MOTION, I THINK ON THE SPECIFIC LEGAL

2    QUESTION PRESENTED IN THE MOTION, MR. HUNT IS CORRECT THAT I

3    LACK THE AUTHORITY TO COMPEL PEOPLE TO APPEAR THAT ARE OUTSIDE

4    THE SUBPOENA POWER OF THIS DISTRICT.  SO ON THAT BASIS, I WILL

5    GRANT THE MOTION TO QUASH.

6         HAVING SAID THAT, I SEE NO REASON NOT TO ASK THE PARTIES

7    TO MAKE A GOOD FAITH DISCLOSURE OF WHO THEY WILL CALL AT TRIAL

8    NO LATER THAN THAT THURSDAY, THE 1ST, SINCE WE'RE NOT GOING TO

9    START TRIAL UNTIL WEDNESDAY, THE 7TH, OR TRIAL PROPER UNTIL

10   WEDNESDAY, THE 7TH.

11        I RECOGNIZE YOU MAY MAKE SOME LAST MINUTE TWEAKS TO THAT

12   IN THE INTERVENING PERIOD, BUT AT LEAST THAT GIVES YOU SOME

13   SENSE OF WHAT'S GOING TO HAPPEN.  SO BY 5:00 O'CLOCK ON

14   THURSDAY, THE 1ST, I'D LIKE EACH SIDE TO IDENTITY WHO IT

15   EXPECTS TO CALL AT THAT POINT AND HOPEFULLY THAT'LL GIVE YOU A

16   LITTLE MORE INSIGHT.

17        OKAY.  UNLESS THERE'S ANYTHING ON THAT ISSUE OR OTHER

18   ISSUES THAT ARE SEPARATE AND APART FROM THE MOTIONS IN LIMINE,

19   I'D LIKE TO GET TO THE MOTIONS IN LIMINE.

20        WHY DON'T WE START WITH MOTION IN LIMINE NUMBER 2 FROM

21   CORNING?  I BELIEVE MOTION IN LIMINE NUMBER 1 WE ALREADY TALKED

22   ABOUT WAS WITHDRAWN, SO NUMBER 2 IS NEXT ON THE LIST.

23        I'LL TAKE THESE UP ONE AT A TIME FROM EACH SIDE SO THAT NO

24   ONE IS PREJUDICED.

25        GO AHEAD, MR. HUNT.  THIS HAS TO DO WITH DR. ACAMPORA?

```
1              MR. HUNT:  YES.  WE'VE SPOKEN A LOT ABOUT

2     DR. ACAMPORA, AND IN THIS INSTANCE, YOUR HONOR, THE DEFENDANTS

3     MADE A VERY DELIBERATE CHOICE WITH RESPECT TO DR. ACAMPORA'S,

4     QUOTE-UNQUOTE, NON-INFRINGEMENT REPORT.

5              IN FACT, HE DIDN'T DO ANY ANALYSIS OF THE ALLIANCE DAS AT

6     ALL.  THAT'S THEIR CHOICE, I SUPPOSE.

7              HE DOESN'T SAY, "I'VE LOOKED AT THE ENTIRE PRODUCT AND IT

8     DOES NOT HAVE THIS FEATURE OR IT DOES NOT HAVE THIS FEATURE,"

9     AND THEN GIVE A REASONED, SUPPORTED VIEWPOINT.

10             INSTEAD, DR. ACAMPORA'S NON-INFRINGEMENT REPORT REALLY IS

11    AN ATTACK ON THE PLAINTIFF'S INFRINGEMENT EXPERT, MR. MCKAY.

12             AND I WOULD ACKNOWLEDGE THAT IN CERTAIN INSTANCES, EVEN

13    THAT IS PERMISSIBLE.  MR. MCKAY DID A TEST, SAID, "I DID THIS,

14    THIS, THIS, AND THIS, AND REACHED THIS RESULT."

15             I THINK IT WOULD BE ENTIRELY PROPER FOR AN EXPERT, SUCH AS

16    DR. ACAMPORA, TO SAY, "THIS IS A FLAW IN THAT TEST."  OR "IF

17    YOU DO THE TEST THE WAY MR. MCKAY DID, I BELIEVE YOU WOULD GET

18    THIS RESULT."  I THINK THAT'S ENTIRELY APPROPRIATE.

19             THAT'S NOT WHAT DR. ACAMPORA DID, EITHER.

20             WHAT DR. ACAMPORA DOES IS HE SAYS, "I LOOKED AT THE

21    EVIDENCE THAT MR. MCKAY LOOKED AT AND MR. MCKAY IMPROPERLY

22    REACHED HIS CONCLUSION."

23             THAT'S WEIGHING THE EVIDENCE.  THAT'S NOT SOMETHING FOR A

24    TECHNICAL EXPERT TO TESTIFY ABOUT, NOR IS IT WITHIN HIS FIELD

25    OF EXPERTISE.
```

1      SO WE'VE QUOTED SOME OF THOSE WHERE HE SAYS, FOR EXAMPLE,

2  "MR. MCKAY'S ANALYSIS IS NOT SUFFICIENT PROOF."

3      WELL, THAT'S WHAT THE JURY IS SUPPOSED TO DECIDE IS

4  WHETHER OR NOT IT'S SUFFICIENT PROOF THAT A CERTAIN CLAIM

5  ELEMENT IS OR IS NOT FOUND IN THE PRODUCT.

6      SIMILARLY, DR. ACAMPORA SAYS THINGS LIKE -- ON PAGE 4

7  WE'VE QUOTED WHERE HE SAYS, "WELL, THIS IS A PROBLEM --

8  MR. MCKAY'S ANALYSIS IS A PROBLEM BECAUSE HE MAKES AN

9  ASSUMPTION, BUT THERE'S NO BASIS FOR THE ASSUMPTION," AND THEN

10  HE STOPS.  HE DOESN'T SAY THAT THE PRODUCT FEATURE DOESN'T

11  EXIST.  HE DOESN'T SAY THE ALLIANCE DAS DOESN'T HAVE A

12  SPLITTER.

13      HE IS SIMPLY SAYING, "THIS IS WHAT MR. MCKAY DID AND THAT

14  ANALYSIS IS INSUFFICIENT TO FIND INFRINGEMENT OF THAT ELEMENT,"

15  AND WE BELIEVE, YOUR HONOR, THAT THAT IS WELL BEYOND THE

16  PURVIEW OF WHAT A TECHNICAL EXPERT CAN OPINE ABOUT.

17      SECONDLY, IN SOME INSTANCES HE MULTIPLIES THE PROBLEM BY

18  PROVIDING CLAIM CONSTRUCTIONS, AND PERHAPS MOST NOTABLY, YOUR

19  HONOR, AN ISSUE WE HAVE ADDRESSED, AND WILL CONTINUE TO ADDRESS

20  IN THIS CASE, IS FIRST AND SECOND FIBERS.

21      AND THE COURT WILL REMEMBER FROM THE SUMMARY JUDGMENT

22  MOTION -- WE HAVE THE FIGURE WHICH I CAN SHOW YOU IF YOU'D

23  LIKE.

24          THE COURT:  I REMEMBER IT WELL.

25          MR. HUNT:  IT IS UNDISPUTED THAT THERE ARE FIVE AT

1    LEAST FIBER ELEMENTS IN THE ALLIANCE DAS.

2         AND DR. ACAMPORA'S REPORT SAYS, "WELL, THEY DON'T MEET THE

3    CLAIM ELEMENT BECAUSE THEY DON'T OPERATE ONE WAY AND THEY DON'T

4    HAVE THESE OTHER THINGS THAT ARE NOT IN THE CLAIM LANGUAGE AT

5    ALL."

6         AND THE COURT WILL ALSO UNDOUBTEDLY RECALL THAT THE

7    DEFENDANTS HAVE BEEN PROVIDED MULTIPLE OPPORTUNITIES TO SEEK

8    CLAIM CONSTRUCTION ON THIS ISSUE AND HAVE REPEATEDLY REFUSED,

9    AND THEY CERTAINLY -- IT WOULD NOT BE PROPER TO ALLOW THEM TO

10   TRY TO MAKE THIS CLAIM CONSTRUCTION ARGUMENT AT TRIAL THROUGH

11   DR. ACAMPORA.

12        LAST IS, AT LEAST IN HIS REPORT, THERE ARE A COUPLE OF

13   TIMES WHERE THERE ARE HEADINGS WHERE HE WILL SAY, "THIS IS A

14   DISCUSSION OF THIS MISSING ELEMENT," HE'LL SAY, "THE MISSING

15   SPLITTER ELEMENT."

16        BUT, AGAIN, HIS ANALYSIS THAT FOLLOWS DOESN'T SAY, "I'VE

17   LOOKED AT THE ALLIANCE PRODUCT," OR "I LOOKED AT DOCUMENTS OF

18   THE ALLIANCE PRODUCT.  I LOOKED AT ALL OF THE COMPONENTS AND I

19   CAN SAY THERE'S NO SPLITTER."

20        IT'S MERELY A HEADING OR A CONCLUSION THAT THEN HAS NO

21   BASIS IN HIS ANALYSIS.

22             THE COURT:  SO I TAKE IT THE HEADING NOTWITHSTANDING,

23   WHAT HE DOES BELOW THE HEADING IS ESSENTIALLY TURN BACK TO

24   MR. MCKAY?

25             MR. HUNT:  CORRECT.

```
1              THE COURT:  OKAY.  I THINK I HAVE IT, MR. HUNT.

2              MR. HUNT:  THANK YOU.

3              THE COURT:  MR. PLATT, ANY REBUTTAL?

4              MR. PLATT:  SURE.  WITH RESPECT TO DR. ACAMPORA, THEY

5       DON'T ATTACK HIS QUALIFICATIONS OR HIS METHODOLOGY.

6          INSTEAD WHAT THEY SAY IS THAT HE'S SOMEHOW WEIGHING THE

7       EVIDENCE IMPROPERLY, WHICH IS NOT THE CASE.

8          HE DOES GO THROUGH AND EXPLAIN THAT IN ADDITION TO LOOKING

9       AT THE MCKAY REPORT, HE LOOKED AT THE SAME EVIDENCE THAT MCKAY

10      LOOKED AT, WHICH INCLUDES ALLIANCE MANUALS, IT INCLUDES

11      SCHEMATICS, DIAGRAMS, INCLUDING THEIR INFRINGEMENT CONTENTIONS,

12      HE LOOKED AT THE '837 PATENT AND THE PROSECUTION HISTORY, AS

13      WELL AS THE COURT'S CLAIM CONSTRUCTION ORDER AND DEPOSITION

14      TRANSCRIPTS AS WELL.

15         SO IN TERMS OF LOOKING AT DOCUMENTS AND TESTIMONY, HE

16      LOOKED AT THAT.

17         HE ALSO INSPECTED THE ALLIANCE EQUIPMENT.

18         AND WITH RESPECT TO HIS OPINIONS, HE DOES GO THROUGH AND

19      TALK ABOUT EACH OF THE ELEMENTS AND SAYS -- OF COURSE HE

20      CRITICIZES MCKAY.  IT'S A REBUTTAL REPORT.

21         BUT HE ALSO GOES THROUGH AND EXPLAINS WHY IT DOESN'T --

22      WHY EACH OF THOSE ELEMENTS ARE NOT THERE AND ARE NOT INFRINGED.

23         SO, FOR EXAMPLE, AT THE END OF -- I'M ABOUT, I'LL SAY,

24      20-SOME ODD PARAGRAPHS LOOKING AT THE ONE FIBER VERSUS TWO

25      FIBER ISSUE, AND THEN GOING THROUGH THE DOCTRINE OF
```

1    EQUIVALENTS.  HE GOES THROUGH AND SAYS, AFTER DOING A FUNCTION,

2    WAY, RESULT TEST ANALYSIS, HE SAYS, "IT IS MY OPINION THAT NONE

3    OF THE FUNCTION, WAY, RESULT ARE SUBSTANTIALLY THE SAME AND

4    THERE'S NO INFRINGEMENT UNDER DOCTRINE OF EQUIVALENTS."

5        SO HE DOES GO THROUGH AND DOES THAT, DOES THE APPROPRIATE

6    ANALYSIS AND IDENTIFIES THE ELEMENTS THAT ARE MISSING FROM THE

7    ACCUSED ALLIANCE PRODUCTS.

8        AND WE THINK HIS -- YOU KNOW, WE THINK THAT ANY ATTACKS ON

9    SORT OF, YOU KNOW, THAT HE MAY DISAGREE WITH MCKAY, I THINK

10   THAT GOES TO THE WEIGHT.  IT DOESN'T GO TO THE ADMISSIBILITY.

11            THE COURT:  DO YOU WANT TO SPEAK TO THE ISSUE OF

12   WHETHER DR. ACAMPORA CONSTRUES CLAIM TERMS, MR. PLATT?

13            MR. PLATT:  SURE.  AND HE DOES GO THROUGH -- AND I

14   THINK WE POINTED THIS OUT IN OUR BRIEFING, THAT HE DOES USE THE

15   COURT'S CLAIM CONSTRUCTION ORDER.

16       THERE ARE SOME TERMS THAT HAVE NOT BEEN CONSTRUED BY THE

17   COURT, AND HE TESTIFIED -- OR HE IS GOING TO PROVIDE TESTIMONY

18   AS THOSE TERMS ARE UNDERSTOOD BY ONE OF ORDINARY SKILL IN THE

19   ART, AND WE THINK THAT'S ENTIRELY APPROPRIATE.

20            THE COURT:  THAT RAISES AN INTERESTING QUESTION I

21   CAN'T SAY I'VE FIGURED OUT ENTIRELY IN MY OWN MIND IN OTHER

22   CASES, WHICH IS WHEN YOU HAVE A CLAIM TERM THAT'S NOT CONSTRUED

23   BY THE COURT, THAT NEITHER SIDE ASKED TO BE CONSTRUED BY THE

24   COURT, AND THE EXPERT GETS UP ON THE WITNESS STAND AND EXPLAINS

25   WHY THAT CLAIM LIMITATION EITHER IS OR ISN'T IN THE ACCUSED

```
1     PRODUCT, ALMOST INVARIABLY THE EXPERT STARTS TO GET INTO WHAT

2     THE CLAIM TERM MEANS TO ONE OF ORDINARY SKILL IN THE ART AND

3     WHY WHAT'S IN THE PRODUCT EITHER DOES OR DOESN'T MEET THAT

4     UNDERSTANDING.

5         IS THAT CLAIM CONSTRUCTION IN YOUR VIEW OR IS THAT

6     INFRINGEMENT ANALYSIS?

7              MR. PLATT:  I THINK THAT'S AN INFRINGEMENT ANALYSIS.

8              THE COURT:  ALL RIGHT.  I THINK I HAVE IT, MR. PLATT.

9         MR. HUNT, GO AHEAD.

10             MR. HUNT:  I COULD NOT DISAGREE MORE, YOUR HONOR.

11             THE COURT:  TELL ME WHY.

12             MR. HUNT:  AND, IN FACT, AS WE'VE SAID IN OUR PAPERS,

13     WE BELIEVE THE COURT SHOULD ACTUALLY FIND THAT THERE IS

14     INFRINGEMENT.

15        THERE IS NO DISPUTE OF FACT.  THE DIAGRAM THAT YOU'RE

16     FAMILIAR WITH, THE FIVE FIBERS, THERE'S NO DISPUTE OF FACT,

17     YOUR HONOR.  THAT IS THE STRUCTURE.

18        SO HAVING DR. ACAMPORA SAY, "THIS IS WHAT THE CLAIM MEANS

19     AND HOW IT'S DIFFERENT THAN THAT STRUCTURE" IS ABSOLUTELY CLAIM

20     CONSTRUCTION, AND WE HAVE SAID SEVERAL TIMES THAT WE DISAGREE

21     WITH THE CONSTRUCTION THAT THEY PROVIDE, WHETHER IT WAS ON

22     SUMMARY JUDGMENT OR IN DR. ACAMPORA'S REPORT TO TRY TO READ IN

23     REQUIREMENTS.

24        THEY DON'T DENY, MR. PLATT SAID RIGHT HERE, HE'S GOING TO

25     SAY FIRST FIBER MEANS IT'S ONE WAY, AND IT CAN'T HAVE ANY --
```

1      YOU CAN'T DO THAT.

2           IN FACT, THE ONLY REASON WE COULDN'T MOVE FOR SUMMARY

3      JUDGMENT ON THIS POINT, YOUR HONOR, WAS BECAUSE THEY WERE

4      HIDING FROM US ALL OF THE SALES INFORMATION ABOUT THE ANTENNAS.

5           IF WE'D HAVE SAID, "JUDGE, THEY INFRINGE LITERALLY,

6      SUMMARY JUDGMENT," THEY WOULD HAVE SAID, "WELL, THERE'S NO

7      EVIDENCE OF SALES."

8           THAT'S BECAUSE IT CAME LATER.

9           IT WOULD BE IMPROPER FOR THE COURT TO EVEN PUT THIS ISSUE

10     TO THE JURY.  THERE IS NO DISPUTE OF FACT AND WE BELIEVE THE

11     COURT SHOULD FIND IN ADVANCE THAT THAT FIRST AND SECOND FIBER

12     IS LITERALLY SATISFIED.

13           THE COURT:  ALL RIGHT.  THANK YOU, MR. HUNT.

14           LET ME FOCUS ON THE MOTION IN LIMINE BEFORE ME.  I'VE

15     ALREADY DEALT, I THINK, WITH ENOUGH AT SUMMARY JUDGMENT AND I

16     SUSPECT 50(A) MOTIONS ARE INEVITABLE IN THIS CASE, AS WELL AS

17     50(B)'S.

18           I'M GOING TO DENY MOTION IN LIMINE NUMBER 2 AND ALLOW

19     DR. ACAMPORA TO TESTIFY.

20           I WANT TO BE VERY CLEAR, THOUGH, WHETHER IT'S WITH RESPECT

21     TO DR. ACAMPORA OR ANY OTHER EXPERT IN THIS CASE, IF I GET A

22     WHIFF THAT ANY EXPERT IS GETTING UP THERE AND TRYING TO EXPLAIN

23     TO THE JURY HOW THIS CLAIM TERM OUGHT TO BE INTERPRETED, I'M

24     GOING TO SHUT IT DOWN AND I'M GOING TO CONSIDER WHETHER I NEED

25     TO DO FURTHER CLAIM CONSTRUCTION IF I CONCLUDE THAT IT'S A

```
 1        LEGITIMATE ISSUE IN DISPUTE BETWEEN THE PARTIES.

 2             I DON'T WANT THE EXPERTS GETTING UP THERE AND INVITING THE

 3        JURY TO TURN TO THE SPECIFICATION AND TO DIG INTO THE

 4        PROSECUTION HISTORY TO UNDERSTAND WHAT A CLAIM TERM MEANS.

 5             IF YOU THINK THAT'S PERTINENT TO THE INFRINGEMENT

 6        QUESTION, THEN THAT'S A QUESTION YOU NEED TO -- YOU SHOULD HAVE

 7        RAISED, FRANKLY, BEFORE, BUT YOU CERTAINLY NEED TO BRING TO MY

 8        ATTENTION AND I'LL CONSTRUE IT AS BEST I CAN GIVEN THESE

 9        CIRCUMSTANCES.

10             ALL RIGHT.  LET'S TURN TO THE FIRST MOTION IN LIMINE FROM

11        THE DEFENDANTS, WHICH --

12             MS. LEE, GO AHEAD.  I'M JUST PULLING UP MY COPY OF YOUR

13        BRIEF.

14                 MS. LEE:  OF COURSE, YOUR HONOR.

15             ARE YOU REFERRING TO MOTION IN LIMINE NUMBER 1, OR THE

16        MOTION TO EXCLUDE CERTAIN EXPERT TESTIMONY FROM MR. MCKAY?

17                 THE COURT:  I'LL TELL YOU WHAT.  I'LL LET EACH OF YOU

18        BRING UP WHATEVER MOTION YOU WANT IN WHATEVER ORDER YOU'D LIKE.

19             SO WHERE WOULD YOU LIKE TO START WITH FIRST?

20                 MS. LEE:  SURE.  I THINK A NATURAL PLACE TO START

21        WOULD BE WITH THE MOTION TO EXCLUDE THE EXPERT TESTIMONY OF

22        MICHELE RILEY.

23                 THE COURT:  GO AHEAD.

24                 MS. LEE:  WE THINK IT'S WORTH TAKING A STEP BACK TO

25        ADDRESS WHAT THIS MOTION IS AND WHAT IT ISN'T.
```

1        THIS MOTION ISN'T JUST ABOUT ERRORS IN RILEY'S

2   CALCULATIONS.  THAT'S WHAT OUR EXPERT DOES.  HE POINTS OUT THE

3   ERRORS IN HER CALCULATIONS.

4            THE COURT:  AND CAN YOU REMIND ME, FOR PERHAPS THE

5    SIXTH OR SEVENTH TIME, THE NAME OF YOUR EXPERT?

6            MS. LEE:  OF COURSE.  BRETT REED, YOUR HONOR.

7            THE COURT:  GO AHEAD.  THANK YOU.

8            MS. LEE:  SO BRETT REED POINTS OUT THOSE SORT OF

9    CALCULATION TYPE ERRORS.

10       BUT THIS MOTION ISN'T ABOUT THAT.  THIS MOTION IS ABOUT

11   RILEY'S FUNDAMENTAL FAILURE TO USE A DAMAGES APPROACH THAT FITS

12   THE FACTS OF THIS CASE AS IS REQUIRED BY THE FEDERAL CIRCUIT.

13       NOW, OUR MOTION ADDRESSES IN DETAIL THE VARIOUS STEPS THAT

14   SHE TAKES TO GO THROUGH HER PROCESS AND THE PROBLEMS WITH EACH

15   OF THOSE STEPS.

16       BUT WE THINK IT'S WORTH FOCUSSING ON THREE STEPS OF HER

17   APPROACH WHICH ARE PARTICULARLY ILLUSTRATIVE OF THIS LACK OF

18   FIT OF THE APPROACH TO THE FACTS OF THIS CASE.

19       THE FIRST IS RILEY'S IMPORTATION OF THIS NORMAL INDUSTRY

20   PROFITABILITY FIGURE, THIS 4 PERCENT REDUCTION IN HER STARTING

21   RANGE.  THAT'S BASED ON THE TRANSFER PRICING STUDIES WHICH

22   ANALYZE THE, QUOTE-UNQUOTE, NORMAL INDUSTRY PROFITABILITY FOR

23   COMPUTER AND ELECTRONICS DISTRIBUTORS, NOT FOR THE DAS

24   INDUSTRY, NOT FOR THE '837 PATENT.

25       AND AT DEPOSITION, MS. RILEY TESTIFIED THAT THE USE OF

1      THAT, NORMAL INDUSTRY PROFITABILITY OR ITS USE IN THE TRANSFER

2      PRICING STUDY, WASN'T FOCUSSED ON THE DAS INDUSTRY, WASN'T

3      FOCUSSED ON THE '837 PATENT, IN FACT, WAS FOCUSSED ON THIS

4      CONCEPT OF HOW TO PRICE PRODUCTS FOR, FOR TRANSFER FROM ONE

5      FOREIGN COUNTRY TO ANOTHER OR INTERCOMPANY PRICING.

6            THE COURT:  SO WAS THIS 4 PERCENT ADJUSTMENT THAT

7      RILEY RELIED UPON AN ADJUSTMENT IN THE RANGE OF PROFIT MARGINS

8      THAT SHE TALKS ABOUT IN STEP 1?

9            MS. LEE:  IT'S, I BELIEVE, INTENDED TO DO THAT.

10           BUT THE 4 PERCENT PROFITABILITY FIGURE IS ACTUALLY -- HAS

11     NOTHING TO DO WITH INCREMENTAL PROFIT MARGINS FOR COMPANIES

12     INVOLVED IN THE DAS INDUSTRY OR WITH ANY RELATIONSHIP TO THE

13     '837 PATENT.

14           SO IT'S SOMETHING SHE DOES TO SUBTRACT FROM THIS INFLATED

15     RANGE THAT SHE ORIGINALLY COMES UP WITH BASED ON SOME FIGURES

16     FROM BOTH PARTIES' FINANCIALS THAT DON'T TAKE INTO ACCOUNT THE

17     PARTIES -- OR THE DEFENDANTS' -- OR THE PLAINTIFF'S ADMISSIONS

18     IN THIS CASE.

19           SHE USES IT TO SUBTRACT FROM THAT INFLATED RANGE.

20           THE COURT:  SO IS YOUR -- I APOLOGIZE FOR

21     INTERRUPTING YOU.

22           MS. LEE:  OF COURSE.

23           THE COURT:  BUT IS YOUR PROBLEM WITH THAT PART OF HER

24     ANALYSIS THEN THE NEXUS OR LINKAGE BETWEEN THE RATE SHE PICKED

25     AND THE PATENTS OR TECHNOLOGY AT ISSUE?  OR IS IT IN USING ANY

```
1       KIND OF ADJUSTMENT UNDER ANY CIRCUMSTANCES?

2               MS. LEE:  NO.  IT'S THE FORMER, YOUR HONOR.  THE

3       ISSUE IS FIT FOR THESE PARTICULAR CIRCUMSTANCES.

4           SO THE TRANSFER PRICING STUDY, WE ALL UNDERSTAND, IT WAS

5       PREPARED BY TWO DIFFERENT BIG FOUR ACCOUNTING FIRMS IN A

6       PARTICULAR CONTEXT.

7           THERE'S NO REASON TO BELIEVE THAT THAT PRICING STUDY OF

8       NORMAL INDUSTRY PROFITABILITY FOR A COMPUTER AND ELECTRONICS

9       DISTRIBUTOR HAS ANY PLACE HERE.

10          THIS IS VERY SIMILAR TO WHAT THE COURT DISAPPROVED OF IN

11      LASER DYNAMICS IN WHICH THE EXPERT FOUND A 6 PERCENT ROYALTY

12      RATE FROM AN EXECUTIVE LICENSING SURVEY AND BROUGHT IT TO BEAR

13      IN THAT CASE, EVEN THOUGH THAT MARKETING, OR THAT LICENSING

14      SURVEY HAD NOTHING TO DO WITH THE PATENT IN THAT CASE OR THE

15      TECHNOLOGY IN THAT CASE.

16          THERE'S A FUNDAMENTAL LACK OF FIT HERE.  THERE'S NO REASON

17      THAT THAT SORT OF PRICING ANALYSIS HAS ANY BEARING ON THE STUDY

18      THAT'S HAPPENING HERE.

19          THAT'S A BIG DISCONNECT IN TERMS OF FIT AND IT'S SOMETHING

20      THAT THE FEDERAL CIRCUIT HAS DISAPPROVED.

21          THAT'S ONLY ONE ERROR, FUNDAMENTAL LEGAL ERROR THAT SHE

22      MAKES IN HER ANALYSIS.

23              THE COURT:  SO IN THAT SENSE THEN, THE PROBLEM, AS

24      YOU SEE IT, WITH RILEY ISN'T REALLY THAT DIFFERENT FROM THE

25      PROBLEMS THE FEDERAL CIRCUIT HAS FOCUSSED ON NOW FOR PROBABLY
```

1    FIVE YEARS.  RECALL MR. GOLDSCHEIDER'S FAMOUS LES NOUVELLES

2    ARTICLE WHERE HE DOES THE INDUSTRY SURVEY AND ADAPTS A RULE OF

3    THUMB AND SO FORTH.

4         IS THAT THE BASIC ARGUMENT YOU'RE MAKING HERE?

5              MS. LEE:  THAT IS, YOUR HONOR, AND I THINK IT'S VERY

6    WELL ILLUSTRATED IN SORT OF THE NEXT STEP THAT SHE TAKES, WHICH

7    IS THIS CONCEPT OF RELATIVE MARKET SHARE AS A PROXY FOR

8    BARGAINING POWER, HER ADJUSTMENT IN THAT WAY.

9         I THINK THAT YOUR HONOR'S POINT IS UNDERSCORED BY THE FACT

10   THAT IN ITS OPPOSITION TO THIS MOTION, PLAINTIFF POINTS TO

11   ARTICLES AND STUDIES AS ENDORSING MS. RILEY'S PURPORTED

12   APPROACH, BUT WHEN YOU LOOK AT THOSE ARTICLES, THEY'RE ABOUT,

13   AGAIN, SURVEYS FOR LICENSING IN A VARIETY OF INDUSTRIES, NOT

14   THE DAS INDUSTRY, NOT WITH RESPECT TO THE '837 PATENT, AND

15   ARTICLES ABOUT BARGAINING POWER IN THE CONTEXT OF MERGERS.

16        THESE HAVE NOTHING TO DO WITH THE PARTICULAR FACTS OF THIS

17   CASE, AND SIMPLY TAKING AN APPROACH THAT LACKS THAT FIT AND

18   TRYING TO PLUG IN FACTS AFTER THE FACT TO MAKE IT LOOK MORE

19   LEGITIMATELY TIED TO THIS CASE IS SOMETHING THAT BOTH UNILOC

20   AND LASER DYNAMICS DISAPPROVED OF IN DISAPPROVING THE USE OF

21   THE NASH BARGAINING SOLUTION, IN DISAPPROVING THE USE OF THE

22   25 PERCENT RULE.

23        STARTING FROM AN IMPROPER PREMISE AND THEN TRYING TO

24   ADJUST TO MAKE THE FIGURES LOOK REASONABLE IS EXACTLY WHAT THE

25   FEDERAL CIRCUIT HAS DISAPPROVED.  THERE'S A FUNDAMENTAL LACK OF

1    FIT HERE.

2         AND IT DOESN'T MATTER WHERE IN HER ANALYSIS SHE MAKES

3    THESE ERRORS -- AND SHE MAKES THEM ALL OVER -- BUT EVEN ONE OF

4    THESE ERRORS IS ENOUGH TO INFECT THE ENTIRE ANALYSIS.

5         AND THE FINAL PLACE WHERE WE'D LIKE TO FOCUS TODAY ON

6    RILEY'S ROYALTY OPINIONS IS THE FINAL ADJUSTMENT THAT SHE MAKES

7    TO ARRIVE AT THE 19 PERCENT FIGURE.

8         SO SHE STARTS WITH THIS RANGE, SHE ADJUSTED DOWN --

9    ADJUSTED DOWNWARDS IN A COUPLE OF STEPS, EACH OF WHICH HAS ITS

10   PROBLEMS, AND THEN FINALLY COMES TO A 19 PERCENT ROYALTY RATE

11   BY SAYING THAT SHE TOOK INTO ACCOUNT THE FACT THAT COMMSCOPE

12   WAS GRANTED 0 -- A ROYALTY FREE LICENSE.

13        BUT SHE OFFERS NO ECONOMIC BASIS FOR HOW SHE GOT FROM HER

14   FINAL RANGE TO THE FINAL FIGURE.

15            THE COURT:  DOESN'T SHE EXPLICITLY LABEL IT AS

16   SUBJECTIVE?

17            MS. LEE:  THAT'S EXACTLY RIGHT, YOUR HONOR, AND I

18   THINK THAT THAT TELLS THE ENTIRE STORY.  IT WAS ENTIRELY

19   SUBJECTIVE.  IT'S EXACTLY THE KIND OF PLUCKING FROM THIN AIR OF

20   NUMBERS THAT LASER DYNAMICS AND OTHER FEDERAL CIRCUIT CASES

21   HAVE DISAPPROVED OF, AND IT'S THE KIND OF GUESSWORK THAT

22   CERTAINLY SHOULDN'T -- THAT WE DON'T TOLERATE FROM JURIES, AND

23   SHOULDN'T TOLERATE FROM EXPERTS.

24        AND AT DEPOSITION -- THIS ISN'T JUST ATTORNEY ARGUMENT

25   SAYING THAT, THAT RILEY HASN'T TIED HER ANALYSIS TO THE FACTS

1  OF THIS CASE.

2       AT DEPOSITION, OVER AND OVER, MS. RILEY TESTIFIED, "NO,

3  THIS APPROACH OR THIS STEP IN MY APPROACH DIDN'T TAKE INTO

4  ACCOUNT THE '837 PATENT.  IT DIDN'T TAKE INTO ACCOUNT THE DAS

5  INDUSTRY.  NO, THIS NORMAL INDUSTRY PROFITABILITY STUDY" --

6  THAT WAS MUCH BROADER THAN THE DAS INDUSTRY THAT WE'RE TALKING

7  ABOUT HERE.  IT HAS TO DO WITH A COMPLETELY DIFFERENT SET OF

8  TECHNOLOGY IN A COMPLETELY DIFFERENT CONTEXT.

9       NOW, WHAT THE PLAINTIFFS ARE TRYING TO DO HERE IS GIVE

10  MS. RILEY CREDIT FOR STARTING WITH AN INFLATED RANGE AND THEN

11  ADJUSTING IT USING INAPPROPRIATE AND INAPPOSITE METHODOLOGY TO

12  MAKE THE ORIGINAL NUMBER SEEM MUCH, MUCH MORE REASONABLE.  THEY

13  GO FROM, I THINK, AN UPPER RANGE OF 38 PERCENT OR SO DOWN TO 19

14  PERCENT.

15       BUT THAT'S ALSO EXACTLY WHAT UNILOC DISAPPROVED OF AND THE

16  FEDERAL CIRCUIT DISAPPROVES OF.  STARTING WITH AN INFLATED

17  RANGE AND THEN MAKING ADJUSTMENTS TO MAKE IT LOOK MORE

18  REASONABLE, THERE'S NOTHING THAT -- THAT IS THE EXACT SORT OF

19  THING THAT CAUSES A JURY TO ANCHOR ITS CONSIDERATION OF DAMAGES

20  IN SOMETHING THAT'S SPECULATIVE AND NOT TIED TO THE FACTS OF

21  THIS CASE.

22       AND SO AS A RESULT, RILEY'S ROYALTY OPINIONS SHOULD BE

23  OUT.

24       AND TURNING VERY BRIEFLY, YOUR HONOR, TO LOST PROFITS, WE

25  MAINTAIN -- THE DEFENDANTS MAINTAIN THAT RILEY SHOULD BE

1    PRECLUDED FROM PUTTING ON OPINIONS RELATING TO LOST PROFITS.

2         WE UNDERSTAND YOUR HONOR'S RULING ON THE MOTION FOR

3    SUMMARY JUDGMENT, BUT EVEN IF RILEY IS ABLE TO PUT ON A LOST

4    PROFITS OPINION, AT THE VERY LEAST, SHE SHOULD BE BARRED FROM

5    OFFERING ANY OPINION RELATING TO DEMAND FOR THE PATENTED

6    FEATURE.

7         I THINK IN THEIR OPPOSITION BRIEF, PLAINTIFFS POINT OUT

8    THAT THIS CONCEPT OF DEMAND FOR THE PATENTED FEATURE TYPICALLY

9    YOU SEE IN THE CONTEXT OF A ROYALTY AS OPPOSED TO A LOST

10   PROFITS ANALYSIS.

11        THE REASON WHY IT'S RAISED IN OUR BRIEFING IS BECAUSE IT'S

12   RAISED BY RILEY IN THE CONTEXT OF HER LOST PROFITS ANALYSIS.

13   SHE SAYS IN HER REPORT THAT -- AT PAGE -- AT PAGES 22 TO 23,

14   "IN ANALYZING THE DEMAND FOR THE PATENTED PRODUCTS IN THE

15   CONTEXT OF A LOST PROFITS OPINION, THE RECORD ALSO DEMONSTRATES

16   CORNING WIRELESS, SOLID, REACH, AND TRI-POWER HAVE ADVERTISED

17   THE BENEFITS OF THE PATENTS-IN-SUIT IN PRODUCT LITERATURE.

18   BASED ON THE FOLLOWING DATA, I CONCLUDE THAT THE PATENTED

19   INVENTIONS MOTIVATE CUSTOMERS TO BUY THE MA 1000, MA 2000, THE

20   ONE PLATFORM, AND THE ALLIANCE PLATFORM."

21        IN THAT OPINION, RILEY IS EXPRESSING SOME OPINION ABOUT

22   DEMAND FOR THE PATENTED FEATURE WHEN, IN HER DEPOSITION, SHE

23   ADMITS THAT ALL THAT SHE'S OFFERING IS HER PERSPECTIVE AS A LAY

24   PERSON.  SHE DIDN'T SPEAK TO ANY TECHNICAL EXPERTS.  SHE DIDN'T

25   DO ANY MARKET STUDIES.  SHE DOESN'T PURPORT TO BE AN EXPERT ON

1    MARKET STUDIES, CONSUMER DEMAND OR DEMAND FOR THE PATENTED

2    FEATURES.

3         WHATEVER CONTEXT THAT MS. RILEY ATTEMPTS TO PUT ON THESE

4    OPINIONS REGARDING DEMAND FOR THE PATENTED FEATURE, WHETHER

5    IT'S IN THE LOST PROFITS SECTION OF HER OPINION OR IN THE

6    REASONABLE ROYALTY SECTION OF HER OPINION, IT SHOULDN'T COME

7    IN.  SHE'S NOT AN EXPERT IN THAT FIELD AND SHE DOESN'T RELY ON

8    ANY EXPERT METHODOLOGY TO PROVIDE THOSE OPINIONS.

9              THE COURT:  ALL RIGHT.  THANK YOU, MS. LEE.

10             MS. LEE:  THANK YOU.

11             MR. STOVER:  GOOD MORNING, YOUR HONOR.

12        CHAD STOVER FROM BARNES & THORNBURG.

13             THE COURT:  MR. STOVER, WELCOME.

14             MR. STOVER:  YOUR HONOR, I'LL START WITH THE LOST

15   PROFITS, I THINK THAT'S EASIER, AND WHAT I THOUGHT I HEARD

16   THERE WAS A DIFFERENT ARGUMENT THAN THE ONE THAT THEY MADE IN

17   THEIR BRIEF, AND THE ONE THAT THEY MADE IN THEIR BRIEF, WHICH

18   IS THE ONE THAT WE RESPONDED TO AND WHICH I THINK IS THE ONE

19   THAT WE SHOULD BE DISCUSSING TODAY, IS WHETHER OR NOT MS. RILEY

20   SHOULD BE PRECLUDED FROM HAVING AN OPINION ON THE DEMAND FOR

21   THE PATENTED PRODUCT IN THE LOST PROFITS CONTEXT.

22        AND I THINK SHE SHOULD BE ABLE TO GIVE THAT OPINION.  SHE

23   SHOWED DEMAND FOR THE PATENTED PRODUCTS BY ANALYZING THE SALES

24   NUMBERS, THE PRODUCT LITERATURE, AND THIRD PARTY RESEARCH

25   REPORTS, AND SHE'S MORE THAN QUALIFIED TO GIVE THAT OPINION.

1    I THINK THAT THEY ARE -- DEFENDANTS ARE TRYING TO CONFUSE

2    THIS ISSUE OF PRODUCT VERSUS FEATURE, AND IN THE LOST PROFITS

3    CONTEXT, THAT FEATURE IS JUST NOT THE RIGHT INQUIRY.

4         THE COURT:  AND THAT'S WHAT'S DIFFERENT BETWEEN THE

5    LOST PROFIT ANALYSIS, AMONG OTHER THINGS, AND A REASONABLE

6    ROYALTY ANALYSIS; CORRECT?

7         MR. STOVER:  THAT'S RIGHT, YOUR HONOR.

8    AND THEN IN THE CONTEXT OF A REASONABLE ROYALTY, THEY MADE

9    SEVERAL ARGUMENTS, AND I GUESS, YOU KNOW, THERE WERE ADDITIONAL

10   ARGUMENTS IN THEIR BRIEF AND I'M ASSUMING, SINCE THEY DIDN'T

11   RAISE THEM TODAY, THAT THEY'RE ABANDONING THOSE ARGUMENTS.

12   BUT THE FIRST ONE THAT THEY -- THE FIRST ARGUMENT THEY

13   MADE RELATED TO THE DOWNWARD ADJUSTMENT OF 4 PERCENT THAT COMES

14   FROM THE TRANSFER PRICING STUDY.

15   IT'S INTERESTING TO ME THAT WE HAD QUITE A LONG

16   CONVERSATION THIS MORNING ABOUT THE TRANSFER PRICING STUDY IN

17   THE CONTEXT OF MARKING, AND IN THAT CONTEXT, THE TRANSFER

18   PRICING STUDY APPARENTLY WAS VERY AUTHORITATIVE ACCORDING TO

19   THE DEFENDANTS.

20   BUT NOW, IN THIS LOST PROFITS CONTEXT, THEY ARE ABANDONING

21   SHIP AND SAYING THAT IT'S COMPLETELY UNRELATED TO THE DAS

22   INDUSTRY, AND THAT'S JUST NOT THE CASE.

23   THE RANGE ACTUALLY IS ABSOLUTELY RELATED TO THE FACTS OF

24   THIS CASE.  SHE GOT THIS NUMBER FROM THE PRICING STUDY, IT WAS

25   PERFORMED BY INDEPENDENT AUDITORS, AND THOSE AUDITORS LOOKED

1    FOR COMPARABLE DISTRIBUTORS.

2         THEY CHOSE -- THEY CHOSE TO STUDY COMPUTER AND ELECTRONICS

3    DISTRIBUTORS, WHICH IS A BROAD CATEGORY, BUT IT INCLUDES DAS

4    DISTRIBUTORS.

5         SO REALLY THE POINT THAT THEY'RE RAISING HERE IS ONE THAT,

6    AT BEST, SHOULD BE ADDRESSED ON CROSS-EXAMINATION AND IS NOT A

7    BASIS FOR EXCLUSION.

8              THE COURT:  CAN I JUST ASK ONE QUESTION ABOUT THE

9     TRANSFER STUDY, OR TRANSFER MEMO?

10             MR. STOVER:  UM-HUM.

11             THE COURT:  AS I UNDERSTAND WHAT -- IS IT MS. RILEY?

12             MR. STOVER:  YES.

13             THE COURT:  -- WHAT MS. RILEY DOES HERE IS THAT SHE

14    TAKES THE INITIAL RANGE THAT SHE CALCULATES OR ESTIMATES BASED

15    ON THE RESPECTIVE PROFITABILITY OF THE PARTIES AND SHE DOWNWARD

16    ADJUSTS IT, OR ADJUSTS IT DOWNWARD BY 4 PERCENT AFTER LOOKING

17    AT THE TRANSFER MEMO OR TRANSFER STUDY.

18         IS THE 4 PERCENT SOMETHING THAT THE MEMO OR STUDY ITSELF

19    CALLS OUT?  OR IS THAT JUST THE DIFFERENCE BETWEEN HER RANGE TO

20    START AND THE RANGE FOR THE INDUSTRY THAT'S LAID OUT IN THAT

21    STUDY?

22         IN OTHER WORDS, IT'S NOT AS IF THE STUDY SAYS "TAKE 4

23    PERCENT OFF IF YOU'RE TALKING ABOUT A DAS" OR ANYTHING LIKE

24    THAT.  IS THAT FAIR?

25             MR. STOVER:  THAT'S FAIR.  THE USE OF THE 4

```
 1        PERCENT -- SO THE 4 PERCENT NUMBER DOES COME FROM THE TRANSFER

 2        PRICING STUDIES.

 3             THE COURT:  OKAY.

 4             MR. STOVER:  AND THOSE STUDIES ARE TRYING TO CREDIT A

 5        DISTRIBUTOR FOR CERTAIN MARKET RISKS AND DISTRIBUTION RISKS

 6        THAT THEY HAVE, AND THAT WOULD RELATE TO THE GEORGIA-PACIFIC

 7        ANALYSIS, AND IN PARTICULAR THERE'S --

 8             THE COURT:  AND CREDIT A DISTRIBUTOR AS OPPOSED TO A

 9        MANUFACTURER?  IS THAT THE ISSUE?

10             MR. STOVER:  RIGHT.  SO THERE'S A CERTAIN AMOUNT OF

11        MARKET RISK ASSOCIATED WITH DISTRIBUTING THESE PRODUCTS THAT,

12        IN THIS HYPOTHETICAL NEGOTIATION, SOLID OR REACH WOULD BE

13        TAKING ON, TRI-POWER, THAT RISK.

14             AND SO THAT'S A WAY TO ALLOCATE THAT RISK IN THE

15        NEGOTIATION AND THE DOWNWARD ADJUSTMENT.  SO IT'S A WAY THAT

16        RILEY, MS. RILEY IS TRYING TO BE MORE CONSERVATIVE IN HER

17        ROYALTY RANGE.

18             THE COURT:  OKAY.  AGAIN, I APOLOGIZE IF I'M NOT

19        GETTING AN OBVIOUS POINT.

20             IS THE ISSUE THAT, AS COMPARED TO A MANUFACTURER, THE

21        DEFENDANT -- THE PARTIES HERE ARE TALKING ABOUT A DISTRIBUTOR

22        TAKING THE PRODUCT AND THEN SELLING IT SUCH THAT THAT LICENSING

23        PARTY, I GUESS A LICENSEE, FACES ADDITIONAL RISK THAT'S

24        ESTIMATED AS ONLY 4 PERCENT -- THAT OUGHT TO BE PRICED INTO THE

25        MARGIN AT SOMETHING LIKE 4 PERCENT?  IS THAT THE BASIC IDEA OF
```

1      WHAT'S GOING ON?

2              IF NOT, TELL ME WHERE I GOT IT WRONG.

3              MR. STOVER:  I THINK THAT'S -- I THINK THAT'S

4      GENERALLY RIGHT, YOUR HONOR.

5              AND SO IF YOU'RE LOOKING AT A NEGOTIATION BETWEEN TWO

6      PARTIES, YOU HAVE CORNING OR MOBILE ACCESS ON ONE SIDE AND THEY

7      WOULD BE SELLING THE PRODUCT, RIGHT, AND THEY WOULD BE

8      DISTRIBUTING IT AND THEY WOULD WANT TO CONTINUE TO DO THAT.

9              THE COURT:  I SEE.  OKAY.

10              MR. STOVER:  RIGHT?  AND SO IF THEY'RE GOING TO ALLOW

11      ANOTHER COMPETITOR TO COME INTO THE MARKET AND TAKE PART OF

12      THEIR SHARE AND DISTRIBUTE PRODUCTS, THEN WE HAVE TO LOOK AT

13      HOW TO ALLOCATE THE PROFIT BETWEEN THE TWO OF THEM IN THAT

14      HYPOTHETICAL NEGOTIATION.

15              THE COURT:  SEE, IT'S INTERESTING, BECAUSE I WOULD

16      HAVE -- AND PERHAPS SHE DOES THIS, BUT I WOULD HAVE -- I

17      UNDERSTAND THE LOGIC THAT YOU HAVE LAID OUT, BUT I WOULD HAVE

18      CHARACTERIZED THAT SO-CALLED DISTRIBUTION RISK AS ADDITIONAL

19      MARGIN THAT YOU GIVE UP WHEN YOU MOVE FURTHER DOWN THE CHAIN.

20              SO, FOR EXAMPLE, AS A DISTRIBUTOR, RIGHT, IT'S NOT MUCH,

21      BUT YOU'RE TAKING ON ADDITIONAL G&A TO TAKE THE PRODUCT

22      INVENTORY AND MANAGE THE CUSTOMER RELATIONS, AS OPPOSED TO WHAT

23      THE MANUFACTURER HAS TO DEAL WITH.

24              AT ANY RATE, THAT'S NEITHER HERE NOR THERE.

25              MR. STOVER:  AND YOU HAVE THE RISK THAT PRODUCT COULD

1    BE DESTROYED DURING SHIPMENT AND THINGS LIKE THAT.

2            THE COURT:  SO THAT'S THE 4 PERCENT.

3            MR. STOVER:  THAT'S THE 4 PERCENT.

4        AND THEN THE NEXT THING THAT THEY ATTACKED TODAY WAS THE

5    DOWNWARD ADJUSTMENT FOR THE DESIRED SHARE OF PROFITS, AND HERE

6    MS. RILEY WENT THROUGH THE GEORGIA-PACIFIC ANALYSIS, AND THIS

7    PART RELATES REALLY TO THE END, THE GEORGIA-PACIFIC FACTOR 15,

8    AND SHE, SHE TAKES A REDUCTION, SO SHE MAKES HER ANALYSIS MORE

9    CONSERVATIVE BY --

10           THE COURT:  OH, THAT'S INTERESTING.  SO YOU'RE --

11   THIS IS A NEW ARGUMENT SO I WANT TO EXPLORE THIS.  I HAVE

12   STRUGGLED FOR YEARS TO FIGURE OUT WHY AND HOW WE WOULD EVER GET

13   TO GEORGIA-PACIFIC NUMBER 15 IN AN ANALYSIS, BUT IT SOUNDS LIKE

14   WHAT YOU'RE SAYING IS THIS IS WHERE IT COMES INTO PLAY, AMONG

15   OTHER THINGS, WHERE THE --

16           MR. STOVER:  THIS IS ONE PLACE.

17           THE COURT:  -- WHERE AN EXPERT BRINGS TO BEAR HIS OR

18   HER OWN EXPERIENCE, WISDOM, AUTHORITY, AND MAKES ADJUSTMENTS

19   BASED ON THAT TO WHAT THE OTHER EVIDENCE IN THE RECORD SHOWS.

20   IS THAT FAIR?

21           MR. STOVER:  WELL, I MEAN, SHE DOES TIE IT TO THE

22   FACTS OF THIS CASE, SO IT'S NOT JUST MERELY HER EXPERIENCE IN

23   GENERAL.

24           THE COURT:  OKAY.

25           MR. STOVER:  SHE'S LOOKING AT THE MARKET SHARES OF

1    THE PARTIES IN THIS CASE AND USING THAT INFORMATION TO MAKE A

2    DOWNWARD ADJUSTMENT.

3         THE COURT:  AND THE IDEA HERE IS THAT THE MARGIN

4    OUGHT TO GO, OR THE RATE OUGHT TO GO DOWN BECAUSE ONE IMPACT OR

5    EFFECT OR RESULT OF THIS LICENSE IS A LOSS OF MARKET SHARE?

6         MR. STOVER:  IT'S A LOSS OF MARKET SHARE FOR CORNING

7    THAT THEY WOULD OTHERWISE WANT TO BE SELLING AND MAKING PROFIT

8    ON THEIR PRODUCTS IN THE MARKETPLACE.

9       SO THE --

10        THE COURT:  AND THE RATE GOES DOWN BECAUSE THEY LOSE

11   SHARE?  I WOULD HAVE THOUGHT IT WOULD HAVE GONE UP.

12        MR. STOVER:  WELL, WE'RE TRYING TO LOOK AT THE

13   RELATIVE BARGAIN POSITIONS OF THE PARTIES, AND MS. RILEY IS

14   USING THE MARKET SHARE COMPARISON BETWEEN THE TWO PARTIES TO DO

15   THAT.

16        THE COURT:  OKAY.  SO SHE'S LOOKING AT RESPECTIVE

17   MARKET SHARE AS A PROXY FOR NEGOTIATING POWER?  IS THAT --

18        MR. STOVER:  RIGHT, AND ALSO AS A WAY TO LOOK AT THE

19   WAY THE -- AT CORNING'S DESIRE NOT TO GIVE UP MARKET SHARE.

20        THE COURT:  OKAY.  WHAT'S NEXT, MR. STOVER?

21        MR. STOVER:  AND I JUST WANTED TO MAKE A COUPLE MORE

22   POINTS ON THAT.  I'M SORRY, YOUR HONOR.

23        THE COURT:  SURE.

24        MR. STOVER:  I WAS JUST LOOKING AT MY NOTES.

25       SO BASICALLY HERE TODAY THEY'RE TRYING TO ANALOGIZE THIS

```
1     TO THE 25 PERCENT RULE OF THUMB OR NASH BARGAINING.

2          IT'S VERY DIFFERENT BECAUSE IT'S NOT A THEORY THAT'S

3     COMPLETELY DETACHED FROM THE FACTS OF THIS CASE.

4               THE COURT:  ALTHOUGH I THINK EARLIER THIS WEEK,

5     DIDN'T THE FEDERAL CIRCUIT ACTUALLY GIVE A THUMBS UP TO AT

6     LEAST ONE OPINION BASED ON NBS?

7               MR. STOVER:  YOU BEAT ME TO IT.

8               THE COURT:  HAVE YOU GOT A COPY THERE?  I HAVEN'T

9     READ IT YET.

10              MR. STOVER:  THIS IS THE SUMMIT 6 VERSUS SAMSUNG

11    ELECTRONICS CASE.  ACTUALLY, IT WAS JUST YESTERDAY.

12              THE COURT:  WELL, IT WON'T SURPRISE YOU, YOU ALL

13    MANAGED TO GIVE ME SOME OTHER THINGS TO READ LAST NIGHT, SO I

14    HAVEN'T HAD A CHANCE TO SEE THIS, BUT I DID PICK UP A SUMMARY

15    OF IT.

16          TELL ME ABOUT IT.

17              MR. STOVER:  IT'S AN INTERESTING DECISION, AND WHILE

18    THE FACTS HERE ARE OBVIOUSLY SLIGHTLY DIFFERENT THAN OURS, SOME

19    OF THE REASONING THAT THE FEDERAL CIRCUIT GIVES IS VERY

20    APPLICABLE TO THIS CASE.

21          AND IN PARTICULAR, I'D DRAW THE COURT'S ATTENTION TO

22    PAGE 23 AT THE END OF THE OPINION.

23              THE COURT:  OKAY.

24              MR. STOVER:  IN TALKING ABOUT THE PLAINTIFF'S DAMAGES

25    EXPERT AND HIS METHODOLOGY THE OTHER SIDE CLAIMED WAS NOT PEER
```

1    REVIEWED AND, THEREFORE -- AND NOT PUBLISHED AND, THEREFORE,

2    SHOULD NECESSITATE EXCLUSION, THE FEDERAL CIRCUIT REJECTS THAT

3    POSITION AND NOTES THAT IT'S SOMETIMES IMPRACTICAL, IF NOT

4    IMPOSSIBLE, TO SUBJECT THE METHODS TO PEER REVIEW AND

5    PUBLICATION.

6             THE COURT:  THAT'S INTERESTING.

7             MR. STOVER:  I THINK THAT'S AN ADDITIONAL, YOU KNOW,

8    LEGAL AUTHORITY THAT WOULD SUPPORT THE CONCLUSION THAT

9    MS. RILEY'S TESTIMONY SHOULD BE ADMISSIBLE AND THE WEIGHT OF

10   THAT TESTIMONY CAN BE DETERMINED BY THE JURY.

11        AND THE THIRD POINT THEY MADE WAS THE DOWNWARD ADJUSTMENT

12   FOR THE COMMSCOPE LICENSE.

13            THE COURT:  RIGHT.

14            MR. STOVER:  AND BASED ON -- THIS WAS BASED ON THE

15   ANALYSIS OF GEORGIA-PACIFIC FACTOR NUMBER 3, THE SCOPE AND

16   NATURE OF THE LICENSE, AND IT WOULD BE A NONEXCLUSIVE LICENSE

17   BECAUSE OF THE PRESENCE OF THIS COMMSCOPE LICENSE THAT ALREADY

18   EXISTED BEFORE THE '837 PATENT.

19        NOW, SHE TIED -- MS. RILEY TIED HER ANALYSIS TO THE FACTS

20   OF THIS CASE BECAUSE SHE'S LOOKING AT THE FACTS OF THIS CASE,

21   THE COMMSCOPE LICENSE.  BOTH SIDES' EXPERTS AGREE ACTUALLY THAT

22   THE PRESENCE OF THIS LICENSE TO COMMSCOPE SHOULD REDUCE THE

23   REASONABLE ROYALTY RATE, SO MR. REED AGREES WITH THAT.

24        AND WHAT THEY'RE DOING HERE IS THEY'RE TRYING TO HOLD

25   MS. RILEY TO A STANDARD THAT NOT EVEN THEIR OWN EXPERT COULD BE

1   HELD TO, OR REALLY ANY EXPERT, AND THAT IS ABSOLUTE PRECISION

2   AND THAT'S JUST NOT THE STANDARD.

3        MS. RILEY LOOKED AT ALL OF THE GEORGIA-PACIFIC FACTORS,

4   INCLUDING THIS COMMSCOPE LICENSE, AND MADE HER FINAL DOWNWARD

5   ADJUSTMENT TO 19 PERCENT AND THAT SHOULD BE ADMISSIBLE.

6        THE COURT:  THANK YOU, MR. STOVER.

7        MR. STOVER:  THANK YOU.

8        THE COURT:  MS. LEE, ANYTHING FURTHER ON THIS ONE?

9        MS. LEE:  JUST VERY BRIEFLY, YOUR HONOR.

10       I THINK COUNSEL'S ARGUMENT WAS INSTRUCTIVE BECAUSE NOT

11  ONCE DID I HEAR HIM EXPLAIN HOW RILEY'S OPINIONS ARE TIED TO

12  EITHER THE '837 PATENT OR THE DAS INDUSTRY.

13       FOR EXAMPLE, WITH RESPECT TO THAT TRANSFER PRICING STUDY,

14  WE'RE NOT IMPUGNING THE BIG FOUR'S ABILITY TO DETERMINE WHAT AN

15  APPROPRIATE TRANSFER PRICE IS BETWEEN COMPANIES IN THE COMPUTER

16  AND ELECTRONICS DISTRIBUTION INDUSTRY.  WE'RE NOT SAYING THAT

17  THAT'S NOT A GOOD SOURCE FOR THAT TEST.

18       WHAT WE'RE SAYING IS THAT EVEN A NOBEL PRIZE WINNER, LIKE

19  JOHN NASH, HIS OPINIONS IN ONE CONTEXT CAN'T SIMPLY -- OR HIS

20  THEORIES IN ONE CONTEXT CAN'T SIMPLY BE IMPORTED INTO THE

21  CONTEXT OF NEGOTIATING A HYPOTHETICAL LICENSE FOR USE OF A

22  PARTICULAR TECHNOLOGY UNDER A PARTICULAR PATENT.

23       EVEN THE SUMMIT 6 CASE THAT COUNSEL CITED ON PAGE 23

24  POINTS OUT THAT THE REASON THAT THE NASH BARGAINING SOLUTION

25  WAS APPROVED IN THAT CASE IS BECAUSE THE EXPERT SPECIFICALLY

1    FOCUSSED ON THE INFRINGING FEATURES AND VALUED THOSE INFRINGING

2    FEATURES.

3         THAT HAS NOT BEEN DONE HERE, AND REGARDLESS OF WHICH TEXTS

4    MS. RILEY'S APPROACH CAME FROM, WHETHER IT'S FROM THE TRANSFER

5    PRICING STUDY, WHETHER SHE PLUCKED IT OUT OF THIN AIR, NONE OF

6    THEM IS TIED TO ANY SORT OF ECONOMICALLY RATIONAL AND TAILORED

7    APPROACH TO THE PARTICULAR TECHNOLOGY AT ISSUE HERE AND THE

8    PARTICULAR PATENT AT ISSUE HERE.

9         AND WITH RESPECT TO ONE JUST LAST POINT, WE HAVEN'T

10   ADDRESSED EVERY ISSUE THAT'S RAISED IN OUR BRIEF.  IF YOUR

11   HONOR HAS ANY QUESTIONS, WE'RE HAPPY TO ANSWER THAT, BUT WE

12   CERTAINLY HAVEN'T ABANDONED ANY OF THOSE POSITIONS.

13             THE COURT:  I UNDERSTAND THAT.

14        ONE LAST QUESTION FOR YOU ON THIS ISSUE, MS. LEE.  SO

15   IF -- AND I EMPHASIZE IF -- I WERE TO AGREE WITH YOU ON SOME

16   BUT NOT ALL OF YOUR ARGUMENT, FOR EXAMPLE, LET'S SAY I AGREE

17   WITH YOU THAT THERE IS NO EMPIRICAL OR METHODOLOGICAL BASIS FOR

18   OFFERING THE 4 PERCENT DOWNWARD ADJUSTMENT, BUT I DISAGREE WITH

19   YOU AS TO EVERYTHING ELSE IN MS. RILEY'S REPORT, THE EFFECT

20   WOULD BE, RIGHT, THAT MS. RILEY WOULD BE PERMITTED TO OFFER A

21   HIGHER ROYALTY RATE THAN THE ONE THAT SHE IS OFFERING IN THIS

22   REPORT?  WOULD YOU AGREE WITH THAT OR DISAGREE?

23             MS. LEE:  I WOULD NOT AGREE WITH THAT, YOUR HONOR.

24             THE COURT:  TELL ME WHY.

25             MS. LEE:  AS THE FEDERAL CIRCUIT IN UNILOC EXPLAINED,

1   WHEN THERE'S A FLAW IN THE METHODOLOGY WITH RESPECT TO

2   CALCULATION OF A REASONABLE ROYALTY, WHETHER IT HAPPENS AT THE

3   BEGINNING, WHETHER IT HAPPENS IN THE MIDDLE, OR WHETHER IT

4   HAPPENS AT THE END, IT INFECTS THE ENTIRE METHODOLOGY AND

5   RENDERS IT UNRELIABLE.

6        IF MS. RILEY AT ANY STEP -- IF YOU FIND THAT ANY STEP

7   SUFFERS FROM THE PROBLEMS THAT WE DESCRIBED TO YOU TODAY, SHE

8   MAY NOT OFFER ANY OF THOSE OPINIONS ON REASONABLE ROYALTY

9   BECAUSE IT INFECTS THE ENTIRE ANALYSIS.

10        THE COURT:  ALL RIGHT.  I THINK I HAVE IT.

11        MS. LEE:  THANK YOU.

12        THE COURT:  THANK YOU.  I'M GOING TO TAKE THIS

13   PARTICULAR MOTION UNDER SUBMISSION.

14        LET ME JUST ASK IF I COULD TAKE A FIVE MINUTE BREAK AND

15   THEN WE'LL CONTINUE AFTER THAT.

16        THANK YOU.

17        (RECESS FROM 3:14 P.M. UNTIL 3:24 P.M.)

18        THE COURT:  PLEASE BE SEATED.

19        WHY DON'T WE RETURN TO THE MOTIONS IN LIMINE AND MOTION TO

20   EXCLUDE.

21        MR. HUNT, I BELIEVE YOU GET TO PICK THE NEXT MOTION WE

22   ARGUE.  WHAT ARE WE GOING TO TURN TO NEXT?

23        MR. HUNT:  HOW ABOUT THE MOTION -- THE DEFENDANTS'

24   MOTION -- PARDON ME, YOUR HONOR.  THE DEFENDANTS' MOTION IN

25   LIMINE ADDRESSED TO MR. MCKAY.

```
 1              THE COURT:  THAT'S FINE.

 2         ALL RIGHT.  MS. LEE?

 3         AND I MUST SAY -- WELL, LET ME HEAR ARGUMENT FROM COUNSEL.

 4    I'LL SAVE YOU THE EDITORIAL.

 5              MS. LEE:  THANK YOU, YOUR HONOR.

 6         YOUR HONOR, WE'VE BROUGHT A VERY FOCUSSED MOTION HERE ON

 7    ONE OF THE OPINIONS THAT DR. -- THAT MR. MCKAY ADVANCES IN HIS

 8    EXPERT REPORT, SPECIFICALLY REGARDING WHETHER VHF, UHF, 700

 9    PUBLIC SAFETY, AND 800 PUBLIC SAFETY BANDS QUALIFY OR

10    CORRESPOND TO WIDE AREA DATA NETWORKS.

11         THE BASIS FOR THE MOTION IS SIMPLY THAT THERE'S NO

12    RELIABLE METHODOLOGY, OR EVEN ANY METHODOLOGY BY WHICH

13    MR. MCKAY ARRIVES AT THIS OPINION.  IT'S SIMPLY A SINGLE

14    SENTENCE.  AND HE CITES THE PROJECT 25 STANDARDS, BUT MAKES NO

15    EXPLANATION OF WHAT THOSE STANDARDS ARE, WHO IMPLEMENTS THEM,

16    WHERE THEY'RE IMPLEMENTED, IN WHAT CONTEXT.

17         THE CITED PORTIONS, THE PORTIONS CITED BY BOTH MR. MCKAY

18    AND BY PLAINTIFF IN ITS BRIEFING DON'T MENTION UHF, VHF, 700 OR

19    800 PUBLIC SAFETY.  THEY DON'T EVEN MENTION WIDE AREA DATA

20    NETWORKS.

21         THERE'S NOTHING HERE THAT DEFENDANTS COULD EVEN CLEAN UP

22    ON CROSS-EXAMINATION BECAUSE THERE'S SIMPLY NO METHODOLOGY TO

23    THIS OPINION.

24         AND IT'S AKIN TO THE EXPERT TESTIMONY THAT WAS STRUCK IN

25    MAGNETAR, ONE OF THE CASES THAT WE CITED, OBSERVING THAT SIMPLY
```

1    RECITING THE CLAIM LANGUAGE AND COMING TO SOME SORT OF

2    CONCLUSORY OPINION IS NOT ENOUGH.

3        THERE ARE OTHER RELATED BASES FOR EXCLUDING THIS OPINION,

4    INCLUDING THAT IT DOESN'T DISCLOSE, ADEQUATELY DISCLOSE THE

5    BASIS FOR THE OPINION UNDER RULE 26 AND THE FACT THAT IT'S

6    ESSENTIALLY A WASTE OF TIME AND IS MISLEADING AND UNHELPFUL TO

7    THE JURY BECAUSE IT DOESN'T EXPLAIN THE BASIS FOR THE OPINION.

8        BUT IN SHORT --

9        THE COURT:  MS. LEE, CAN I ASK YOU, WAS MR. MCKAY

10   DEPOSED IN THIS CASE?

11       MS. LEE:  HE WAS, YOUR HONOR.

12       THE COURT:  AND DID HE OFFER ANY TESTIMONY ABOUT THIS

13   PARTICULAR ISSUE?

14       MS. LEE:  NOT THAT I RECALL, YOUR HONOR.

15       THE COURT:  OKAY.  ALL RIGHT.  I'LL GIVE YOU A CHANCE

16   FOR REBUTTAL IF YOU NEED IT.

17       MS. LEE:  THANK YOU.

18       THE COURT:  THANK YOU.

19       MR. LARSEN:  JOSHUA LARSEN.

20       THE COURT:  MR. LARSEN, GOOD AFTERNOON.  WELCOME

21   BACK.

22       MR. LARSEN:  GOOD AFTERNOON, YOUR HONOR.

23       SO, YOUR HONOR, IN THIS CASE, MR. MCKAY DID OFFER AN

24   OPINION HERE AS TO HOW THE CLAIMS READ ON THE VARIOUS NETWORKS

25   THAT ARE HANDLED BY DEFENDANTS' DEVICES.  HE SPECIFICALLY LINED

 1    UP EACH OF THE NETWORKS THAT COULD BE HANDLED BY THE ACCUSED

 2    PRODUCTS WITH SOME OF THE DIFFERENT TYPES OF NETWORKS THAT ARE

 3    LISTED IN THE CLAIM, AND DEFENDANTS HAVE TAKEN ISSUE

 4    PARTICULARLY WITH HIS OPINION HERE ABOUT FOUR SPECIFIC NETWORKS

 5    WHICH THE PARTIES HAVE SOMETIMES CALLED THE PUBLIC SAFETY

 6    NETWORKS AND SAID THAT THOSE DO, IN FACT, CORRESPOND TO ONE OF

 7    THE CLAIM TERMS, SPECIFICALLY WIDE AREA DATA NETWORKS.

 8        AND HE DID, IN FACT, SET FORTH AN EXPLANATION FOR THAT.

 9    IT IS CONCISE.  HE DOES CITE TO --

10        THE COURT:  WELL, THAT IS -- I MENTIONED AN EDITORIAL

11    COMMENT I WAS TEMPTED TO MAKE, AND I HAVE TO SAY, THAT WAS THE

12    MOST CANDID REFERENCE THAT I'VE SEEN IN A BRIEF IN MANY WEEKS

13    AND MONTHS.  IT IS CONCISE.

14        MR. LARSEN:  IT IS VERY CONCISE.

15        THE COURT:  IT DOESN'T SAY VERY MUCH.

16        MR. LARSEN:  YOUR HONOR, I BELIEVE THAT THE -- I

17    DON'T RECALL OFF THE TOP OF MY HEAD THE DICTIONARY DEFINITION

18    OF "CONCISE," BUT I BELIEVE IT MEANS STRAIGHTFORWARD AND TO THE

19    POINT IN THE SENSE THAT NOT ANY MORE IS NEEDED, AND WE THINK

20    THAT IS THE CASE HERE.

21        MR. MCKAY DOES SPECIFICALLY POINT TO THE EVIDENCE THAT

22    HELPS SUPPORT HIS OPINION HERE, SPECIFICALLY THAT THESE

23    NETWORKS ARE DATA NETWORKS, AND HE POINTS TO THE PROJECT 25

24    STANDARDS, WHICH, WHILE THE TEXT OF THAT DOCUMENT ISN'T SET

25    FORTH IN HIS REPORT, IT'S CLEAR THAT THAT'S WHAT HE'S

1    REFERENCING, AND THE VERY WEB PAGE THAT THE DEFENDANTS HAVE

2    THEN -- THAT HE CITES TO THAT THE DEFENDANTS THEN ATTACH TO

3    THEIR MOTION SAYS WE'RE TALKING ABOUT PUBLIC SAFETY NETWORKS,

4    AND ONE OF THE SPECIFIC TECHNOLOGY BENEFITS IS THAT THEY HAVE

5    DATA SERVICES ON THESE NETWORKS.

6         SO, YOUR HONOR, WE THINK THAT MR. MCKAY HAS ADEQUATELY SET

7    FORTH A BASIS --

8              THE COURT:  MR. LARSEN, THE MAJOR CONCERN I HAVE WITH

9    THIS PORTION OF MR. MCKAY'S REPORT IS NOT THAT HE HAS NOT CITED

10   TO A SOURCE FOR HIS OPINION THAT HE LAYS OUT IN THAT CONCISE

11   SECTION AS YOU PUT IT, BUT RATHER THAT THE SOURCE ITSELF

12   POTENTIALLY COULD BE ANY NUMBER OF DIFFERENT THINGS.

13        IN OTHER WORDS, I WILL CONFESS, I HAVE NOT GONE ON THE

14   INTERNET AND LOOKED TO SEE HOW MANY PAGES AND HOW MANY LINKS

15   ARE PROVIDED AT THAT URL, BUT I SUSPECT YOU HAVE.  IS IT A

16   COUPLE PAGES?  IS IT THOUSANDS OF PAGES?  IS IT SOMETHING IN

17   BETWEEN?

18             MR. LARSEN:  YOUR HONOR, MY SENSE IS THAT IT'S MORE

19   ON THE END OF A COUPLE OF PAGES.

20        BUT ASIDE FROM -- I MEAN, TO SLIGHTLY REFOCUS THAT,

21   THOUGH, IT'S NOT EVEN SO MUCH THAT IT'S BURIED SOMEWHERE ON

22   THIS WEB PAGE.

23             THE COURT:  THAT'S WHAT I'M GETTING AT.

24             MR. LARSEN:  IT HONESTLY IS ON THE VERY LANDING PAGE.

25   WHEN WE TYPED IN THE URL THAT HE PROVIDED IN HIS EXPERT REPORT,

1    THAT PAGE ITSELF THAT THE USER IS IMMEDIATELY DIRECTED TO HAS

2    THE INFORMATION THAT IS RELEVANT TO SUPPORTING HIS OPINION

3    HERE.

4              THE COURT:  AND MR. MCKAY IS NOT SUGGESTING IN ANY

5    WAY THAT HE'S GOING TO START PULLING OTHER PAGES FROM ELSEWHERE

6    ON THAT WEBSITE TO SUPPORT THAT OPINION?

7              MR. LARSEN:  NO, YOUR HONOR, HE IS NOT.

8              THE COURT:  OKAY.  ANYTHING ELSE, MR. LARSEN?

9              MR. LARSEN:  I'D JUST LIKE TO POINT OUT ONE LAST

10   POINT, YOUR HONOR, THAT THE SUPPORT FOR MR. MCKAY'S OPINION

11   HERE, WE THINK, STANDS IN STARK CONTRAST TO THAT OF

12   MR. ACAMPORA.

13       BOTH SIDES' EXPERTS HAVE OPINED ON THIS ISSUE OF WHETHER

14   OR NOT PUBLIC SAFETY NETWORKS CORRESPOND OR DON'T CORRESPOND TO

15   THE CLAIM LANGUAGE.  WHEREAS MR. MCKAY HAS SUPPORT, AT LEAST

16   SOME PIECE OF OBJECTIVE EVIDENCE TO SUPPORT HIS OPINION, WE

17   BELIEVE THAT MR. ACAMPORA'S REPORT IS WHOLLY LACKING IN THIS

18   REGARD AND THAT HE JUST ASSUMES THAT THESE CANNOT CORRESPOND TO

19   ANY OF THE CLAIMED NETWORKS THAT ARE ACTUALLY RECITED IN THE

20   CLAIM, BUT PROVIDES NO FURTHER ANALYSIS OR SUPPORT FOR THAT

21   OPINION AND WE WOULD ASK THAT THAT OPINION BE EXCLUDED.

22             THE COURT:  I THINK WE'VE DEALT WITH THAT ISSUE WITH

23   RESPECT TO DR. ACAMPORA.

24        BUT LET ME RETURN TO MR. MCKAY.  DO YOU HAPPEN TO KNOW OR

25   RECALL, MR. LARSEN, WAS MR. MCKAY ASKED ABOUT THIS PARTICULAR

```
1    CITATION IN HIS DEPOSITION?
2            MR. LARSEN:  YES, HE WAS, YOUR HONOR.  I'M SORRY --
3    YOU ASKED THAT QUESTION AS OPPOSING COUNSEL WAS JUST GETTING --
4    FINISHING UP, SO I DIDN'T HAVE A CHANCE TO LOOK UP THE
5    CITATION.
6        BUT HE WAS, IN FACT, ASKED ABOUT THIS CLAIM LIMITATION,
7    ABOUT WHAT HE THOUGHT A WIDE AREA DATA NETWORK WAS IN HIS
8    DEPOSITION AND DID PROVIDE AN ANSWER TO THAT QUESTION.
9        I DON'T RECALL THE CONTENT IMMEDIATELY OFF THE TOP OF MY
10   HEAD, YOUR HONOR.
11           THE COURT:  I WON'T HOLD THAT AGAINST YOU OR MS. LEE.
12   I THOUGHT I'D ASK ANYWAY.
13       ANYTHING ELSE YOU THINK I NEED TO KNOW?
14           MR. LARSEN:  NO, YOUR HONOR.  THANK YOU.
15           THE COURT:  ALL RIGHT.  MS. LEE, ANYTHING FURTHER ON
16   THIS ONE?
17           MS. LEE:  JUST BRIEFLY, YOUR HONOR.
18       YOU POSED A QUESTION REGARDING THE P25 WEBSITE.  WE
19   ACTUALLY HAVE NO IDEA HOW MANY PAGES IT CONTAINS BECAUSE IT'S
20   PASSWORD PROTECTED.  SO ASIDE FROM LOOKING AT THE FIRST PAGE OF
21   THE WEBSITE, THERE'S NO WAY WE CAN ACTUALLY CONDUCT ANY SORT OF
22   CROSS-EXAMINATION.
23           THE COURT:  SO EVEN IF I HAD GONE ONLINE TO CHECK,
24   YOU'RE TELLING ME I WOULDN'T HAVE BEEN ABLE TO DO MUCH?
25           MS. LEE:  THAT'S RIGHT.
```

1        AND EVEN A QUICK SEARCH OF P25, OR PROJECT 25 STANDARDS ON

2    THE INTERNET INDICATES THAT THE U.S. HASN'T EVEN ADOPTED THOSE

3    STANDARDS.

4        SO, AGAIN, HERE'S A PROBLEM OF FIT.  SOMEONE HAS INVOKED

5    SOME STANDARDS OUT THERE SOMEWHERE, BUT HAS FAILED TO TIE THOSE

6    STANDARDS TO THE FACTS OF THIS CASE.  THERE'S NO MENTION OF

7    THESE PARTICULAR PUBLIC SAFETY BANDS.  THERE'S NO MENTION OF

8    THE CLAIM LANGUAGE.  THERE'S NO -- THERE'S SIMPLY NO TIE FROM

9    THE PROJECT 25 STANDARDS TO THE ACTUAL TECHNOLOGY OR THE PATENT

10   THAT'S AT ISSUE HERE.

11       AND UNLESS THE COURT HAS ANY OTHER QUESTIONS, WE'LL

12   SUBMIT.

13           THE COURT:  NO.  I THINK I HAVE WHAT I NEED IN ORDER

14   TO RULE.

15       AS TO THE MOTION TO EXCLUDE MR. MCKAY'S TESTIMONY, THE

16   MOTION IS DENIED.  HOWEVER, I WANT TO BE CLEAR THAT UNLESS I AM

17   PRESENTED WITH EVIDENCE THAT OTHER PAGES ON THAT WEBSITE WERE

18   AVAILABLE TO THE DEFENDANTS TO EXPLORE, I WILL NOT ALLOW

19   MR. MCKAY TO REFERENCE ANY OTHER PAGES BESIDES THE LANDING PAGE

20   WHICH WAS PROVIDED IN THE REPORT ITSELF.  OTHERWISE THE MOTION

21   IS DENIED.

22       MR. PLATT, WOULD YOU LIKE TO PICK THE NEXT MOTION WE TALK

23   ABOUT?

24           MR. PLATT:  SURE, AND THIS IS MOTION IN LIMINE

25   NUMBER 2 SEEKING TO EXCLUDE EVIDENCE AND ARGUMENT REGARDING

```
1        WILLFUL INFRINGEMENT.

2             AND THE MOTION HERE IS BASED ON, YOU KNOW, STARTING OFF AT

3        THE BEGINNING, YOU'VE GOT TO LOOK SEAGATE.  SEAGATE HAS TWO

4        PRONGS, THE OBJECTIVE PRONG, WHICH IS THE COURT'S PURVIEW; AND

5        THEN THE SUBJECTIVE PRONG, WHICH GOES TO THE JURY.

6             AND THE BARD DECISION TELLS US THAT THE SUBJECTIVE PRONG

7        SHOULD ONLY GO TO THE JURY IF THE COURT DETERMINES THAT THE

8        OBJECTIVE PRONG HAS BEEN SATISFIED.

9             AND IN THIS CASE THE COURT GRANTED ITS SUMMARY JUDGMENT --

10       GRANTED SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S NO

11       INVALIDITY MOTION, AND AS A RESULT, WE BELIEVE THAT THE ISSUE

12       OF THE OBJECTIVE PRONG CANNOT BE SATISFIED BY CORNING.

13            THE COURT:  SO JUST TO EXPLORE THAT A LITTLE BIT

14       FURTHER, YOU'RE REMINDING ME THAT THIS COURT HAS ALREADY RULED

15       THAT A REASONABLE JURY COULD FIND THAT THESE PATENTS, OR THIS

16       PATENT RATHER, IS INVALID.

17            MR. PLATT:  THAT'S CORRECT.

18            THE COURT:  AND ON THAT BASIS ALONE, THE OBJECTIVE

19       PRONG UNDER SEAGATE AND THE REST COULD NOT POSSIBLY BE

20       SATISFIED AS A MATTER OF FACT.

21            MR. PLATT:  THAT'S CORRECT, YOUR HONOR.

22            AND IN LIGHT OF THAT, WE DON'T THINK IT'S APPROPRIATE FOR

23       THERE TO BE ARGUMENT TO THAT ISSUE TO BE PRESENTED TO THE JURY.

24            AND AS I'M SURE THE COURT WILL RECALL, YOUR HONOR RECALLS

25       BACK IN THE GTE VERSUS WESTERN DIGITAL CASE, THERE WAS ALSO A
```

1    MOTION IN LIMINE THAT WAS SIMILARLY SITUATED TO THIS

2    CIRCUMSTANCE AND THE COURT GRANTED THE MOTION IN LIMINE

3    RELATING TO WILLFUL INFRINGEMENT.

4         AND THEN IF I CAN JUST ADDRESS BRIEFLY COMMIL.  OUR VIEW

5    IS THAT COMMIL DOESN'T APPLY HERE.  YOU KNOW, THE WILLFULNESS

6    STANDARD IS THE, YOU KNOW, OBJECTIVE/SUBJECTIVE PIECE.

7    WILLFULNESS IS BASED ON COMMON LAW.

8         COMMIL WAS LOOKING AT INDUCED INFRINGEMENT AND

9    SPECIFICALLY DISCUSSING THE MENTAL STATE OF THE ACCUSED

10   INFRINGER.  SO IT WAS LOOKING AT -- WHEN COMMIL SAYS, "WELL, A

11   DEFENSE THAT I THOUGHT THE PATENTS WERE INVALID," YOU KNOW,

12   THAT MAY NOT APPLY.

13        WE THINK THAT ONLY APPLIES TO THE SUBJECTIVE PIECE WITH

14   RESPECT TO INDUCED INFRINGEMENT.

15             THE COURT:  I SEE.  SO YOU'RE SAYING THAT EVEN IF ONE

16   CAN INDUCE INFRINGEMENT OF A PATENT THAT ONE FIRMLY BELIEVES IS

17   INVALID, POST-COMMIL, ONE CANNOT WILLFULLY INFRINGE THAT SAME

18   PATENT BECAUSE OF A SUBJECTIVE REQUIREMENT UNDER --

19             MR. PLATT:  THE OBJECTIVE REQUIREMENT.

20             THE COURT:  I'M SORRY, THE OBJECTIVE REQUIREMENT.

21             MR. PLATT:  THAT'S CORRECT.

22        AND THE SEAGATE STANDARD HAS NOT BEEN OVERRULED BY COMMIL.

23   NEITHER HAS BARD.

24        AND, IN FACT, THE MONTH AFTER THE COMMIL DECISION CAME

25   DOWN -- AND THIS IS ACTUALLY AN UNPUBLISHED DECISION FROM THE

```
 1        FEDERAL CIRCUIT, AND THAT WAS THE GLOBAL TRAFFIC VERSUS MORGAN
 2        CASE, AND THE CITE ON THAT IS 2015 U.S. APP. LEXIS 9281, AND
 3        THAT'S WHERE THE FEDERAL CIRCUIT REVERSED A FINDING OF
 4        WILLFULNESS WHERE THE COURT HAD FOUND THAT THERE WERE -- THERE
 5        WAS AN OBJECTIVE BASIS FOR FINDING INVALIDITY, AND THE COURT
 6        SAID THAT IT -- THAT THIS REQUIRES ANALYSIS OF ALL OF THE
 7        INFRINGER'S NON-INFRINGEMENT AND INVALIDITY DEFENSES.
 8             SO EVEN AFTER COMMIL, THE FEDERAL CIRCUIT WAS STILL
 9        APPLYING THE SAME SEAGATE STANDARD.
10             THE COURT:  ALL RIGHT.  I APPRECIATE THAT.  THANK
11        YOU, MR. PLATT.
12             MR. HUNT.
13             MR. HUNT:  I CAN'T WAIT TO GET ENGAGED INTO A DEBATE
14        ABOUT COMMIL, AND WE'LL LEAVE THAT TO THE END, BUT I HEARD
15        MR. PLATT ZIG AND THE COURT ZAG, AND SO I'M NOT SURE I
16        UNDERSTAND WHAT THE COURT'S QUESTION WAS.
17             THE BASIS OF THE MOTION, THE PRIMARY BASIS WAS THAT THE
18        NON-INFRINGEMENT POSITION WAS SO REASONABLE AND, IN FACT,
19        MR. PLATT ACKNOWLEDGED THAT THE COURT, IN FACT, DENIED THE
20        MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT AND THEN THE
21        COURT MOVED TO VALIDITY.
22             LET'S START AT LEAST WITH NON-INFRINGEMENT, BECAUSE HERE
23        AGAIN, THE DEFENDANTS HAVE STILL TO THIS DAY NOT PRESENTED NOT
24        ONLY A REASONABLE NON-INFRINGEMENT POSITION, BUT ONE, OF
25        COURSE, WHICH WE BELIEVE THERE IS NO DISPUTE OF FACT AND THE
```

1    COURT MUST FIND THERE IS INFRINGEMENT.

2         THERE IS NO DOUBT THAT THE DEFENDANTS' PRODUCTS HAVE FIVE

3    FIBERS.  THE CLAIM SAYS THERE'S A FIRST ONE AND A SECOND ONE.

4         AT SUMMARY JUDGMENT, YOUR HONOR, THEY MADE THIS SAME --

5    THEY MADE THIS SAME ARGUMENT BY SAYING, WELL, IF -- THERE'S ONE

6    FIBER THAT CONNECTS A HEAD END TO A REMOTE.

7         BUT THAT'S NOT WHAT THE CLAIM SAYS.

8         EVEN NOW, THEY'RE CLAIMING THAT THEIR, QUOTE-UNQUOTE,

9    REASONABLE NON-INFRINGEMENT ARGUMENT IS ONE THAT IGNORES THE

10   CLAIM LANGUAGE.  THERE IS STILL NO REASONABLE ARGUMENT, IN

11   FACT, NO ARGUMENT THAT HAS ANY CHANCE OF BEATING LITERAL

12   INFRINGEMENT OF A CLAIM THAT SAYS A FIRST FIBER AND A SECOND

13   FIBER WHEN THEY HAVE FIVE FIBERS.

14        THE SECOND ARGUMENT IS VALIDITY.  THEY HAVE NEVER MADE A

15   VALIDITY PRESENTATION, YOUR HONOR.

16        CORNING, THE PLAINTIFF, SOUGHT TO EXCLUDE -- OR SOUGHT

17   SUMMARY JUDGMENT BASED ON DEFICIENCIES OF PARTICULAR ELEMENTS

18   IN DR. ACAMPORA'S REPORT, BUT THAT HAS NEVER BEEN PRESENTED.

19        THEY WANT TO SAY DR. ACAMPORA IS GOING TO GIVE A VALIDITY

20   ANALYSIS WHICH, IN FACT, HAS NOT YET BEEN PRESENTED TO THE

21   COURT, BUT JUST TRUST US, IT'S GOING TO BE SO GOOD THAT YOU

22   SHOULD, IN ADVANCE, LIMIT WILLFUL INFRINGEMENT, OR WILLFULNESS

23   EVIDENCE.

24        THAT HASN'T BEEN PRESENTED.  THEY DID NOT MOVE FOR SUMMARY

25   JUDGMENT.  THE COURT HAS NEVER BEEN PRESENTED WITH

1    DR. ACAMPORA'S ANALYSIS FROM WHICH IT COULD DETERMINE WHETHER

2    IT WAS REASONABLE OR NOT OR MERITORIOUS.

3          WITH RESPECT TO COMMIL, YOUR HONOR, I THINK COMMIL SAYS

4    THAT THERE'S A DISTINCTION BETWEEN LIABILITY AND INFRINGEMENT

5    AND THAT THE CASE THAT MR. PLATT CITES DOESN'T MENTION COMMIL

6    EITHER WAY.

7          UNDENIABLY, THIS IS A DIFFERENT ARGUMENT FROM WHAT THE

8    FEDERAL CIRCUIT HAS SAID SEVERAL TIMES IN THE PAST, THAT COMMIL

9    IS NEW, AND COMMIL ITSELF HAS SAID THAT SIMPLY HAVING A DEFENSE

10   TO LIABILITY IS DIFFERENT THAN A DEFENSE TO INFRINGEMENT.

11         AND SINCE THE ISSUE HERE IS WILLFUL INFRINGEMENT, NOT

12   WILLFUL LIABILITY, THERE IS A STRONG ARGUMENT THAT THE COMMIL

13   ANALYSIS WOULD APPLY TO THEIR VALIDITY STUDY ANYWAY.

14         BUT, AGAIN, I THINK THAT THAT'S THE CART BEFORE THE HORSE

15   BECAUSE THAT ANALYSIS HAS NEVER BEEN PRESENTED TO THE COURT IN

16   ITS COMPLETENESS FROM WHICH THE COURT COULD DETERMINE WHETHER

17   OR NOT IT'S EVEN A REASONABLE POSITION.

18              THE COURT:  ALL RIGHT.  I THINK I HAVE IT, MR. HUNT.

19              MR. HUNT:  THANK YOU.

20              THE COURT:  MR. PLATT, ANYTHING ELSE ON THIS ISSUE?

21              MR. PLATT:  I JUST WANTED TO POINT OUT THAT WE DID

22   MOVE WITH RESPECT TO THE MOTION IN LIMINE BASED ON OUR

23   INVALIDITY DEFENSE, AS WELL AS THE NON-INFRINGEMENT DEFENSES

24   THAT WE HAVE.

25              THE COURT:  OKAY.  ALL RIGHT.  I THINK I HAVE IT.

```
 1              ALL RIGHT.  WITH RESPECT TO MOTION IN LIMINE NUMBER 2, I'M

 2      GOING TO DENY THE MOTION.  I'M GOING TO ALLOW THE EVIDENCE IN.

 3      I SUSPECT THIS IS AN ISSUE I'M GOING TO RETURN TO, OR MAY HAVE

 4      TO RETURN TO AT A LATER DATE, BUT THAT'S WHERE WE STAND FOR

 5      NOW.

 6              ALL RIGHT.  WITH THAT I BELIEVE -- I'VE LOST TRACK.

 7      MR. HUNT, IS IT YOUR TURN TO PICK A MOTION?

 8                  MR. HUNT:  I THINK IT'S MY TURN.

 9                  THE COURT:  OKAY.

10                  MR. HUNT:  AND WE HAVE DONE -- HAVE WE DONE THE

11       DEFENDANTS' MOTION IN LIMINE NUMBER 1?  I THINK NOT.

12                  THE COURT:  NO, WE HAVE NOT, SO WHY DON'T WE TURN TO

13       THAT ONE RIGHT NOW.

14          MS. LEE, GO AHEAD.

15                  MS. LEE:  THANK YOU, YOUR HONOR.

16              THE PARTIES APPEAR TO AGREE ABOUT WHAT THE LAW IS UNDER

17      THE FEDERAL CIRCUIT, THAT THERE CAN BE NO ADVERSE INFERENCE

18      THAT CAN BE DRAWN FROM EITHER A FAILURE TO OBTAIN OR DISCLOSE

19      AN EXCULPATORY OPINION OF COUNSEL.

20              BUT I THINK THAT THE MOTION THEN CAN BE GRANTED -- AND AS

21      A RESULT, I THINK THE MOTION CAN AND SHOULD BE GRANTED.

22              BUT I THINK IT'S ALSO WORTH CLARIFYING THAT IN GRANTING

23      THE MOTION, IT SHOULD BE MADE CLEAR THAT PLAINTIFF MAY NOT

24      ATTEMPT TO OPEN THE DOOR TO REFERENCING THE COMMUNICATIONS WITH

25      COUNSEL ABOUT THE '837 PATENT BY SUGGESTING IN LINES OF
```

1    QUESTIONING TO WITNESSES THAT NEITHER REACH NOR SOLID DID

2    ANYTHING AFTER LEARNING ABOUT THE '837 PATENT.

3          THE REASON THAT THAT SORT OF LINE OF QUESTIONING IS

4    IMPORTANT TO EXCLUDE IS BECAUSE TO TRUTHFULLY ANSWER THOSE

5    QUESTIONS, THE WITNESSES WOULD HAVE TO DISCUSS, OR AT LEAST

6    REFERENCE THE FACT THAT THERE WERE COMMUNICATIONS WITH COUNSEL

7    FOLLOWING LEARNING OF THE '837 PATENT.

8          WE'RE NOT RELYING ON OPINION OF COUNSEL HERE.  WE HAVE

9    MAINTAINED A PRIVILEGE OVER THOSE COMMUNICATIONS, AND I THINK

10    BOTH PARTIES AGREE, AT LEAST AS FROM WHAT WE CAN TELL IN THE

11    OPPOSITION BRIEF, THAT NEITHER SIDE WANTS TO REFERENCE THOSE

12    OPINIONS OF COUNSEL.

13          BUT NEITHER SHOULD PLAINTIFF BE ALLOWED TO SUGGEST, IN ITS

14    QUESTIONING OF WITNESSES, THAT NOTHING WAS DONE, BECAUSE I

15    THINK AT THIS POINT IT'S CLEAR THAT SOMETHING WAS DONE.  WE'VE

16    HAD A WHOLE MOTION ABOUT IT.

17          AND TO AVOID OPENING THE DOOR, THAT'S WHAT A GRANT OF THE

18    MOTION IN LIMINE NUMBER 1 SHOULD PRECLUDE.  IT SHOULD PRECLUDE

19    EVIDENCE AND ARGUMENT OR ATTEMPTS TO ELICIT OR SUGGEST THAT

20    WITNESSES DID NOT DO ANYTHING AFTER LEARNING ABOUT THE '837

21    PATENT.

22                THE COURT:  BUT ON THAT LAST POINT, HOW DO I, ON THE

23     ONE HAND, LET THE DEFENDANTS CREATE THE INFERENCE THAT

24     SOMETHING WAS DONE, WITHOUT PERMITTING THE PLAINTIFF TO POINT

25     OUT THAT -- WELL, EXACTLY WHAT THAT WAS OR WHAT THAT WASN'T?

1    HOW DO I DRAW THAT LINE?

2            MS. LEE:  AND I THINK, YOUR HONOR, DEFENDANTS WON'T

3    BE -- NEITHER DEFENDANTS' COUNSEL NOR THEIR WITNESSES WILL BE

4    IMPLYING THAT SOMETHING WAS DONE WITH RESPECT TO COMMUNICATIONS

5    WITH COUNSEL.

6            AS YOUR HONOR IS AWARE, I THINK BY THIS POINT, DEFENDANTS

7    HAVE OTHER DEFENSES AS TO WHAT THEIR STATE OF MIND WAS

8    FOLLOWING KNOWLEDGE OF THE '837 PATENT THAT RELIES AT LEAST IN

9    LARGE PART ON THE ACTIONS OF PLAINTIFF AND THE PLAINTIFF'S

10   PREDECESSORS IN NOT PURSUING CLAIMS OF THE '837 PATENT AGAINST

11   REACH AND ITS PREDECESSORS AND SOLID AFTER THOSE -- AFTER THE

12   DISCUSSIONS THAT LED TO THE 2009 SETTLEMENT AGREEMENT.

13           WE DON'T INTEND TO RAISE OR SUGGEST THAT THERE WAS ANY

14   SORT OF OPINION OF COUNSEL OBTAINED OR THAT THERE WERE

15   DISCUSSIONS ABOUT COUNSEL.  WE DON'T THINK THAT THEY SHOULD BE

16   ABLE TO ASK QUESTIONS ABOUT THAT.

17           AND WE ALSO DON'T THINK THAT THEY SHOULD BE ABLE TO

18   SUGGEST THAT NOTHING WAS DONE BECAUSE THERE WILL BE EVIDENCE

19   APART FROM ANY SORT OF DISCUSSIONS WITH COUNSEL OR OPINIONS

20   THAT WERE OBTAINED FROM COUNSEL.  THEY'RE FREE TO REFERENCE THE

21   FACT THAT WITNESSES AND REACH OR TRI-POWER KNEW OF THE PATENT.

22   THEY COULD EVEN ASK QUESTIONS ABOUT WHAT WERE THEIR BELIEFS

23   ABOUT NON-INFRINGEMENT AFTER THAT.

24           BUT WHERE THE LINE IS DRAWN IS DON'T ASK QUESTIONS

25   ABOUT -- OR DON'T SUGGEST THAT NOTHING WAS DONE AFTER THAT

1    POINT BECAUSE AT THAT POINT THEY WOULD JUST BE OPENING THE DOOR

2    TO THIS WHOLE MESS OF OPINION OF COUNSEL, WHICH IT SOUNDS LIKE

3    NEITHER PARTY WANTS TO GET INTO.

4              THE COURT:  ALL RIGHT.  THANK YOU.

5              MS. LEE:  THANK YOU.

6              THE COURT:  MR. HUNT.

7              MR. HUNT:  THIS IS WILDLY INAPPROPRIATE, YOUR HONOR.

8    THEY FILE A VERY SPECIFIC AND NARROW MOTION AND NOW THEY'RE

9    SAYING, "WELL, REALLY WHAT WE WANT TO DO IS SAY YOU CAN'T ASK

10   QUESTIONS THAT YOU ASKED OF WITNESSES IN DEPOSITION AND WE DID

11   NOT OBJECT."

12        THEIR SPECIFIC MOTION WAS THAT WE CANNOT MENTION THAT THEY

13   HAVE INVOKED THE ATTORNEY-CLIENT PRIVILEGE.  WE DON'T HAVE ANY

14   INTENTION OF THAT DOING THAT.  THERE WILL BE NO EVIDENCE

15   PRESENTED BY EITHER SIDE THAT THERE WAS ANYTHING PROTECTABLE.

16        BUT NOW THEY'RE WANTING TO UNWIND IT AND SAY, "WELL, IN

17   FACT, YOU CAN'T ASK A WITNESS," WHO I ASKED THESE QUESTIONS AT

18   DEPOSITION AND THEY WERE NOT OBJECTED TO AS PRIVILEGED, "WHAT

19   DID YOU DO?"  AND THE ANSWER SAYS "NOTHING."

20        HOW IS THAT NOT ADMISSIBLE?  THAT'S NOT PRIVILEGED.

21        THE FOCUS OF THE MOTION WAS, AND WHAT WE WOULD AGREE TO

22   DO, IS NOT ASK A QUESTION OF A WITNESS AT TRIAL THAT THEY HAVE

23   PREVIOUSLY INDICATED WAS PRIVILEGED AND WHICH THE COURT HAS NOW

24   RULED IS PRIVILEGED.

25        BUT TO SUGGEST THAT THAT MEANS THAT WE CAN'T ASK QUESTIONS

1    THAT HAVE BEEN ASKED AND HAVE NOT BEEN OBJECTED TO WOULD BE TO

2    EXPAND THE SCOPE OF THIS WELL BEYOND ANYTHING THEY'VE ASKED

3    FOR.

4         THE COURT:  CAN I ASK YOU, MR. HUNT, IS THERE ANY

5    EVIDENCE IN THE RECORD THAT, IN FACT, ADVICE WAS SOUGHT ON THE

6    '837 PATENT?

7         MR. HUNT:  NO, NOT TO MY KNOWLEDGE.

8     IN FACT, THERE ARE WITNESSES WHO HAVE SAID, WITHOUT

9    OBJECTION, "WE DID NOT GET AN ATTORNEY'S REVIEW."  THAT'S A

10   PERMISSIBLE QUESTION.  IT WAS NOT OBJECTED TO AT THE DEPOSITION

11   AND WASN'T BROUGHT TO THIS COURT'S ATTENTION.

12    THERE ARE WITNESSES WHO SAID, "I WAS AWARE OF THE '837

13   PATENT AND I DID NOTHING."  THAT'S ADMISSIBLE TESTIMONY.

14    TRYING TO EXCLUDE THAT BECAUSE THEY COULD CHOOSE TO SAY,

15   IF THEY WANTED IN RESPONSE TO THAT, "WELL, NO.  WE DID DO THIS

16   ONE PARTICULAR THING, WE GOT ATTORNEY ADVICE," THEY'VE CHOSEN

17   NOT TO DO THAT.

18    MS. LEE SAYS, WELL, WE SHOULDN'T BE ENTITLED TO DO THAT

19   BECAUSE THE DEFENDANTS WILL SAY WE DID OTHER THINGS.

20    WELL, THEY CAN PRESENT THE OTHER THINGS THEY DID.  BUT TO

21   PRECLUDE US FROM THE QUESTIONS THAT DIDN'T INVOKE AN

22   ATTORNEY-CLIENT OBJECTION IN THE FIRST PLACE OR A RULING FROM

23   THE COURT WOULD BE WILDLY OUT OF SCOPE WITH WHAT THE REQUEST

24   IS.

25         THE COURT:  ALL RIGHT.  I THINK I HAVE IT.  THANK

1    YOU.

2        MS. LEE.

3          MS. LEE:  JUST ONE FINAL POINT, YOUR HONOR.

4        OBJECTIONS DURING DEPOSITIONS ARE DIFFERENT FROM

5    ADMISSIBILITY OF THE EVIDENCE AT TRIAL.

6        AND TO POINT OUT ONE OTHER TIMING ISSUE, THE -- THE

7    DEPOSITIONS TOOK PLACE BEFORE DEFENDANTS MADE THEIR ELECTION

8    UNDER THE LOCAL RULES WITH RESPECT TO OPINIONS OF COUNSEL.

9        AND, AGAIN, THOSE OBJECTIONS, WHETHER THEY WERE MADE OR

10   NOT DURING THE DEPOSITION, SHOULDN'T CONTROL WHETHER OR NOT

11   IT'S ADMISSIBLE FOR THESE PURPOSES IN LIGHT OF THE FACT THAT

12   BOTH PARTIES APPEAR TO BE AGREEING HERE THAT THERE SHOULDN'T BE

13   REFERENCES TO OPINION OF COUNSEL DURING TRIAL.

14          THE COURT:  OKAY.  THANK YOU.

15          MS. LEE:  THANK YOU.

16          THE COURT:  AS TO DEFENDANTS' MOTION IN LIMINE

17   NUMBER 1, I'M GOING TO GRANT THE MOTION AND PRECLUDE

18   INTRODUCTION OF EVIDENCE OR ARGUMENT REGARDING INVOCATION OF

19   THE ATTORNEY-CLIENT PRIVILEGE BY DEFENDANTS.

20        NOW, THAT'S THE MOTION THAT WAS PRESENTED.  THAT'S THE

21   MOTION I'M GRANTING.  I'M NOT GOING ABOVE AND BEYOND THAT.

22        TO THE EXTENT THE PARTIES WISH TO PRECLUDE OTHER EVIDENCE

23   OR QUESTIONS DURING TRIAL, I'LL TAKE THOSE UP IN DUE COURSE.

24   BUT AT THIS POINT IT FEELS TO ME A BIT SPECULATIVE AND

25   AMORPHOUS, SO I'LL LEAVE IT AT THAT.

```
 1              MR. PLATT AND MS. LEE, DO YOU WANT TO PICK THE NEXT

 2    MOTION?

 3              MS. LEE:  YOUR HONOR, WE'RE ACTUALLY WILLING TO

 4    SUBMIT ON THE PAPERS UNLESS YOUR COURT HAS -- UNLESS YOUR HONOR

 5    HAS ANY PARTICULAR QUESTIONS ABOUT THE REMAINING MOTIONS.  BUT

 6    OTHERWISE WE'RE PREPARED TO SUBMIT.

 7              THE COURT:  ALL RIGHT.

 8         LET ME HEAR FROM MR. HUNT.  ANY FURTHER ARGUMENTS YOU WISH

 9    TO PRESENT, MR. HUNT.

10              MR. HUNT:  I NEED TO DO A QUICK CHECK.  I'M NOT SURE

11    WHAT'S LEFT.

12              MR. LARSEN:  3, 4, 5, 6.

13         (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFF'S COUNSEL.)

14              MR. HUNT:  COULD WE HAVE JUST -- WHAT ELSE IS ON THE

15    CALENDAR?  I WAS GOING TO ASK IF WE COULD STEP OUTSIDE FOR

16    THREE MINUTES, BUT I DON'T KNOW WHAT ELSE WE HAVE LEFT TO

17    DISCUSS.

18              THE COURT:  I WILL PUT ON THE RECORD THAT THE OFFER

19    MS. LEE MAKES IS A TEMPTING ONE FOR THE COURT, BUT I WANT TO

20    MAKE SURE I'M FAIR TO EVERYONE.  IF YOU WANT TO TAKE A FIVE

21    MINUTE RECESS AND FIGURE OUT IF YOU HAVE ANYTHING ELSE YOU NEED

22    TO TELL ME, THAT'S FAIR.

23              MR. HUNT:  IS THERE SOMETHING ELSE THAT I'M NOT -- ON

24    MY CHECKLIST OR ARE WE DONE?

25              THE COURT:  I THINK THIS IS IT FOR OUR BUSINESS
```

```
 1        TODAY.  SO FIVE MINUTES.  OKAY.

 2               MR. HUNT:  THANK YOU.

 3        (RECESS FROM 3:49 P.M. UNTIL 3:54 P.M.)

 4               THE COURT:  PLEASE BE SEATED.

 5        ALL RIGHT, COUNSEL.  ANYTHING FURTHER ON THE MOTIONS?

 6               MR. HUNT:  WE WOULD REQUEST YOUR INDULGENCE OF A

 7   SHORT STATEMENT ON TWO OF THE REMAINING MOTIONS IN LIMINE.

 8   FIRST IS DEFENDANTS' NUMBER 5.

 9               THE COURT:  GO AHEAD, MR. LARSEN.

10               MR. LARSEN:  THE FIRST, YOUR HONOR, IS MOTION IN

11   LIMINE NUMBER 5.

12               THE COURT:  OKAY.

13               MR. LARSEN:  AND, YOUR HONOR, THIS MOTION HAD TO DO

14   WITH THE -- WITH WHETHER OR NOT THE PARTIES MAY PRESENT ANY

15   EVIDENCE OR ARGUMENT REGARDING THE PARTIES' DISCOVERY DISPUTES

16   IN THIS CASE.  AS SET OUT IN OUR PAPERS, WE BELIEVE THAT THAT

17   IS PROPERLY PRESENTED IN EVIDENCE.  IT DOES GO TO PARTICULARLY

18   THE DEFENDANTS' WILLFULNESS.

19        BUT WE WANTED TO JUST BRIEFLY MENTION FOR THE COURT HERE,

20   YOUR HONOR, THAT THERE IS SOME VAGUENESS IN THE PAPERS IN TERMS

21   OF WHAT THE DEFENDANTS -- OR WHAT THE DEFENDANTS SPECIFICALLY

22   ARE ASKING FOR.

23        AND WE JUST WANT TO MAKE CLEAR THAT WE DO NOT BELIEVE

24   THEY'RE ASKING FOR, AS IT WOULD BE COMPLETELY IMPROPER, TO TRY

25   TO LIMIT WHAT KIND OF QUESTIONS WE CAN ASK TO ANY OF THEIR
```

```
1    WITNESSES.
2          AND SO THAT WAS JUST THE BRIEF POINT WE WANTED TO MAKE ON
3    THAT ONE, YOUR HONOR.
4            THE COURT:  WELL, ON THAT, BECAUSE I HAD A SIMILAR
5    QUESTION, OTHER THAN TO LIMIT WHAT YOU CAN ASK A WITNESS, WHAT
6    IS IT THAT THEY ARE ASKING FOR?  I MEAN, THAT SEEMS TO ME TO BE
7    THE ISSUE, RIGHT, WHICH IS WHAT YOU CAN ASK OF A WITNESS ABOUT
8    WHAT HAPPENED IN DISCOVERY.
9          I UNDERSTAND FROM YOUR PAPERS YOU BELIEVE THAT IT IS FAIR
10   GAME TO ASK CERTAIN QUESTIONS WHICH MAY TOUCH UPON WHAT WAS
11   SEARCHED FOR, ADDUCED AND SO FORTH.
12         BUT WHAT DO YOU HAVE IN MIND THAT YOU'RE WORRIED ABOUT
13   HERE?  BECAUSE NORMALLY, TO BE FAIR, YOU DON'T LET LAWYERS GET
14   INTO BIG TUSSLES WITH WITNESSES OVER PRODUCTIONS AND WHAT CAME
15   OUT OF THE PRODUCTIONS AND WHAT DIDN'T.  IT TENDS TO DISTRACT
16   THE JURY FROM WHAT THEY NEED TO FOCUS ON.
17         IF YOU HAVE SOMETHING SPECIFIC YOU THINK YOU NEED TO GET
18   OUT, I'D LIKE TO HEAR WHAT IT IS.
19           MR. LARSEN:  WELL, YOUR HONOR, I THINK THE PRIMARY
20   THING THAT WE'RE CONCERNED ABOUT HERE IS THE DEFENDANTS', AND
21   PARTICULARLY THEIR WITNESSES' INVESTIGATION INTO THE FACTS,
22   WHETHER OR NOT THAT WAS REASONABLE, IF THEY DID WHAT WAS
23   WARRANTED IN LIGHT OF THE LITIGATION, OR PARTICULARLY IF THEY
24   TOOK AN APPROACH THAT WAS DESIGNED TO LIMIT THEIR KNOWLEDGE OF
25   THE ACTUAL INFRINGEMENTS THAT HAD TAKEN PLACE.
```

1     AND WE BELIEVE THAT'S VERY RELEVANT TO THE WITNESS'S

2     CREDIBILITY, AS WELL AS THE WITNESS'S -- AS WELL AS THE

3     DEFENDANTS' STATE OF MIND AND THEIR INFRINGEMENT, WHICH WE

4     THINK GOES TO WILLFULNESS AS WELL AS SOME OF THE INDIRECT

5     INFRINGEMENT, YOUR HONOR.

6          THE COURT:  OKAY.  SO THEN ARE WE TALKING ABOUT

7     POST-COMPLAINT INVESTIGATIONS?  OR INVESTIGATIONS WHICH

8     PRE-DATE THE FILING OF THE LAWSUIT?

9          MR. LARSEN:  I BELIEVE THAT IT WOULD BE BOTH, YOUR

10    HONOR.  I BELIEVE THERE ARE SOME QUESTIONS AND EVIDENCE THAT'LL

11    BE RELATED TO THE INITIAL INVESTIGATIONS WHEN THE DEFENDANTS

12    LEARNED ABOUT THE PATENT-IN-SUIT HERE, AS WELL AS ALSO JUST

13    INVESTIGATIONS THAT DID HAPPEN POST-COMPLAINT AS WELL IN THE

14    DISCOVERY PROCESS.

15         THE COURT:  OKAY.  BUT THOSE KINDS OF QUESTIONS ARE

16    GETTING AT, DID YOU SEARCH THIS DRIVE FOR THESE FILES?  OR DID

17    YOU TALK TO THIS DATABASE ADMINISTRATOR ABOUT THIS PARTICULAR

18    DIRECTORY.  RIGHT?

19         YOU'RE TALKING ABOUT SOMETHING DIFFERENT, AREN'T YOU?

20         MR. LARSEN:  YES, YOUR HONOR.  I MEAN, THAT COULD BE

21    PART OF IT.

22         BUT IT'S ALSO JUST IN TERMS OF WHAT KIND OF INVESTIGATION

23    DID THEY DO INTO THEIR SALES AND HOW THE SALES PROCESS

24    TYPICALLY WORKED IN TERMS OF WHAT KIND OF COMPONENTS WERE SOLD

25    AND OFFERED FOR SALE TO DIFFERENT CUSTOMERS.

```
 1              THE COURT:  OKAY.  I THINK I HAVE IT --
 2              MR. LARSEN:  ALL RIGHT, THANK YOU.
 3              THE COURT:  -- MR. LARSEN.
 4          MR. PLATT, DO YOU WANT TO RESPOND?
 5              MR. PLATT:  SURE.
 6          AND, YOU KNOW, WHAT WE'RE -- WHAT THIS MOTION IN LIMINE IS
 7      FOCUSSED IN ON IS NOT GETTING INTO THE DISCOVERY DISPUTES, THE
 8      ARGUMENTS BETWEEN THE PARTIES, THE RULINGS BY THE COURT, YOU
 9      KNOW, THE SCOPE OF THE PRODUCTIONS, THOSE KINDS OF THINGS THAT
10      I THINK AREN'T NECESSARILY AND I THINK THEY CAN BE UNFAIRLY
11      PREJUDICIAL AND CONFUSING AND MISLEADING TO THE JURY.
12          WITH RESPECT TO FACTUAL ISSUES, IF THERE'S DECLARATIONS,
13      IF THEY WANT TO CROSS-EXAMINATION WITNESSES ON THAT, THEY
14      CERTAINLY CAN DO THAT.
15          BUT WITH RESPECT TO, I THINK, DISCOVERY AND PRODUCTION AND
16      THOSE TYPES OF THINGS, I DON'T THINK THAT'S GOING TO HELP MOVE
17      THE TRIAL FORWARD.
18              THE COURT:  OKAY.  WELL, MR. -- THANK YOU, MR. PLATT.
19      IS THERE ANYTHING ELSE YOU NEED TO TELL ME?
20              MR. PLATT:  NO.
21              THE COURT:  MR. LARSEN, ANYTHING ELSE ON THIS ONE?
22              MR. LARSEN:  NO, YOUR HONOR.  THANK YOU.
23              THE COURT:  ALL RIGHT.  WITH RESPECT TO MOTION IN
24      LIMINE NUMBER 5 FROM THE DEFENDANTS, I'M GOING TO DENY THE
25      MOTION BECAUSE IT STILL IS NOT CLEAR TO ME WHAT I'M BEING ASKED
```

1    TO RULE ON.

2        I WANT TO BE CLEAR THAT IN DENYING THIS MOTION IN LIMINE,

3    AND ANY OTHER MOTION IN LIMINE, IT DOES NOT PRECLUDE THE

4    PARTIES FROM RAISING OBJECTIONS DURING TRIAL AS TO SPECIFIC

5    ISSUES, SPECIFIC QUESTIONS, SPECIFIC ANSWERS, THINGS LIKE THAT.

6        BUT AT THIS POINT I'M NOT IN A STRONG POSITION TO MAKE A

7    RULING, SO I'M GOING TO DENY THE MOTION ON THAT LIMITED BASIS.

8        MR. LARSEN, YOU SAID THERE WAS ANOTHER MOTION YOU WANTED

9    TO ADDRESS IN PARTICULAR.

10        MR. LARSEN:  YOUR HONOR, MY COLLEAGUE, MR. STOVER, IS

11    GOING TO ADDRESS THAT.

12        THE COURT:  MR. STOVER, GO AHEAD.

13        MR. STOVER:  THANK YOU, YOUR HONOR.

14    VERY BRIEFLY ON MOTION IN LIMINE NUMBER 6, THIS IS THE

15    MOTION WHERE THEY'RE TRYING TO PREVENT US FROM TALKING ABOUT

16    THE NEW CASE THAT WAS FILED AGAINST ADC/TE THAT IS NOW BEFORE

17    YOUR HONOR.

18        AND I'D JUST LIKE TO POINT OUT SOMETHING THAT WE DIDN'T

19    MENTION IN THE BRIEF, WHICH IS THAT THE, THE STANDSTILL

20    AGREEMENT IN THE PREVIOUS LITIGATION WITH TE IS ACTUALLY

21    SOMETHING THAT SOLID AND DEFENDANTS SUBPOENAED TE ABOUT DURING

22    THIS CASE AND THOSE DOCUMENTS ARE ON DEFENDANTS' EXHIBIT LIST.

23        THE COURT:  SO IS THE BASIC IDEA HERE THAT MS. RILEY

24    IS GOING TO WANT TO POINT TO THE ACTIVITIES OF THESE THIRD

25    PARTIES AS PART OF HER PROFITS ANALYSIS?  IS THAT WHERE IT

1    COMES IN?  I'M JUST TRYING TO FIGURE OUT WHERE IN THE FRAMEWORK

2    THIS FITS.

3              MR. STOVER:  I'LL TELL YOU WHERE THEY PUT IT.  THEY

4    PUT IT IN WITH THEIR EXPERT, MR. REED, ON GEORGIA-PACIFIC

5    FACTOR 5 ON COMMERCIAL RELATIONSHIP, AND ON FACTORS 1 AND 4,

6    LICENSING POLICIES.

7              THE COURT:  OKAY.  SO, AGAIN, THE IDEA BEING THAT IF

8    THESE THIRD PARTY ALTERNATIVES ARE, IN FACT, THEMSELVES

9    INFRINGING, THEY'RE NOT REALLY AVAILABLE OR OF MUCH USE IN

10   LOOKING TO ALTERNATIVES TO WHAT'S CLAIMED IN THE -- AND,

11   THEREFORE, IT DRIVES THE VALUE OF THE LICENSE UP, ALL THINGS

12   BEING EQUAL?  IS THAT THE IDEA?

13             MR. STOVER:  THEY'RE SAYING THAT WE'RE NOT PURSUING

14   OTHER INFRINGERS IN THE MARKETPLACE AND, THEREFORE, WE DON'T

15   HAVE CONFIDENCE IN OUR PATENTS.

16             THE COURT:  OKAY.  ALL RIGHT.  I THINK I HAVE IT,

17   MR. STOVER.

18             MR. STOVER:  THANK YOU.

19             THE COURT:  MS. LEE?

20             MS. LEE:  YES, YOUR HONOR, JUST VERY BRIEFLY.

21        SO WITH RESPECT TO THIS PARTICULAR MOTION, WE UNDERSTAND

22   AT THIS POINT THAT ACCORDING TO THE OPPOSITION TO THIS MOTION,

23   THE ONLY REASON THAT PLAINTIFF IS SAYING THAT IT'S PLANNING TO

24   OFFER THIS EVIDENCE OF COLLATERAL LITIGATION WITH TE IS BECAUSE

25   OF MR. REED'S REFERENCE IN HIS REPORT TO THE FACT THAT CORNING

1    HASN'T PURSUED TE FOR INFRINGEMENT NOTWITHSTANDING THE -- OR IN

2    LIGHT OF THE STANDSTILL AGREEMENT.

3              THE COURT:  DO YOU AGREE THAT'S FAIR GAME?

4              MS. LEE:  WELL, ACTUALLY, TO THAT POINT, YOUR HONOR,

5    THAT'S NOT A CENTRAL FOCUS OF MR. REED'S OPINIONS, AND IN LIGHT

6    OF THE DEVELOPMENTS, HE'S NOT PLANNING ON OFFERING THAT AS PART

7    OF HIS OPINIONS IN THIS CASE; AND AS A RESULT, SINCE HE WON'T

8    BE OFFERING THOSE OPINIONS IN THIS CASE, THERE'S NO REASON FOR

9    THEM TO BE INTRODUCING THIS EVIDENCE OF COLLATERAL LITIGATION.

10             AND INTRODUCING THE EVIDENCE OF COLLATERAL LITIGATION WILL

11   JUST SORT OF OPEN THE DOOR TO A BUNCH OF EVIDENCE THAT'S NOT

12   GOING TO BE HELPFUL TO THE JURY IN ITS SINGLE TASK, WHICH IS TO

13   DETERMINE INFRINGEMENT OF THE '837 PATENT, NOT INFRINGEMENT OF

14   THE '148 PATENT, WHICH ISN'T AT ISSUE HERE, AND NOT

15   INFRINGEMENT BY A NON-PARTY, TE, OF THE '837 PATENT.

16             SINCE WE'RE NOT GOING TO BE RAISING IT, IT SOUNDS LIKE

17   THEY WON'T HAVE ANY BASIS TO RAISE IT AS WELL IN RESPONSE AND

18   SO WE REQUEST THAT THE MOTION IN LIMINE BE GRANTED.

19             THE COURT:  THANK YOU.

20        MR. STOVER, ANYTHING ELSE ON THIS ONE?

21             MR. STOVER:  JUST BRIEFLY, YOUR HONOR.

22        SO THIS IDEA THAT THEIR EXPERT IS NOT GOING TO RAISE THIS,

23   THEREFORE, WE DON'T NEED TO RAISE IT, I DON'T THINK THAT'S

24   RIGHT.  THE JURY IS GOING TO HEAR ABOUT TE ONE WAY OR THE

25   OTHER.  THEY'RE ONE OF THE BIG FOUR COMPETITORS IN THE

```
1    INDUSTRY.  THEY'RE GOING TO WONDER, WHAT'S GOING ON WITH TE?

2    AND WE WANT TO BE ABLE TO TELL THEM.

3              THE COURT:  AGAIN, TO BE PRECISE, AT THIS POINT YOU

4    DON'T KNOW YET WHAT THEIR EXPERT IS GOING TO SAY, YOU HAVEN'T

5    HEARD HIS TESTIMONY, BUT YOU HAVE SEEN HIS REPORT.

6         TO BE PRECISE HERE, WHAT YOU'RE INTERESTED IN PRESERVING

7    IS YOUR RIGHT TO POINT OUT THAT YOU BELIEVE TE ITSELF IS AN

8    INFRINGER OF THE --

9              MR. STOVER:  '837 PATENT.

10             THE COURT:  -- '837 PATENT, EVEN THOUGH THE '837

11   PATENT -- IS THAT AT ISSUE IN THE OTHER CASE?

12             MR. STOVER:  ABSOLUTELY.

13             THE COURT:  AH.  I DIDN'T APPRECIATE THAT.

14             MR. STOVER:  YEAH.

15             THE COURT:  OKAY.  THANK YOU.

16             MR. STOVER:  THANK YOU, YOUR HONOR.

17             THE COURT:  ALL RIGHT.  AS TO MOTION IN LIMINE

18   NUMBER 6, I'M GOING TO DENY THAT MOTION.  AGAIN, I SUSPECT THIS

19   MAY BE AN ISSUE WE RETURN TO ONCE THERE'S TESTIMONY IN FRONT OF

20   ME THAT I CAN ENGAGE WITH MORE SPECIFICALLY, BUT AT THIS POINT

21   I THINK IT'S INAPPROPRIATE, SO MOTION IN LIMINE NUMBER 6 IS

22   DENIED.

23        THERE ARE A COUPLE OF OTHER OUTSTANDING MOTIONS.  IT

24   SOUNDS LIKE YOU'RE COMFORTABLE ALLOWING ME TO SIMPLY RULE ON

25   THE PAPERS ON THOSE.
```

```
1              MS. LEE:  YES, YOUR HONOR.

2              MR. HUNT:  YES, YOUR HONOR.

3              THE COURT:  I'M GRATEFUL FOR THAT.

4         ALL RIGHT.  ONE LAST ISSUE, UNLESS YOU HAVE ANY OTHER

5    HOUSEKEEPING MATTERS YOU WANT TO TURN TO, HAS TO DO WITH

6    SETTLEMENT -- EVERY TRIAL JUDGE'S FAVORITE QUESTION -- WHICH IS

7    DO EITHER OR BOTH OF YOU THINK THERE WOULD BE SOME MERIT OR

8    VALUE IN SPENDING EVEN JUST A PHONE CALL WITH ONE OF MY

9    COLLEAGUES, WITH PERHAPS A MEETING IN PERSON TO FOLLOW?

10        I'LL TELL YOU RIGHT UP FRONT, I'M NOT A JUDGE TO SHOVE

11   SETTLEMENT CONFERENCES DOWN PARTIES' OR LAWYERS' THROATS.  I

12   BELIEVE YOU HAVE A RIGHT TO TRIAL.  THAT'S WHY WE'RE HERE.

13        BUT IF IT WOULD BE HELPFUL, I'M MORE THAN HAPPY TO MAKE

14   ONE OF MY LEARNED COLLEAGUES AVAILABLE FOR A SETTLEMENT

15   CONFERENCE.

16             MR. HUNT:  THE PARTIES WENT THROUGH THE COURT ORDERED

17   MEDIATION.  IN THE LAST 30 DAYS, THERE HAVE BEEN HIGH LEVEL

18   DISCUSSIONS AND I BELIEVE THE DEFENDANTS ASKED WHETHER OR NOT

19   WE COULD HAVE A DISCUSSION WITH SOMEONE FROM THE COURT.

20        I DON'T KNOW -- TO THE EXTENT THAT THERE'S A REQUEST IN

21   THE NEXT TWO WEEKS TO DO THAT, AND ON SHORT NOTICE YOU COULD

22   PROVIDE SOMEONE, I THINK IT WOULD BE SOMETHING THAT WE WOULD

23   CERTAINLY ENTERTAIN.

24             THE COURT:  ALL RIGHT.  WELL, I THINK I UNDERSTAND

25   WHERE YOU'RE AT, MR. HUNT, ON THIS.
```

1          WHAT DO YOU THINK, MR. PLATT?

2               MR. PLATT:  WE WOULD BE AGREEABLE TO SOMETHING.

3               THE COURT:  OKAY.  WELL, LET ME SUGGEST THIS:  I'M

4     NOT GOING TO ALLOW MY EFFORTS IN THAT REGARD TO SLOW ANY

5     EFFORTS TO ISSUE THE OPINIONS I OWE YOU, SO THOSE ARE ALL

6     COMING.

7               HAVING MADE THE OFFER TO GO TRY, I HAVE NO IDEA WHAT MY

8     COLLEAGUES' SCHEDULES ARE LIKE, SO IF I CAN FIND SOMEONE WHO'S

9     AVAILABLE ON SHORT NOTICE, I'LL ASK THEM TO REACH OUT TO YOU

10    AND SET UP A PHONE CALL AT LEAST.

11              IT MAY JUST BE, THOUGH, THAT WE'RE SO LATE IN THE GAME

12    THAT WE'RE NOT GOING TO BE ABLE TO PULL THIS OFF, BUT I'LL TRY.

13    IF I FIND SOMEONE, THEY'LL REACH OUT TO YOU DIRECTLY.

14              IN THE MEANTIME, IF YOU'RE CONTINUING DISCUSSIONS, IF

15    THOSE DECISIONS BEAR FRUIT, CERTAINLY DON'T BE SHY ABOUT

16    LETTING ME KNOW SO THAT I CAN SHUT DOWN THE MACHINE.  BUT I'M

17    GOING TO ASSUME THAT WE'RE GOING TO TRIAL AND WE'LL PROCEED

18    ACCORDINGLY.

19              ANYTHING ELSE?  IF NOT, I OWE YOU SOME ORDERS AND I LOOK

20    FORWARD TO SEEING YOU IN JUST A FEW WEEKS.

21              MR. HUNT:  THANK YOU, YOUR HONOR.

22              MR. PLATT:  THANK YOU, YOUR HONOR.

23         (THE PROCEEDINGS WERE CONCLUDED AT 4:06 P.M.)

24

25

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8   STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9   280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10  CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16  _____
    LEE-ANNE SHORTRIDGE, CSR, CRR
17  CERTIFICATE NUMBER 9595

18       DATED:  SEPTEMBER 24, 2015

19

20

21

22

23

24

25