**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CORNING OPTICAL COMMUNICATIONS WIRELESS LTD.,

Plaintiff,

v.

SOLID, INC., et al.,

Defendants.

Case No. 5:14-cv-03750-PSG

**ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHELE RILEY**

**(Re: Docket No. 327-4)**

Before the court is Defendants SOLiD, Inc. and Reach Holdings LLC's motion to exclude the expert testimony of Michele Riley. Riley is the designated damages expert of Plaintiff Corning Optical Communications Wireless Ltd. At issue is whether Riley's reasonable royalty and lost profits opinions are based upon "unreliable principles or methods [or] legally insufficient facts and data," or are "not sufficiently tied to the facts of the case," such that exclusion is required under Fed. R. Evid. 702 and 703.[1]

Defendants challenge a variety of Riley's considerations, ranging from her identification of a starting royalty "reference range" in estimating a hypothetical royalty rate to her demand analysis in estimating Corning's lost profits. While Defendants raise legitimate questions about Riley's

[1] *See Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, Case Nos. 2013-1648, -1651, 2015 WL WL5515331, at *9-10 (Fed. Cir. Sept. 21, 2015) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); *i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010)).

United States District Court
For the Northern District of California

work, they fail to establish that Riley's opinions are methodologically unreliable, as opposed to simply not credible or even just plain wrong. This is not enough to keep Riley from the witness stand. Defendants' motion is DENIED.

**I.**

"[E]stimating a reasonable royalty is not an exact science."[2] Truer words may never have been spoken, and this case offers further evidence.

In her report, Riley set out to "determine the amount of damages due to Corning Wireless in the event that" the Patents-in-Suit are found valid and infringed by Defendants.[3] As to the '837 Patent, Riley says Corning is entitled to collect $33.1 million in damages—$18.7 million in lost profits and $14.4 million in reasonable royalties.[4] Riley also says that "[i]f the Court determines that lost profits is not an appropriate measure of damages," Corning is entitled to reasonable royalties of $23.5 million for alleged infringement of the '837 Patent.[5]

To reach these numbers, Riley starts with a reasonable royalty rate "reference range."[6] These percentages represent SOLiD and Reach's combined operating margin on the distributed antenna systems accused of infringement and the blended incremental profit margin of Corning and its parent, respectively.[7] Riley adjusts this starting range to "credit" Defendants for the "normal" profits earned by computer and electronics distributors.[8] She then looks to the desired share of profits as estimated by the parties' relative market shares to further reduce the range.[9] Riley finally

---

[2] *Id.* at *10.

[3] Docket No. 327-29 at 4.

[4] *See id.* at 7.

[5] *Id.*

[6] *Id.* at 50.

[7] *See id.* at 46-47.

[8] *See id.* at 56, 59-60.

[9] *See id.* at 60.

2

Case No. 5:14-cv-03750-PSG
ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHELE RILEY

adjusts the range to account for Corning's extant license to the asserted patent to a third party.[10] This brings her to her final rate.[11]

Riley then turns to the royalty base. Relying on revenue spreadsheets produced by Defendants reflecting sales of all "Alliance" DAS components, she concludes that all components would be subject to the hypothetical license.[12]

As for lost profits, among other elements of her *Panduit* analysis, Riley opines that "there is demand for embodying DAS products and installations" based on her read of the patent and the parties' financial results.[13]

**II.**

This court has jurisdiction under 28 U.S.C. §§ 1331 and 1338. The parties further consent to the jurisdiction of the undersigned under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 72(a).

In *Summit 6*, the Federal Circuit summarized the standards for evaluating expert testimony generally, and patent damages expert testimony in particular. Rather than recast this summary, the court simply repeats it, with full attribution:

> Whether proffered evidence is admissible at trial is a procedural issue not unique to patent law, and we therefore review the district court's decision to admit expert testimony under the law of the regional circuit, here the Fifth Circuit. The Fifth Circuit reviews the admissibility of expert testimony for abuse of discretion. The question here, therefore, is whether the district court abused its discretion in deciding that Summit's expert testimony was admissible. We conclude that it did not.
>
> In *Daubert*, the Supreme Court set out the requirements for admissibility of expert testimony. The Supreme Court stated that the trial judge plays a "gatekeeping role," which "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." The Court emphasized that the focus "must be solely on principles and methodology, not on the conclusions that they generate." This admissibility assessment, while a flexible one, may consider the following factors: (1) whether

[10] *See id.*

[11] *See id.*

[12] *See id.* at 40-44.

[13] *Id.* at 22.

**United States District Court**
For the Northern District of California

the methodology is scientific knowledge that will assist the trier of fact; (2) whether the methodology has been tested; (3) whether the methodology has been published in peer-reviewed journals; (4) whether there is a known, potential rate of error; and (5) whether the methodology is generally accepted.

The admissibility of expert evidence is also governed by Rules 702 and 703 of the Federal Rules of Evidence. Rule 702 was amended in response to *Daubert* and cases applying it, including *Kumho Tire.* Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 703 states:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Under these rules, a district court may exclude evidence that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case. But the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court. Indeed, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

This court has recognized that estimating a reasonable royalty is not an exact science. The record may support a range of reasonable royalties, rather than a single value. Likewise, there may be more than one reliable method for estimating a reasonable royalty. A party may use the royalty rate from sufficiently comparable licenses, value the infringed features based upon comparable features in the marketplace, or value the infringed features by comparing the accused product to non-infringing alternatives. A party may also use what this court has referred to as the analytical method, focusing on the infringer's projections of profit for the infringing product.

All approaches have certain strengths and weaknesses, and, depending upon the facts, one or all may produce admissible testimony in a particular case. Because

> each case presents unique circumstances and facts, it is common for parties to choose different, reliable approaches in a single case and, when they do, the relative strengths and weaknesses of each approach may be exposed at trial or attacked during cross-examination. That one approach may better account for one aspect of a royalty estimation does not make other approaches inadmissible.
>
> In sum, while all approximations involve some degree of uncertainty, the admissibility inquiry centers on whether the methodology employed is reliable. A distinct but integral part of that inquiry is whether the data utilized in the methodology is sufficiently tied to the facts of the case. Hence, a reasonable or scientifically valid methodology is nonetheless unreliable where the data used is not sufficiently tied to the facts of the case. Likewise, ideal input data cannot save a methodology that is plagued by logical deficiencies or is otherwise unreasonable. But where the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder.[14]

**III.**

Defendants' first issue with Riley is her failure to consider Corning's own royalty estimate in its response to Defendants' interrogatory No. 11. It is true, as Defendants note, that in its response Corning stated that "Corning Wireless would have been willing to accept," and the hypothetical negotiation between the parties would have resulted in, a rate lower than Riley's estimate.[15] But as the court noted in its order compelling Corning's response, "new information may come to light as the case proceeds that might drastically alter Corning's positions."[16] The day may yet come for damages contentions that bind parties to their responses, but no local rule or case law yet imposes such a strict standard.

Defendants' second issue is with the upper limit of Riley's "reference range." Defendants take exception to Riley blending the incremental profit of both Corning and its U.S. parent, Corning Optical Communications Wireless, Inc. But Corning is right that there is no rule against considering a related company in the hypothetical negotiation, particularly where, as here, a license

---

[14] *Summit 6*, 2015 WL 5515331, at *9-11 (citations omitted).

[15] Docket No. 327-24 at 9, 13.

[16] Docket No. 191 at 4.

United States District Court
For the Northern District of California

would impact the related entity's finances. Corning also is right that this very court has ruled that consideration of a related entity is proper in estimating a reasonable royalty.[17]

Defendants' third issue is with Riley's credit for "normal" profits earned by electronics and computer distributors. Riley drew this credit from a transfer pricing study Corning commissioned to justify its internal inventory allocation.[18] Defendants correctly point out that the technological range of such distributors goes beyond the technological scope of the distributed antenna systems at issue in this case. But computer and electronics distributors include DAS distributors, and there is no dispute that Corning itself has relied on these studies and the credit as representative of the normal profits earned by a DAS distributor. Whatever differences in context exist may be addressed through cross-examination.

Defendants' fourth issue is with Riley's use of market shares as a proxy for the parties' relative bargaining strength. But Defendants offer a variety of third-party sources suggesting that market share can be used to estimate bargaining position.[19] This is not a misapplication of the Nash Bargaining Solution of the kind criticized in *VirnetX, Inc. v. Cisco Sys., Inc.*[20] or the 25%

---

[17] *See Accessories Marketing Inc. v. Tek Corp.*, Case No. 11-cv-04773, 2013 WL 1409887, at *1 (N.D. Cal. Apr. 2, 2013) (denying motion to exclude "[b]ecause SSI [related entity] and TEK are competitors in the tire kit repair market, a license to TEK could very well impact SSI's profits, which could itself impact AMI's [plaintiff] profits from SSI's sales"); *see also Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1378 (Fed. Cir. 2005) (where the patent holder was a holding company whose parent company was a competitor of the infringer, the patent holder properly introduced evidence regarding the impact of the infringer's sales on the parent company's sales in evaluating a hypothetical negotiation between the holding company and the infringer), *overruled on other grounds by Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 576 F.3d 1348 (Fed. Cir. 2009) (en banc); *Synthes USA, LLC v. Spinal Kinetics, Inc.*, Case No. 09-cv-01201, 2012 WL 4483158, at *12 (N.D. Cal. Sept. 27, 2012) ("[The patentee] is a mere holding company and any negotiation on its behalf would be conducted by and for the benefit of its corporate parent.").

[18] *See* Docket No. 258-62 at COCW00159531.

[19] These include Helen Meek & Richard Meek, *Strategic Marketing Management: Planning and Control*, at 98 (2003) ("Competitive/business strength criteria include measures such as: market share . . . ."); Tze-Minn Tham, *Essays in Agency, Incentives and Contracting*, at 74 (2008) (Ph.D. dissertation, University of Michigan) (discussing use of "market share of sales to proxy for market power"); Kenneth Ahern, *Bargaining Power and Industry Dependence in Merger*, at 11 (Ross School of Business, University of Michigan, August 2009), *available at* Docket No. 343-8.

[20] 767 F.3d 1308, 1332-33 (Fed. Cir. 2014).

6

Case No. 5:14-cv-03750-PSG
ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHELE RILEY

United States District Court
For the Northern District of California

Rule junked in *Uniloc USA, Inc. v. Microsoft Corp.*[21] Here, whatever her other shortcomings, Riley grounds her analysis in the relative market shares of the parties, the DAS industry, the asserted patent, the parties' profitability, competition between the parties, and Coming's unwillingness to relinquish market share.[22]

Defendants' fifth issue is with Riley's final downward adjustment of the royalty rate based on an existing third-party license that would preclude any exclusivity in the licensee's hypothetical rights. But Defendants' own expert agreed that the presence of the existing license would decrease the royalty rate,[23] and for good reason. *Georgia-Pacific* factor 3 specifically requires consideration of the nature and scope of the license. Exercising judgment as to the significance of the decrease is not fatal to the reliability of the overall estimate.[24]

Defendants' sixth issue is the tie between Riley's estimated royalty base and the sales alleged to infringe. Defendants say that Riley swept in all sales of Alliance DAS components without considering whether they were installed in an infringing way. But Riley relied on financial spreadsheets produced by Reach Holdings and its predecessor Tri-Power Group in response to an interrogatory asking for revenue from sales of the accused products.[25] To the extent these spreadsheets were overinclusive, Defendants can highlight this through Riley's testimony. In any event, where approximate apportionment between infringing and noninfringing items is not possible, the accused infringer bears the burden and risk.[26]

---

[21] 632 F.3d 1291, 1311-17 (Fed. Cir. 2011).

[22] *See* Docket No. 327-29 at 38-60.

[23] *See* Docket No. 343-9 at 57.

[24] *See Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002) (noting that the reasonable royalty analysis "necessarily involves some approximation of the market as it would have hypothetically developed absent infringement"); *see also Del Mar Avionics, Inc. v. Quinton Instrument Co.,* 836 F.2d 1320, 1327 (Fed. Cir. 1987) ("The determination of a damage award is not an exact science, and 'the amount need not be proven with unerring precision.'" (quoting *Bio-Rad Laboratories, Inc. v. Nicolet 5 Instrument Corp.*, 739 F.2d 604, 616 (Fed. Cir. 1984))).

[25] *See* Docket No. 343-11.

[26] *See TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 900 (Fed. Cir. 1986); *see also Electro Scientific Indus. Inc. v. General Scanning Inc.*, 247 F.3d 1341, 1353 (Fed. Cir. 2001) (where accused device could be put to infringing and noninfringing uses, denying remittitur because infringer failed to put forth evidence on extent of noninfringing use).

7

Case No. 5:14-cv-03750-PSG
ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHELE RILEY

As for Defendants' issues with Riley's lost profits analysis, they largely repeat arguments rejected by the court in its order denying Defendants' summary judgment.[27] The one unique issue concerns Riley's analysis of demand for the patent products.[28] But Riley's opinion on demand for the patented products, whatever its ultimate merit, is based on her review of the parties' financial results, product literature, and independent third-party research reports.[29] She also spoke with the Vice President of Strategy for Coming's DAS business unit, William Cune, and Controller, Robert Hutton, and reviewed relevant deposition testimony from the case.[30] She considered this evidence in light of her unchallenged background in finance, marketing and accounting to determine that consumers demand the patented products.[31] This is reliable enough to be presented to the jury, which of course has the last word.

Defendants' cases do not support their argument. In *Good Tech. Corp. v. MobileIron, Inc.*, expert testimony from a technical expert on the commercial acceptability of noninfringing alternatives was barred.[32] Riley is not a technical expert, and her challenged testimony is not on the commercial acceptability of non-infringing alternatives. In *LaserDynamics* and *Imonex*, the court considered opinions on the entire market value rule.[33] Here, Defendants seek to exclude an opinion of the demand for the patented *product*—*not* demand for the patented *features*—rendering these decisions inapposite.

**IV.**

Defendants' motion is DENIED.

---

[27] *See* Docket No. 347 at 12-14.

[28] *See DePuy Spine, Inc. v. Medtronic Sofamor Danek. Inc.*, 567 F.3d 1314, 1331 (Fed. Cir. 2009) ("[T]he focus on particular features corresponding to individual claim limitations is unnecessary when considering whether demand exists for a patented product under the first *Panduit* factor.").

[29] *See* Docket No. 327-29 at 22-24.

[30] *See id.* at 17, 23, 33.

[31] *See id.* at 22-24.

[32] *See* Case No. 12-cv-05826, Docket No. 436 at 15-16 (N.D. Cal. July 16, 2015).

[33] *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012); *Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GmbH*, 408 F.3d 1374, 1380 (Fed. Cir. 2005).

United States District Court
For the Northern District of California

**SO ORDERED.**

Dated: September 24, 2015

PAUL S. GREWAL
United States Magistrate Judge

9

Case No. 5:14-cv-03750-PSG
ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHELE RILEY